## Attachment

Page 1

1              UNITED STATES BANKRUPTCY COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4      - - - - - - - - - - - - - - - - - - - - - - - :

                                         :

5      IN RE:                            :

                                         :

6      MARSHA ANN RALLS,                 :

                                         :    Case No. 16-00222

7              Debtor.           :               Chapter 11

                                         :

8      - - - - - - - - - - - - - - - - - - - - - - - :

9

10                                   Washington, D.C.

11                            Wednesday, June 8, 2016

12

13        The following pages constitute the meeting of

14     creditors held in the above-captioned matter

15     before BRADLEY D. JONES, Trustee, held at the

16     Office of the U.S. Trustee, U.S. Bankruptcy Court,

17     333 Constitution Avenue, N.W., U.S. Trustee's

18     Meeting Room, Room 1207, beginning at

19     approximately 2:00 p.m.

20

21

22

Page 2

1               A P P E A R A N C E S

2    On Behalf of the Debtor:

3            WILLIAM JOHNSON, ESQUIRE

4    On Behalf of Creditor BWF:

5            PATRICK POTTER, ESQUIRE

             1200 17th Street, N.W.

6            Washington, D.C. 20036

             (202) 663-8000

7            (202) 663-8007 - fax

8                    *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1              P R O C E E D I N G S

2         MR. JONES:  Good afternoon.  It is June

3   8, 2016 at approximately 2:00 p.m.

4         My name is Bradley Jones.  I represent

5   the Office of the United States Trustee.

6         We are here for the first meeting of

7   creditors in the bankruptcy case of Marsha Ann

8   Ralls, which is case 16-222, before the U.S.

9   Bankruptcy Court for the District of Columbia.

10        Would the parties please enter their

11   appearances?

12        MR. JOHNSON:  William Johnson, counsel

13   for the Debtor, Marsha Ralls.  Ms. Ralls is

14   present.

15        MS. RALLS:  Marsha Ralls.

16        MR. POTTER:  My name is Patrick Potter.

17   I am with Pillsbury.  And I am representing BWF,

18   the second mortgage holder.

19        MR. JONES:  Ms. Ralls, would you please

20   stand to be sworn in?

21        MS. RALLS:  Yes.

22        MR. JONES:  All right.

Page 4

1          WHEREUPON,

2          MARSHA ANN RALLS, the Debtor, called as

3    a witness, having been duly sworn, was examined

4    and testified as follow:

5          MR. JONES:  Thank you.  And please have

6    a seat.

7          Do you have photo ID with you today?

8          MS. RALLS:  That's what I was just

9    looking for.

10          MR. JONES:  Oh, sure.  Take your time.

11          MS. RALLS:  I gave it to the gentleman

12    when I came in.  Did they give it back to me?

13          MR. JONES:  They should have.  You mean

14    the security officer at the --

15          MS. RALLS:  Yes.

16          MR. JONES:  Okay.

17          MR. JOHNSON:  Did he check your phone?

18          MS. RALLS:  Yes.

19          MR. JOHNSON:  Okay.  They might have

20    held it.

21          MS. RALLS:  Well, I have my passport if

22    that helps.

Page 5

1          MR. JONES:  Oh, that would be fine.

2          MS. RALLS:  Okay.

3          MR. JONES:  Okay.  And let the record

4   reflect that the Debtor is handing me a United

5   States passport with her name and picture on it.

6   And I am handing that back to you.

7          MS. RALLS:  Thank you.

8          MR. JONES:  What is the -- what's the

9   reason that the bankruptcy was filed?

10          MS. RALLS:  BWF.  I've been in a lawsuit

11   with them for three years.  And the day that my

12   lawsuit was filed, my home was broken into.  And I

13   lost my homeowners' insurance and haven't been

14   able to work and do my business there.  So I've

15   had to reinvent the type -- the way I do business.

16          MR. JONES:  Okay.  And what kind of

17   business are you in?

18          MS. RALLS:  I'm an art adviser.

19          MR. JONES:  Okay.  And is that like

20   doing appraisals on artwork or what is an art

21   adviser?

22          MS. RALLS:  So I put artwork in luxury

1   hotels.  And I used to have a space in my house

2   that I would exhibit artwork, but when I lost my

3   insurance, I can't do that anymore.  I used to

4   have like receptions and people who would come by

5   to look at the art and buy it.

6           MR. JONES:  Okay.

7           MS. RALLS:  Other than the -- or what

8   are the main assets that you own or that are at

9   issue in the bankruptcy?

10          MS. RALLS:  The only asset I have is my

11  home.

12          MR. JONES:  Okay.  And what do you

13  believe that the value of the home is?

14          MS. RALLS:  I think around 2 and a half.

15          MR. JONES:  Two and a half million?

16          MS. RALLS:  Yes, sir.

17          MR. JONES:  Okay.  And do you know about

18  how much debt is on it?

19          MS. RALLS:  My mortgage with Capital One

20  is 800,000, which I'm paying.  And then BWF has

21  1.2.

22          MR. JONES:  Okay.  So, to the best of

Page 7

1   your knowledge, there is about $500,000 in equity

2   at least?

3           MS. RALLS:  Yes.

4           MR. JONES:  Okay.  How long have you

5   been working as an art adviser?

6           MS. RALLS:  For -- let's see -- 30-

7   something, 35, years maybe.

8           MR. JONES:  Okay.  And are you --

9           MS. RALLS:  I'm 54.  So as long as I can

10  remember.

11          MR. JONES:  Okay.  And are you currently

12  self-employed?

13          MS. RALLS:  Yes, sir.

14          MR. JONES:  Okay.  And how long have you

15  been self-employed?

16          MS. RALLS:  For -- let's see.  I had The

17  Ralls Collection before it was liquidated for 20-

18  something years.

19          MR. JONES:  Okay.  Have you ever filed,

20  have you personally ever filed, for bankruptcy

21  before?

22          MS. RALLS:  Yes, sir.  I filed Chapter

1    7.

2            MR. JONES:  Okay.  And when was the

3    Chapter 7 filed?

4            MS. RALLS:  Last year, 20 -- January of

5    2015.

6            MR. JONES:  Okay.  And that case isn't

7    pending anymore?

8            MS. RALLS:  No.  It was discharged.

9            MR. JONES:  Okay.  Did you receive a

10   Chapter 7 discharge in that case?

11           MS. RALLS:  Yes, sir.

12           MR. JONES:  Okay.

13           MR. JOHNSON:  Brad, just for

14   clarification, she filed Chapter 13.  That was

15   converted to a 7.

16           MR. JONES:  Okay.  And that is fine.

17   Are there any bankruptcies pending regarding

18   insiders, anyone that is a family member of yours

19   that has an interest in the property or any

20   company that you have or anything like that?

21           MS. RALLS:  Well, The Ralls Collection,

22   I don't think it's finished.

Page 9

1           MR. JONES:  Okay.  So there is a

2    bankruptcy filed for --

3           MS. RALLS:  The Ralls Collection, which

4    --

5           MR. JONES:  Okay.

6           MS. RALLS:  -- was my company for 20-

7    some years.

8           MR. JONES:  Yes.  And that was the

9    company that you were self-employed with?

10          MS. RALLS:  Yes.

11          MR. JONES:  Okay.

12          MS. RALLS:  And I've been self-employed

13   since.  I mean --

14          MR. JONES:  Okay.  Did you start a new

15   company that you are still self-employed with or

16   are you kind of operating as a sole proprietorship

17   or --

18          MS. RALLS:  A new company called Closed

19   Monday Productions that I've had for a couple of

20   years.  And then I do consulting for Women's

21   Leadership.

22          MR. JONES:  Okay.  The consulting

Page 10

1    company, is that a separate entity or is it --

2              MS. RALLS:  I'm --

3              MR. JONES:  You go ahead.

4              MS. RALLS:  It's really separate.  It's

5    not -- I mean, I haven't -- Closed Monday is still

6    somewhat of a startup.  So I haven't -- the

7    leadership work I've done has been paid to me

8    personally.

9              MR. JONES:  Okay.  Who do you have

10   property insurance with?

11             MS. RALLS:  With Chubb.

12             MR. JONES:  Say that again.

13             MS. RALLS:  Chubb.

14             MR. JONES:  Chubb.  And does that

15   property insurance cover general liability or do

16   you know if someone is injured about the property,

17   would that be covered?

18             MS. RALLS:  Well, the only people that

19   are at the property and my children and I.

20             MR. JONES:  Okay.

21             MS. RALLS:  So it doesn't cover us, no.

22             MR. JONES:  Okay.  So there is property

Page 11

1   insurance --

2           MS. RALLS:  I mean, there may be.  I'd

3   have to look.  But there is definitely property

4   insurance for my house.  But, I mean, I don't know

5   if it has liability.

6           MR. JONES:  Okay.  Other than the

7   property insurance, is there any other type of

8   insurance that you have?

9           MS. RALLS:  No.

10          MR. JONES:  Okay.

11          MS. RALLS:  Health insurance.

12          MR. JONES:  The property insurance

13  premiums, are all of those premiums current?

14          MS. RALLS:  Yes.  It's paid through

15  October.

16          MR. JONES:  Of 2016?

17          MS. RALLS:  Yes.

18          MR. JONES:  Okay.  And in your view, are

19  all of these insurance coverages adequate?

20          MS. RALLS:  Yes.

21          MR. JONES:  Okay.  Have you opened up a

22  debtor-in-possession bank account?

Page 12

1              MS. RALLS:  Yes.

2              MR. JONES:  At what bank?

3              MS. RALLS:  At Wells Fargo, I think.

4    No. That was for -- I'm sorry.  It's SunTrust.

5              MR. JONES:  SunTrust.  Okay.  And have

6    you closed all of your pre-petition bank accounts?

7              MS. RALLS:  Yes.

8              MR. JONES:  You mentioned that you have

9    a company, Closed Monday Productions, that is

10   currently operating.

11             MS. RALLS:  Yes.

12             MR. JONES:  Okay.  How many full-time

13   employees does it have?

14             MS. RALLS:  Zero.

15             MR. JONES:  And how many part-time?

16             MS. RALLS:  Zero.

17             MR. JONES:  Okay.  And is it currently

18   operating?

19             MS. RALLS:  Yes.

20             MR. JONES:  You are the only person who

21   works for them?

22             MS. RALLS:  I'm working seven days a

Page 13

1   week.

2            MR. JONES:   Okay.   And is the company

3   currently paying you wages?

4            MS. RALLS:   Yeah.   Well, I take that

5   back.  It -- yes.

6            MR. JONES:   Okay.

7            MS. RALLS:   About 10,000 a month.

8            MR. JONES:   So the company is paying you

9   about $10,000 a month?

10           MR. JONES:   Yes.

11           MS. RALLS:   Is that gross or is that

12  after withholding taxes?

13           MS. RALLS:   That would be gross.   They

14  just started paying me.

15           MR. JONES:   Okay.   I said, "withholding

16  taxes," and maybe that was incorrect.   Are you

17  being paid a salary?   Are you being paid --

18           MS. RALLS:   No.   I get paid by projects

19  that we do.

20           MR. JONES:   Is it essentially a draw

21  from the entity?

22           MS. RALLS:   Yes.

Page 14

1          MR. JONES: ' Okay.  Are all of your wages

2    current?

3          MS. RALLS:  Meaning?

4          MR. JONES:  Meaning are you being -- in

5    your view, does the company owe you any money?

6          MS. RALLS:  No.

7          MR. JONES:  Okay.  And that $10,000 a

8    month, has it paid that every month or have there

9    been months where it hasn't been able to make the

10   payments?

11         MS. RALLS:  Well, there hasn't been any

12   months it hasn't been able to make the payments

13   but just started paying me.

14         MR. JONES:  Okay.  And when did it

15   start?

16         MS. RALLS:  In I guess -- I don't know.

17   Maybe in the beginning of June?

18         MR. JONES:  Okay.  And you have received

19   in June that $10,000?

20         MS. RALLS:  Yes.

21         MR. JONES:  Okay.  But did it pay you

22   anything in May?

Page 15

1          MS. RALLS:  Four thousand.

2          MR. JONES:  And what about April?

3          MS. RALLS:  No.

4          MR. JONES:  At any time before April,

5   did it pay you anything?

6          MS. RALLS:  No.

7          MR. JONES:  Your personal taxes, do you

8   owe anything, any taxes, in the pre-bankruptcy

9   period?

10          MS. RALLS:  I have I think -- it is a

11   little over $10,000 now with IRS.  I've already

12   worked out a payment.  I pay 340 a month to the

13   IRS.

14          MR. JONES:  Okay.

15          MR. JOHNSON:  Did you hear the witness'

16   answer?

17          MR. JONES:  I heard 340.  Is that right?

18          MS. RALLS:  Three hundred and forty.  I

19   think that's it.

20          MR. JONES:  And that's per month?

21          MS. RALLS:  Yes, sir.  Let me just see

22   if I brought the papers here.

Page 16

1          MR. JONES:  Sure.  Take your time.

2          MS. RALLS:  I think it's 340.

3          (Pause.)

4          MS. RALLS:  I think it's 340.  I didn't

5     bring the document with me, though.

6          MR. JONES:  That is okay.  Do you know

7     how long that payment plan lasts?

8          MS. RALLS:  A couple of years or it can

9     be paid in full sooner.

10         MR. JONES:  Okay.  And what is the year

11    of your last-filed tax return?

12         MS. RALLS:  Twenty fifteen.

13         MR. JONES:  And there is not a

14    retirement plan or anything like that that your

15    company has, a 401(k) plan or anything like that?

16         MS. RALLS:  My home.  My home is my

17    retirement plan.

18         MR. JONES:  Oh.  Okay.  What do you mean

19    by that?

20         MS. RALLS:  Well, I mean, I bought the

21    home, and I've been paying for it for 20 years.

22    So my home has been my retirement.  And, you know,

Page 17

1  that's where I've put all of my money and energy

2  into is my home.

3        MR. JONES:  Okay.  By that, do you mean

4  that that at some point you hope to sell the home

5  and use the proceeds to sort of live off of in

6  your retirement?

7        MS. RALLS:  Yeah.  When I get old.  I

8  mean, 54, I've got a lot of years to work.

9        MR. JONES:  Okay.  Are you personally

10 familiar with the information contained in your

11 bankruptcy petition, bankruptcy schedules, and

12 statement of financial affairs?

13        MS. RALLS:  I don't know.

14        MR. JONES:  There is a -- and take your

15 time to look at it.  I see your counsel has placed

16 those documents in front of you.

17        MS. RALLS:  Okay.

18        MR. JONES:  Do you recognize those?

19        MS. RALLS:  Yes.  I see it.  I mean --

20        MR. JONES:  Okay.  You have seen them

21 before?

22        MS. RALLS:  I have.

Marsha Ann Ralls

Page 18

1      MR. JONES:  And you are personally

2   familiar with the information contained in them?

3      MS. RALLS:  Well, I am looking just to

4   make sure because I have a lot of documents.

5      MR. JONES:  Yes.  No.  I understand.

6   And take your time and look through them.

7      (Pause.)

8      MS. RALLS:  Yep.  I mean, that's all

9   correct.  It's a lot of paper.

10      MR. JONES:  Yes.  No.  I understand.

11   And, to the best of your knowledge, is information

12   contained in the bankruptcy petition, schedules,

13   and statement of financial affairs true and

14   correct?

15      MS. RALLS:  To the best of my knowledge.

16   I see that The Ralls Collection was changed to

17   Closed Monday on this copy.

18      MR. JONES:  Okay.  And so but that may

19   not have been changed on the documents that were

20   filed. Is that --

21      MS. RALLS:  I don't know.  Were the --

22   was Closed Monday changed?

1         MR. JOHNSON:  This is the Judd Law Firm

2    (ph).

3         MR. JONES:  Oh, okay.

4         MS. RALLS:  Okay.

5         MR. JOHNSON:  This should be on there.

6         MR. JONES:  Okay.  So it should be on

7    there.

8         MR. JOHNSON:  Right.

9         MS. RALLS:  Okay.

10        MR. JOHNSON:  Now, we have had some

11   issues with the new forms and the software.  So

12   there can be information placed on the system that

13   comes up different when you file it.  I have

14   spoken with Best Case about that.  So they

15   acknowledge that that has been a problem.  So --

16        MR. JONES:  Okay.  Ms. Ralls, do you

17   remember signing the petition, schedules, and

18   statement of financial affairs before they were

19   filed with the Court?  Do you remember picking up

20   a pen and signing your name?

21        MS. RALLS:  Yes.  I see my signature.

22        MR. JONES:  Okay.

Marsha Ann Ralls

Page 20

1          MR. POTTER:  I didn't hear the witness'

2    answer.

3          MS. RALLS:  Yes, I --

4          MR. JONES:  You see your signature?

5          MS. RALLS:  I do -- yes, I do remember

6    signing it.

7          MR. JONES:  Okay.  And you reviewed it

8    before you signed it?

9          MS. RALLS:  Yes.

10          MR. JONES:  And, to the best of your

11    knowledge, are all of your assets, anything you

12    may own, identified in the schedules?

13          MS. RALLS:  The only thing I own is my

14    home.

15          MR. JONES:  Okay.  And are all of your

16    creditors listed, anyone you may owe money to?

17          MS. RALLS:  The only people I owe money

18    to is Capital One, who is my mortgage; BWF; and

19    the IRS, who I've worked out the payment plan.

20          MR. JONES:  Okay.  And are there any

21    errors or omissions that you wish to bring to my

22    attention?

Page 21

1          MS. RALLS:  Well, let me just look at it

2    to make sure.

3               (Pause.)

4          MS. RALLS:  So now I saw it where the --

5    the payoff amount for Capital One.  It says 780,

6    but I know it's 830.  Eight hundred and thirty is

7    the payoff.

8          MR. JONES:  Okay.

9          MS. RALLS:  They don't give you that

10   information over the phone.  You have to request

11   it.

12         MR. JONES:  Okay.  Other than that,

13   there's no errors or omissions that you are aware

14   of that -- well, there are no errors other than

15   that that you are aware of?

16         MS. RALLS:  Not that -- going back

17   through it again, not that I can see.

18         MR. JONES:  Okay.  Since the bankruptcy

19   was filed, have you transferred or sold any

20   assets?

21         MS. RALLS:  No.

22         MR. JONES:  Have you paid any pre-

Page 22

1   petition creditor outside the ordinary course of

2   business?

3           MS. RALLS:  No.

4           MR. JONES:  Have you formed or acquired

5   any interest in any other entity?

6           MS. RALLS:  No.

7           MR. JONES:  Have you obtained any loans?

8           MS. RALLS:  No.

9           MR. JONES:  And post-petition, after you

10  filed for bankruptcy, are your payments to your

11  secured creditors, the BWF and Capital One,

12  current?

13          MS. RALLS:  Capital One is current.

14  BWF, we haven't ever been able to reach a payment

15  plan.

16          MR. JONES:  How much are you paying to

17  Capital One each month?

18          MS. RALLS:  Six thousand.

19          MR. JONES:  Okay.  In your view, why

20  have you not been able to reach a payment with

21  BWF?

22          MS. RALLS:  I think because they're

Marsha Ann Ralls

Page 23

1   predatory lenders who set me up and they're trying

2   to get as much money off of my house, throwing my

3   children and I out on the street.  I think that's

4   the reason why.

5        MR. JONES:  Okay.  In your view, they

6   are predatory lenders.  Why do you believe they

7   are predatory?

8        MS. RALLS:  Because I got $391,000.  And

9   not only did I not have appropriate counsel; it

10  was the anniversary of my mother's death and lots

11  of reasons why I should have never been making any

12  important decisions.  And I -- there's not a doubt

13  in my mind, as everybody in this city knows, that

14  they set me up to take my house and disguised it

15  as a loan to my business.

16        And I have tried from -- a long time.

17  The damage they have done to me is horrible and to

18  my children.

19        MR. JONES:  Do you recall what the

20  interest rate was on the loan?

21        MS. RALLS:  I don't know, some

22  ridiculous -- I think the lawyers -- it's like

Marsha Ann Ralls

Page 24

1   almost a half a million dollars and the interest

2   is like 25 or 35 percent.  I don't -- it's

3   ridiculous amount.

4         MR. JONES:  When was the last time you

5   made a payment to BWF?

6         MS. RALLS:  I don't make a payment

7   because we don't have a payment schedule.  We've

8   been in the lawsuit.

9         MR. JONES:  Okay.  Have you ever made a

10  payment to BWF?

11        MS. RALLS:  They took like the $109,000

12  paid for pre -- like for a year.  They put a half

13  a million dollars against my house, but the --

14  like the 109 I guess paid for the first year

15  payments and fees and whatever that first year.

16        MR. JONES:  You said they took the

17  109,000.  What did --

18        MS. RALLS:  Well, they put --

19        MR. JONES:  Can you describe that a

20  little bit more?  I didn't quite understand.

21        MS. RALLS:  They put $500,000 as the

22  debt for the 391 that I received.  So the 109 was

Marsha Ann Ralls

Page 25

1    the like whatever fees and payments, whatever.

2    Well, a lot of it was in fees because I paid fees

3    on top of that, but it was the -- it was -- it was

4    payments for the first year.

5            MR. JONES:  Okay.  So you made payments

6    in the first year of the loan in the amount of

7    109,000?

8            MS. RALLS:  Correct.

9            MR. JONES:  Okay.  And what year was

10   that?

11           MS. RALLS:  In -- I got the loan at the

12   end of 2011.  So it would have been all of -- at

13   the end of 2011, all of 2012, to the beginning of

14   2013.

15           MR. JONES:  Okay.  And since the

16   beginning of 2013, have you made any additional

17   payments to BWF?

18           MS. RALLS:  I think the art that was

19   liquidated, they received a payment of 20-

20   something thousand.

21           MR. JONES:  Okay.  When did the art

22   liquidation occur?

Marsha Ann Ralls

Page 26

1              MS. RALLS:  In the Fall of 2013.

2              MR. JONES:  Is there any other money

3      that went to them?

4              MS. RALLS:  Not that I'm aware of.

5              MR. JONES:  The $390,000 that you got

6      for the loan, did that go into the business?

7              MS. RALLS:  No.  It paid for a whole

8      list of personal expenses because I hadn't been

9      working. I had been taking care of my dying

10     mother.

11             MR. JONES:  Okay.  But the Capital One

12     loan you have been paying currently.  So when was

13     the last payment to Capital One?

14             MS. RALLS:  For June 1st.

15             MR. JONES:  Of this year?

16             MS. RALLS:  Yes.

17             MR. POTTER:  I didn't hear the answer.

18             MS. RALLS:  June 1st, 2016.

19             MR. JONES:  Do you understand the

20     requirements of the Chapter 11 guidelines,

21     including filing monthly operating reports and

22     paying quarterly bankruptcy fees?

Page 27

1          MS. RALLS:  Yes, I understand quarterly

2    bankruptcy fees, and I understand the monthly --

3          MR. JONES:  Operating --

4          MS. RALLS:  -- operation expenses.

5          MR. JONES:  And you had an initial

6    debtor interview at the U.S. Trustee's Office and

7    met with analyst, who explained these requirements

8    to you?

9          MS. RALLS:  Exactly, yes.

10         MR. JONES:  The first part of the

11   operating report, will that be due -- I see the

12   case was filed in early May.  Are you planning to

13   file it around June 15?  When are you planning to

14   file the first monthly operating report?

15         MR. JOHNSON:  Yes, June 15th.

16         MR. JONES:  Okay.  I have a couple of

17   questions on the bankruptcy schedules.  First, the

18   house that you have, is that your personal

19   residence?

20         MS. RALLS:  Yes.

21         MR. JONES:  Can you describe the home?

22         MS. RALLS:  It has three floors.  And

Marsha Ann Ralls

Page 28

1   the first floor has my living room, but I used

2   that to show artwork back when I was able to.  And

3   then the second room, it's a dining room and then

4   a kitchen in the back.  And you go upstairs, and

5   you have a master bedroom and the -- I've got a

6   little study and a back room.  That was a

7   playroom.  And then on the third floor are my two

8   sons' rooms and a guest room.

9           MR. JONES:  Okay.  And the property is

10  property of the bankruptcy estate, to the best of

11  your knowledge?

12          MS. RALLS:  Well, to the best of my

13  knowledge, it's my property.  But I guess it's the

14  property of the bankruptcy.

15          MR. JONES:  Okay.  And are you planning

16  to exempt the property or are you planning to not

17  file an exemption on the property?

18          MS. RALLS:  I think that we filed for

19  the -- we didn't file for an exemption because

20  however this BWF did these documents, I don't

21  know, but there's a big issue with the papers.  So

22  I think we only filed the exemption for the

Marsha Ann Ralls

Page 29

1    interest.  But we're still debating their loan.

2              MR. JONES:  Okay.  I see you listed the

3    loan as "disputed."  Is that what you mean by

4    "debating their loan"?

5              MS. RALLS:  Yeah.  "Disputed" is a

6    better way to put it.

7              MR. JONES:  Okay.  That is okay.  What

8    is the nature of the dispute?

9              MS. RALLS:  I think what they did was

10   illegal.  And I am in the Court of Appeals trying

11   to get it overturned.

12             MR. JONES:  Is that litigation ongoing?

13             MS. RALLS:  Unfortunately, my previous

14   attorney, who -- took the money for transcripts

15   and never paid for them.  So he was released.  And

16   I am looking for a new attorney so that we can

17   finish the appeal.

18             MR. JONES:  Has a notice of appeal been

19   filed?

20             MS. RALLS:  So the notice of appeal was

21   filed October 5th.  I gave him a check on my

22   transcripts on October 2nd.  The report was filed.

Page 30

1    And the brief was -- the schedule for the brief to

2    be due came out.  And that's like either that day

3    or the next day, BWF filed to foreclose on my

4    house.

5            And my attorney, who -- I kept asking

6    for my transcripts.  And he didn't produce them.

7    And I went to the transcript office.  And I was

8    informed that only like a small part of them had

9    been paid for.  For our relationship, as you can

10   imagine, deteriorated.

11           MR. JONES:  Okay.

12           MS. RALLS:  And so I've been kind of

13   focusing on this part of it, but yes, I'm

14   interviewing attorneys.

15           MR. JONES:  And you'll file an

16   application to employ the attorneys before paying

17   them anything?

18           MR. JONES:  Yes, once they have been

19   identified.

20           MR. JONES:  Yes.  And I understand that

21   may take a little time.

22           I see on schedule I, you listed The

Page 31

1    Ralls Collection as your employer.  Should that,

2    instead, say the new company, the --

3              MS. RALLS:  Closed Monday.

4              MR. JONES:  Closed Monday.  Thank you.

5              MS. RALLS:  Uh-huh.

6              MR. JONES:  Okay.  But before that, you

7    were employed by The Ralls Collection for 10

8    years?

9              MS. RALLS:  Correct -- or no.  For 25

10   years.

11             MR. JONES:  Or 25 years.  Okay.  I am

12   looking at your statement of financial affairs.

13   On the documents that are in front of you, it

14   starts on page 29 if you are using the page

15   numbers at the top.

16             MS. RALLS:  Okay.

17             MR. JONES:  I just want to make sure I

18   understand kind of your historical income.  If you

19   look towards the bottom on page 4, it lists your

20   income for the previous 3 years, going back to

21   2014. The $35,000 that you received so far this

22   year, is that all from The Ralls Collection and

Page 32

1    the Closed Monday?

2          MS. RALLS:  So that's from consulting

3    work and from Closed Monday, not from The Ralls

4    Collection.

5          MR. JONES:  Okay.  And how much is from

6    consulting work?

7          MS. RALLS:  Oh, I don't know.

8          MR. JONES:  Okay.

9          MS. RALLS:  I would have to look it up.

10          MR. JONES:  Okay.  You don't know how

11    much came from consulting versus Closed Monday

12    without looking it up?  And that is fine.

13          MS. RALLS:  I think most of this is

14    probably from consulting.  There might be --

15    what's the date?  From January 1 until the filing

16    of the bankruptcy?

17          MR. JONES:  Yes --

18          MS. RALLS:  Yes.

19          MR. JONES:  -- which would have been

20    early May.

21          MS. RALLS:  So that's -- I mean, most of

22    it is consulting.

Page 33

1      MR. JONES: Okay. And that in 2015, you

2  only made $13,000. Was that from consulting as

3  well?

4      MS. RALLS: Yes. I was devastated from

5  what I had dealt with in 2015.

6      MR. JONES: Okay. The break-in and the

7  interruption to your business?

8      MS. RALLS: Well, the break-in happened

9  May 15, 2013, same day that my lawsuit was filed

10  for BWF, but the -- I had to file bankruptcy.

11  It's humiliating. It's a horrible -- for anybody

12  to go through.

13      MR. JONES: And so dealing with that,

14  kind of bankruptcy and the difficulty from that,

15  is why your income dropped that year?

16      MS. RALLS: Yes, sir.

17      MR. JONES: Okay. And then the 193,000

18  that you made in 2014, was that from The Ralls

19  Collection or from consulting?

20      MS. RALLS: So which -- what was the

21  amount?

22      MR. JONES: A hundred and ninety-three

1   thousand, seven hundred and three dollars.

2            MS. RALLS:  So that was from The Ralls

3   Collection.  Probably some of it is from Closed

4   Monday because I started Closed Monday in -- or

5   maybe, actually, 2015 is probably Closed Monday.

6            MR. JONES:  What led to The Ralls

7   Collection filing for bankruptcy?

8            MS. RALLS:  Well, I didn't have much

9   choice because I had everything liquidated.  I

10  couldn't operate my gallery anymore, which was the

11  main source of their revenue.

12           MR. JONES:  And it was liquidated

13  because of the debt owed to BWF?

14           MS. RALLS:  Uh-huh.

15           MR. JONES:  Okay.  Question 9 requires

16  you to identify legal actions.  That action we

17  talked about, the BWF Private Loan financing, B.

18  Marshall Ralls, that is marked on appeal on the

19  status of the case?

20           MS. RALLS:  It is on appeal, correct.

21           MR. JONES:  And that is the action we

22  were talking about before?

Page 35

1           MS. RALLS:  Okay.

2           MR. JONES:  Well, I am asking.  Is that

3    the action that you were talking about before

4    where your attorney didn't pay for the transcripts

5    and --

6           MS. RALLS:  Yes.

7           MR. JONES:  There are no other legal

8    proceedings that you are involved in?

9           MS. RALLS:  No.

10          MR. JONES:  Okay.  Who is Bonnie

11   McDaniel?

12          MS. RALLS:  She is -- that's so funny.

13   She is one of my best friends.

14          MR. JONES:  And she loaned you money to

15   pay your attorney?

16          MR. JOHNSON:  Actually, I have a

17   correction on that.  Her name is somehow

18   transcribed.  It was two other gentlemen that

19   paid. What were the names?

20          MS. RALLS:  So one of them is Michael

21   Hershman.

22          MR. JONES:  Who is the other?

Page 36

1              MS. RALLS:  It's Jim Dickey, James

2     Dickey.

3              MR. JONES:  Who is Mr. Hershman?

4              MS. RALLS:  He's my boyfriend.

5              MR. JONES:  And Mr. Dickey?

6              MS. RALLS:  He's my younger son's

7     godfather.

8              MR. JONES:  Okay.  And they loaned you

9     money to pay your attorney?

10             MS. RALLS:  Yes, sir.

11             MR. JONES:  And they weren't expecting

12    anything --

13             MS. RALLS:  They --

14             MR. JONES:  -- in return?  It was --

15             MS. RALLS:  Praying I get justice.

16    That's about it.

17             MR. JONES:  And the initial retainer was

18    $8,283?

19             MS. RALLS:  Yes, sir.

20             MR. JONES:  Okay.  And they also paid

21    the filing fee of $1,717?

22             MS. RALLS:  Correct.  They both gave

Marsha Ann Ralls

Page 37

1   5,000 each.

2           MR. JONES:  Do you intend to pay them

3   back at some point or was it -- I am trying to

4   figure out, basically, if it was a loan or a gift

5   or --

6           MS. RALLS:  It was a gift.

7           MR. JONES:  Okay.  Do they have any

8   other interest in the case?  Are they living at

9   the property?

10           MS. RALLS:  No.

11           MR. JONES:  Okay.  I saw the 216(b) was

12   filed, and I saw that your employment application

13   was filed.  So I don't think there is anything

14   else that needs to be done there.  What is the

15   plan going forward?  How do you see bankruptcy

16   helping you?

17           MS. RALLS:  Well, I am working on

18   putting together a payment plan.  I've also looked

19   -- I mean, the problem is BWF is hostile.  So it's

20   not -- a payment plan is impossible with them.

21   Capital One is not an issue.  I mean, they're

22   working with me.  So is the IRS.  But BWF is, you

Page 38

1   know, impossible to do anything with.

2            MR. JONES:  Okay.

3            MS. RALLS:  So I would like to submit a

4   payment plan, but I can't imagine that they will

5   let me.  I will also talk to a real estate agent,

6   which would be my last resort.

7            MR. JONES:  Okay.  So if it was

8   necessary in order to complete the bankruptcy, you

9   are willing to sell the home, but it is your last

10  resort?

11           MS. RALLS:  It would be definitely not

12  what I want to do.  It is my home.  So I would

13  prefer to be given an opportunity to pay off the

14  debt.

15           MR. JONES:  Do you know how much income

16  you would have to have in order to make a Chapter

17  11 plan with periodic payments work?

18           MS. RALLS:  Yeah, probably -- I would

19  say probably close to, you know, 35,000 a month.

20           MR. JONES:  Okay.

21           MR. POTTER:  I didn't hear the witness'

22  answer.

1          MS. RALLS:  Close to 35,000 a month

2    because my overhead and mortgage, including the

3    IRS, is $10,000.  And so the other 25,000 would

4    need to go to BWF if they would be willing to --

5          MR. JONES:  How do you anticipate

6    generating that much income per month?

7          MS. RALLS:  Working seven days a week,

8    closing a lot of contracts.  I was emotionally

9    distraught last year.  So I did not work.  And I

10   have -- you know, I am hoping that -- I'm working

11   now.  So --

12         MR. JONES:  Do you think it is realistic

13   to think that you would be able to bring in that

14   level of income?

15         MS. RALLS:  It's -- everything's

16   realistic when you have your whole life on the

17   line.

18         MR. JONES:  By that, do you mean you are

19   going to do the best you can and you are motivated

20   and you will sort of see how you do?

21         MS. RALLS:  I mean, there's -- I'm

22   motivated.  I think I have some really good things

Page 40

1   that could make all of that happen.

2           MR. JONES:  How long do you think it

3   would take, you know, kind of working at that

4   level to know whether you are able to bring in

5   that much income?

6           MS. RALLS:  Well, I mean, definitely at

7   least three months of time, maybe longer.

8           MR. JONES:  So you think that would take

9   at least three months in order to generate that

10  much income and to kind of build up to that income

11  level?

12          MS. RALLS:  Yeah, between three and six

13  months, maybe three, maybe one if everything goes

14  well.

15          MR. JONES:  Okay.  And are you going to

16  -- you said you talked to a real estate agent.

17  Are you going to hire a real estate agent to

18  market the property in the meantime?

19          MS. RALLS:  She has -- yes.  I have a --

20  I had somebody who I've done a contract with.  But

21  no. I would prefer her not to market it.  Do you

22  know what it's like having people walk in your

Page 41

1   backyard and look in your window when you're

2   sitting there at the table because of the public

3   filing that they make?

4           It also is pre-foreclosure on the

5   internet.  So I have people come in my home where

6   my children are and walk up to the window.  And I

7   look out like terrified because I'm wondering who

8   the stranger is and walk out.  And they're like

9   "Oh, are you selling your house?"  So I think, you

10  know, there's some level of -- it is everything

11  I've worked for.  There's some level of, you know,

12  respect for the hard work of 20 years, of what

13  I've put into this.

14          MR. JONES:  Okay.  So your plan right

15  now is to see how much income level you are able

16  to get over the next three to six months and look

17  at selling it and listing it after that point.  Is

18  that accurate?

19          MS. RALLS:  Well, I mean, I guess we'll

20  take it day by day.

21          MR. JONES:  What do you mean?

22          MS. RALLS:  They are a very hostile

Page 42

1   group. So I may be forced to sell it if it's left

2   up to them.

3          MR. JONES:  Okay.  Those are all the

4   questions I have.  At this time, I will open up

5   the floor to any questions that creditors may

6   have.

7          MR. POTTER:  Thank you.

8          Good afternoon, Ms. Ralls.  I am Patrick

9   Potter.  I guess I have identified myself for the

10  record already for the second secured creditor,

11  BWF. I am going to pick up just at the very end

12  where Mr. Jones was and then, rather than go back

13  through his questions, go through the schedules

14  and see if I can clean up questions I had and

15  then, if not, go back through some of these items.

16         My first question is, on this issue of

17  selling your home, the property -- it is the only

18  property, the only real estate, in the case -- is

19  it fair to say that you did not file for Chapter

20  11 with the intention of selling the property?

21         MS. RALLS:  I don't think that's fair to

22  say, no.

Marsha Ann Ralls

1          MR. POTTER:  So you did file -- it would

2     be fair, then, to say that you filed with the

3     intention of selling the property?

4          MS. RALLS:  The intention is to -- it's

5     my understanding that I'd get a chance to work out

6     a plan.  I may be wrong.  And I -- but, you know,

7     if I'm forced to sell the property, then I'm

8     forced to sell the property.  But it is my home.

9          MR. POTTER:  My question is, though, was

10    your intention, when you filed the case, was your

11    intention, to sell the property?  Is that your

12    intention or is it, as you say, a last resort?

13         MS. RALLS:  I also think that, as far as

14    my intention, having my home foreclosed on would

15    not be in the best interest of my entire life's

16    savings and hard work.  So I am answering exactly

17    the best I can from my heart.  I don't know that I

18    have any intentions except in my heart to stay in

19    my home. Okay?

20         So, you know, I understand that -- I've

21    talked to a real estate agent.  I have a listing

22    agreement.  So I understand that BWF is trying to

Marsha Ann Ralls

Page 44

1    throw me out on the street.  And, you know, I

2    understand clearly what is happening.

3              MR. POTTER:  So you have a listing

4    agreement with someone?

5              MS. RALLS:  Yes, I do.

6              MR. POTTER:  Who is the listing

7    agreement with?

8              MS. RALLS:  Nancy Bubes.

9              MR. POTTER:  Nancy?

10             MS. RALLS:  Bubes.

11             MR. POTTER:  Can you spell that, please?

12             MS. RALLS:  B-U-B-E-S.

13             MR. POTTER:  B-U-B-E-F?  Is that right?

14             MS. RALLS:  E-S.  E-S.

15             MR. POTTER:  E-S?

16             MS. RALLS:  Uh-huh.

17             MR. POTTER:  B-U-B, as in boy, E-S.  Is

18   she with a company or on her own?

19             MS. RALLS:  She is with a company, maybe

20   like Washington Fine Properties.  I think that's

21   it.

22             MR. POTTER:  I will let you or your

Marsha Ann Ralls

Page 45

1    counsel look and confirm that.  We will come back

2    to it so that we can keep the process moving and

3    conserve on time.

4              When was the contract entered, the

5    listing agreement entered, into?

6              MS. RALLS:  Today.

7              MR. POTTER:  What do you see as your

8    anticipated next step on the list agreement in

9    order to move forward with the listing?

10             MS. RALLS:  I haven't --

11             MR. POTTER:  Is she going to put it into

12   the system?

13             MS. RALLS:  I haven't gone that far with

14   her.  I am going by to see her tomorrow.

15             MR. POTTER:  How many times have you met

16   with Ms. Bubes?

17             MS. RALLS:  Bubes.

18             MR. POTTER:  Bubes.

19             MS. RALLS:  Well, she is my neighbor.

20   So I've --

21             MR. POTTER:  How many times have you met

22   with her to discuss the subject of the listing

Page 46

1   agreement?

2          MS. RALLS:   Once.

3          MR. POTTER:   Today?   Is that correct?

4          MS. RALLS:   Monday.

5          MR. POTTER:   Monday.   Monday of this

6   week?

7          MS. RALLS:   Uh-huh.

8          MR. POTTER:   So you met with her on

9   Monday.   Where did you meet?

10          MS. RALLS:   At my house.

11          MR. POTTER:   And then you signed it?

12   Did she give you the contract, then, on Monday,

13   and you signed it today?

14          MS. RALLS:   No.   She emailed it to me.

15   My printer is not working.   So Mr. Johnson printed

16   it for me to sign.   So I have to go meet with her

17   tomorrow.

18          MR. POTTER:   Now, counsel, may the U.S.

19   Trustee's Office have a copy of the listing

20   agreement, please?

21          MR. JOHNSON:   Yes.   Once we finalize it,

22   we will file a motion with the Court and give you

1    a copy.

2              MR. POTTER:  When do you anticipate

3    doing that?

4              MR. JOHNSON:  As soon as she actually

5    meets with her and we can confirm that this is the

6    listing agreement.  She has signed it, but there

7    are other things that have to happen.  We need a

8    verified statement from her to support the motion.

9              MR. POTTER:  What is the purchase price

10   on the listing agreement?

11             MS. RALLS:  I think two and a half.

12             MR. POTTER:  $2.5 million?

13             MS. RALLS:  Uh-huh.

14             MR. POTTER:  And what is the commission?

15             MS. RALLS:  I haven't even had a chance

16   to look.

17             MR. JOHNSON:  Five percent is the

18   commission.

19             MR. POTTER:  Pardon me?

20             MR. JOHNSON:  Well, six percent actually

21   listed.

22             MR. POTTER:  Six percent?

Marsha Ann Ralls

Page 48

1          MR. JOHNSON:  Yes.

2          MR. POTTER:  What is the duration of the

3     listing?

4          MR. JOHNSON:  I think this is 180 days.

5     Let me make certain, 6 months, 180 days, 6 months

6     on entry in --

7          MR. POTTER:  You discussed with Mr.

8     Jones, ma'am, the possibility of achieving a

9     $35,000-a- month income.  When is the last time

10    you on some regular basis achieved a $35,000-a-

11    month gross income?

12         MS. RALLS:  So years ago.  I mean, it

13    depends if you're talking about my company or

14    paying me personally?  So I don't always pay

15    myself.  So The Ralls Collection years ago, before

16    my mother got sick and I started taking care of

17    her for the three years before she died and -- we

18    did very well.  And it just depended on how much I

19    paid myself.

20         MR. POTTER:  Well, you are not going to

21    achieve it this year based upon your projections;

22    right?

Page 49

1      MS. RALLS:  Oh, I'm sure that if I want

2   to, I can achieve it this year.

3      MR. POTTER:  Well, you didn't achieve it

4   last year; correct, 35,000?

5      MS. RALLS:  No because I was forced into

6   bankruptcy.  And I was emotionally -- I should

7   have been in therapy for what your client put me

8   through.

9      MR. POTTER:  And the year before

10  according to the schedule, statement of financial

11  affairs, is 193,000?  You didn't achieve it that

12  year either?

13     MS. RALLS:  Well, that's the -- that's a

14  -- that's what I paid myself.

15     MR. POTTER:  And then the year before

16  that, do you remember, 2013?

17     MS. RALLS:  Twenty thirteen?  I don't

18  know.

19     MR. POTTER:  I mean, if we were to go --

20  I assume these numbers match up with your tax

21  returns; right, the --

22     MS. RALLS:  Of course, they do.

Marsha Ann Ralls

Page 50

1          MR. POTTER:  Pardon me?

2          MS. RALLS:  Of course, they do.  They're

3    --

4          MR. POTTER:  So do you remember 2013?

5          MS. RALLS:  Again, I don't always pay

6    myself personally.

7          MR. POTTER:  But if we were to look at

8    your tax return for 2013 and so that we'd continue

9    the reverse chronological here in your statement

10   of financial affairs, what do you think it would

11   say?

12         MS. RALLS:  I actually don't know

13   without looking at it.  I don't want to state

14   something that is incorrect because I don't know.

15   Remember, my home was broken into in 2013, and I

16   was pretty devastated by that experience as well.

17   I have been bullied for quite a while now.

18         MR. POTTER:  Okay.  So let's talk about

19   the schedules.  These are dated.  They were filed

20   with the Court May 4th of 2016.  You have got a

21   set in front of you; right?  Mr. Jones put it in

22   front of you?

Page 51

1          MS. RALLS:  Uh-huh.

2          MR. POTTER:  And you signed them the

3    same day; right, May 4th, 2016.  Look, for

4    example, on page 6 of 43.  You will see an e-

5    signature. Obviously it is not your handwritten

6    signature.

7          MS. RALLS:  Uh-huh.

8          MR. POTTER:  So you signed these that

9    day? So let me stop.  Let me just strike the

10   question, and I will come back to it.

11         Today is the 8th of June.  This is the

12   May 4th.  So that it was a month and four days

13   ago.  Do you remember signing these?

14         MS. RALLS:  Yes, I remember signing

15   them. Yes.

16         MR. POTTER:  And you signed them all on

17   or about the 4th of May, last month?

18         MS. RALLS:  Yep.

19         MR. POTTER:  And did you keep signed

20   copies or does your counsel have signed copies?

21   Do you know what signed copies are?

22         MS. RALLS:  Well, that's a signed copy.

Page 52

1          MR. POTTER:  You have signed copies?

2     Okay.

3          And let's see.  You testified earlier

4     with some additional commentary from your counsel

5     that you filed Chapter 13 last year, it was

6     converted to a 7, and you filed a Chapter 11 this

7     year.  In both cases, you went through credit

8     counseling; right?

9          MS. RALLS:  Yes, I went through credit

10    counseling.

11         MR. POTTER:  Did the credit counselors

12    explain to you the difference between the Chapter

13    7, 13, and 11?

14         MS. RALLS:  I don't know if they

15    explained it to me.

16         MR. POTTER:  Do you have an

17    understanding of the difference between Chapters

18    13, 7, and 11?

19         MS. RALLS:  I know what Chapter 7.  I

20    know what Chapter 11 is.

21         MR. POTTER:  Okay.  Can you tell me --

22         MS. RALLS:  And 13 I think is less debt.

Page 53

1          MR. POTTER:  Can you just give me your

2     basic understanding of the differences?

3          MS. RALLS:  A Chapter 7 is a

4     liquidation. A Chapter 13 is a payment plan.  And

5     Chapter 11 is a payment plan.

6          MR. POTTER:  Do you have any further

7     understanding of the different chapters?

8          MS. RALLS:  That I have 120 days that I

9     can work on a plan, that I have to pay a fee to a

10    trustee quarterly based on income and revenue that

11    comes in, I have to file a report that's due by

12    the 15th or 20th of all of this for every month

13    that they review, that I have to have a bank

14    account that everything goes through.

15         MR. POTTER:  So some number of

16    additional things that you didn't have to do when

17    you were in the 13 and 7; correct?

18         MS. RALLS:  Correct.

19         MR. POTTER:  The payment plan Mr. Jones

20    asked you about, tax returns -- I just want to

21    understand if I heard you correctly; my hearing is

22    not the best -- that you are current on your tax

Page 54

1    returns.   The last year filed was for 2015?

2              MS. RALLS:   Correct.

3              MR. POTTER:   And is the payment plan --

4    was there a refund for 2015 or amount due?

5              MS. RALLS:   No.

6              MR. POTTER:   Neither?

7              MS. RALLS:   No, neither.

8              MR. POTTER:   And the payment plan is for

9    which tax year?

10             MS. RALLS:   Twenty fourteen.

11             MR. POTTER:   And the total amount due

12   under the payment plan is?

13             MS. RALLS:   I'd have to call them and

14   check, but, I mean, it's around -- I mean, I don't

15   even want to say because it -- it was -- I did owe

16   them like 27,000.  I paid it down to under -- I

17   mean, I think it's around 15 or 13.  I don't know

18   what it is right now.

19             MR. POTTER:   It is less than $20,000.

20   Is that fair to say?

21             MS. RALLS:   Yes.  It's definitely less

22   than 20,000.

Page 55

1          MR. POTTER:  Counsel, can we get the

2   documentation on that?

3          MR. JOHNSON:  Sure.

4          MR. POTTER:  Thank you.

5          Can you turn to what is page 8 of 43?

6   Let me see if I have this right so we can go

7   deeper faster.  Let's see.  Page 11 of 43.  This

8   is schedule A/B, "Property."  I will give you a

9   few minutes here.  I have a few questions.

10          Question number 3, do you see that,

11   "Cars, vans, trucks, tractors, et cetera"?

12          MS. RALLS:  Correct.

13          MR. POTTER:  You answered "No."  So you

14   have no vehicle; right?

15          MS. RALLS:  No.

16          MR. POTTER:  How do you get around?

17          MS. RALLS:  I walk.  I take the bus.

18   Sometimes I borrow people's cars.

19          MR. POTTER:  Do you have an estimate of

20   monthly cost of transportation?

21          MS. RALLS:  Not much.  I don't -- I

22   mean, I walk everywhere.

Marsha Ann Ralls

Page 56

1          MR. POTTER:  Number 7, next page,

2     question number 7, you indicated "No" to

3     electronics, but I think on the record, you say

4     you left your cell phone with the marshal.

5          MS. RALLS:  Yes.

6          MR. POTTER:  So is that incorrect?

7          MS. RALLS:  I have a cell phone, but it

8     is on somebody else's bill.

9          MR. POTTER:  The cell phone is on

10    someone else's bill.  Whose bill is it on?

11         MS. RALLS:  Mr. Hershman, the guy I go

12    out with.

13         MR. POTTER:  Okay.  Does he own the

14    phone?

15         MS. RALLS:  I guess if it's paying for

16    it.

17         MR. POTTER:  And you mentioned a

18    printer, which I gather is connected to a

19    computer.  Does he own the computer, too?

20         MS. RALLS:  No.  My company owns the

21    computer, Closed Monday.

22         MR. POTTER:  So the answer here is

Marsha Ann Ralls

1    accurate that you did not own any electronics?

2            MS. RALLS:  No.

3            MR. POTTER:  "Collectibles of value.

4    Any paintings, prints, other work"?  It says,

5    "No," but I just wanted to make sure you focused

6    on it carefully and that there is no artwork that

7    you own?

8            MS. RALLS:  As you know, all my artwork

9    was liquidated that I owned.

10            MR. POTTER:  Prints?

11            MS. RALLS:  Everything.

12            MR. POTTER:  So if we were to come into

13    the house, we wouldn't see any artwork, any

14    prints, or anything like that?

15            MS. RALLS:  You would not.

16            MR. POTTER:  Question 17, next page,

17    $100 in the Bank of Georgetown, but I understand

18    your testimony, you have now closed down that

19    account?

20            MS. RALLS:  Yes, that is closed.

21            MR. POTTER:  And your sole banking

22    relationship now is with SunTrust?

Page 58

1          MS. RALLS:  Correct.

2          MR. POTTER:  Is that true for you and

3    any corporations or entities that you have an

4    interest in?

5          MS. RALLS:  No.

6          MR. POTTER:  Who would, for example --

7    why do you say "No"?

8          MS. RALLS:  Because Closed Monday has a

9    different bank account because it's a different

10   company.

11         MR. POTTER:  So Closed Monday has a bank

12   account with which bank?

13         MS. RALLS:  Bank of Georgetown.

14         MR. POTTER:  Do you have signature

15   authority in that account?

16         MS. RALLS:  I do.

17         MR. POTTER:  Do you have an ATM card for

18   that account?

19         MS. RALLS:  No.  I've never used an ATM.

20         MR. POTTER:  Does anyone else have

21   signature authority on the account to write a

22   check?

Page 59

1          MS. RALLS:  I'm not sure right now.

2          MR. POTTER:  Pardon me?

3          MS. RALLS:  I can't answer that right

4    now. It depends on a project that I'm working on

5    if I -- if they become partners.  So right now,

6    no.

7          MR. POTTER:  Right now you are the only

8    person with signature authority?

9          MS. RALLS:  Exactly.

10         MR. POTTER:  Okay.  Any other bank

11   accounts in your name or entities' names?

12         MS. RALLS:  No.

13         MR. POTTER:  Historically, ma'am, when

14   you pay your personal expenses, they come out of

15   the -- I guess you had -- the account that we see

16   here for the $100 is Bank of Georgetown I got.

17   That is separate from the Closed Monday account;

18   right?

19         MS. RALLS:  Correct.

20         MR. POTTER:  Okay.  And so when you

21   would pay your expenses, would they come out of

22   the Closed Monday account or would they come out

Page 60

1   of the --

2           MS. RALLS:  They'd come out of my

3   personal account, but I gave Mr. Pica (ph) all of

4   my -- all of my -- like my heating bill, my

5   electricity.  All of that is paid by me personally

6   and the DIP account.

7           MR. POTTER:  That now will be paid out

8   of the SunTrust account?

9           MS. RALLS:  Exactly.

10          MR. POTTER:  And, just to be clear, the

11  next question I am going to ask about is 19, which

12  is "Corporations, LLCs, and the like."  This

13  answer is incorrect because it doesn't list either

14  The Ralls Collection, which is in Chapter 7, nor

15  does it list the Closed Monday entity; correct?

16          MS. RALLS:  Yeah.  That needs to be

17  corrected.

18          MR. POTTER:  That is an oversight?

19          MS. RALLS:  Yeah.  I missed it.  Where?

20  Which number is it?  What?  Which number?

21          MR. POTTER:  It was just an oversight?

22          MS. RALLS:  Correct.

Page 61

```
 1        MR. JONES:  Which number are you
 2   speaking of?
 3        MS. RALLS:  Yeah.  I'm trying to -- I
 4   don't know which number you're talking about.
 5        MR. POTTER:  Number 19.  It was just a -
 6   -
 7        MR. JONES:  Number 19.
 8        MR. POTTER:  Yes.  Right?  The --
 9        MS. RALLS:  "Non-publicly traded stock
10   and interest in incorporated or unincorporated
11   business, including an interest in an LLC
12   partnership or" -- yes, it is an oversight --
13        MR. POTTER:  Right.
14        MS. RALLS:  -- because I didn't
15   understand that The Ralls Collection that's in
16   Chapter 7 should be there and Closed Monday.  I
17   mean, it's -- it's all -- for the most part, it's
18   the same because everything that I've been doing
19   has been paid to me personally.  So the money that
20   I've made for -- from January, when they asked me,
21   to the day I filed, that's all in my personal
22   account.  It's not in Closed Monday's account
```

Page 62

1   because it was -- it was all consulting work I

2   did.

3          MR. POTTER:  You're now referring back

4   to the questions that Mr. Jones asked you

5   regarding the $35,000?

6          MS. RALLS:  Correct.

7          MR. POTTER:  Look, I will come back to

8   it.

9          MS. RALLS:  So yes, it's an oversight.

10          MR. POTTER:  Okay.  Have you had any

11   appraisals done on any of your assets, including

12   the real estate?

13          MS. RALLS:  Not recently besides real

14   estate agent looking at it.

15          MR. POTTER:  Meaning?

16          MS. RALLS:  But that's not an appraisal.

17   She's not an appraiser.

18          MR. POTTER:  You are referring to Ms.

19   Bubes?

20          MS. RALLS:  Yeah, but she hasn't had a

21   chance to send an appraiser in.

22          MR. POTTER:  How do you pronounce her

Page 63

1   name again?  I want to get it right.

2           MS. RALLS:  Bubes.

3           MR. POTTER:  Pardon?

4           MS. RALLS:  Bubes.

5

6           MR. POTTER:  Bubes.  Bubes.  Do you

7   remember the last time the real estate was

8   appraised, if it was ever appraised?  Do you know?

9           MS. RALLS:  I think it was appraised by

10  your client.

11          MR. POTTER:  So, to your knowledge, that

12  would be the last time?

13          MS. RALLS:  Probably, to my knowledge.

14          MR. POTTER:  Schedule C, which starts on

15  16 of 43?  You know, the colloquy that has been

16  occurring among your schedules has been, you know,

17  did you look at it and you read it and sign it,

18  but, I mean, the data in these schedules all came

19  from you; right?  It didn't come from your

20  counsel?  You had to give it to your counsel;

21  right?

22          MS. RALLS:  We went over it pretty

Page 64

1    quickly, but yeah.  What's your question?

2           MR. POTTER:  I will get to my question.

3    I am trying to -- I want to start with an

4    understanding because I don't entirely have an

5    understanding as to where he got this information,

6    where your counsel got this information.  Did he

7    get it from you?  Did he get it from somebody

8    else, from a group of people?  Where did he get

9    this information?

10          MS. RALLS:  The 2.3?

11          MR. POTTER:  Everything in the document.

12   Did he get it from you or did he get it from your

13   son?  Did he get it from Mr. -- from the gentleman

14   you are seeing as you described it?  I mean, what

15   was the source of information?

16          MS. RALLS:  He got this information from

17   me.

18          MR. POTTER:  Okay.  All of this

19   information came from you?

20          MS. RALLS:  Yes.

21          MR. POTTER:  So all the numbers we see

22   in here, all the data, that came from you?

Page 65

1          MS. RALLS:  Yes.

2          MR. POTTER:  Okay.  So I am going to

3     just draw your attention to schedule C.  This is

4     the exemptions schedule.  And you understand, I

5     gather, how this works; right?  The left=hand

6     column, which starts with the 2.352 and ends with

7     the 100, those are the valuation columns.  You

8     understand that; right?  And the right-hand column

9     is the amount of the value that you are exempting

10    or if you have a different understanding, please

11    tell me.

12         MS. RALLS:  Well, I'm trying to look at

13    it and understanding it --

14         MR. POTTER:  Oh, sure.

15         MS. RALLS:  -- because this is not my

16    area of expertise.

17         MR. POTTER:  That is fine.

18         MS. RALLS:  I am an expert when it comes

19    to fine art but not numbers.

20         MR. POTTER:  Take your time.

21         MS. RALLS:  Clearly, I think we have all

22    proven that over the last few years.

Page 66

1              So on the left is the value.  And on the

2     right is the exemption.

3              MR. POTTER:  So, for example, let's take

4     the last one.  That is the easy one; right?  The

5     value of the account with the Bank of Georgetown,

6     that was $100 as of the bankruptcy filing.  And

7     you took an entire $100 exemption with respect to

8     that account; right?  So is it dollar-for-dollar

9     value in exemption; right?

10             MS. RALLS:  Yeah.

11             MR. POTTER:  And then you move up the

12    chain the same with respect to your clothing and

13    same with respect to your furniture; correct?

14             MS. RALLS:  Correct.

15             MR. POTTER:  Value and exemption equal

16    one another?

17             MS. RALLS:  Uh-huh.

18             MR. POTTER:  And then with respect to

19    the real estate, there is an ascribed value on the

20    paper of $2,352,000; correct?

21             MS. RALLS:  Uh-huh.

22             MR. POTTER:  1.572 million of which is

Page 67

1    what you are taking an exemption for; right?

2              MS. RALLS:  It's what it says.

3              MR. POTTER:  And you agree with that;

4    right?

5              MS. RALLS:  Well, with my mortgage, that

6    would be pretty close to being correct.  The --

7              MR. POTTER:  Okay.  The portion of the -

8    - go ahead.  I didn't mean to cut you off.

9              MS. RALLS:  I mean, your client, BWF,

10   we're in a dispute and legal -- dispute over the

11   amount.

12             MR. POTTER:  We will get to the amounts

13   in a minute.  I am trying to just understands what

14   this says.  Okay?  This says a value of X and

15   exemption of Y; right?  And so the exemption is

16   less than the value.  There is a delta there, a

17   difference, between the two numbers.  And that

18   delta, that difference, that you are not claiming

19   an exemption in is with the bankruptcy estate;

20   right?  If you are not --

21             MS. RALLS:  Well, look.

22             MR. POTTER:  If you are not taking --

Page 68

1        MS. RALLS:  I am not clear, to be

2   honest. I'm not clear.  We didn't go through this

3   again before we met, but it looks like to me that

4   the amount I'm not taking is my mortgage to

5   Capital One, which is about $800,000.

6        MR. POTTER:  Yes.  I will come to how

7   you derived the amount because I figured out how

8   you derived the amount.  And that is fine.  We

9   will come to that in a second.  I am trying to

10  figure out what is in the estate and what is not

11  in the estate, what is in the bankruptcy estate

12  and what is not in the bankruptcy estate.  And so

13  I read this -- and you can tell me whether my

14  reading is correct or whether my reading is

15  incorrect --

16        MS. RALLS:  Uh-huh.

17        MR. POTTER:  -- that a portion of the

18  property is in the bankruptcy estate and a portion

19  of the property is not in the bankruptcy estate.

20        MS. RALLS:  Correct.

21        MR. POTTER:  Okay.  Now, the way you

22  calculated it on paper here, I think, is you took

Page 69

1    the $2,352,000, the value; right?

2              MS. RALLS:  Uh-huh.

3              MR. POTTER:  And then if you turn to the

4    next page -- actually, it is two pages later, 18

5    of 43 --

6              MS. RALLS:  Uh-huh.

7              MR. POTTER:  And you had listed here --

8    and I understand you have amended your answer

9    verbally here, but just on paper just so we

10   understand how the paper flows here.  You had

11   indicated that Capital One was owed $780,000;

12   correct?

13             MS. RALLS:  Uh-huh.

14             MR. POTTER:  They are owed whatever they

15   are owed.  But for purposes of understanding these

16   numbers, what you did is you took the $2,352,000

17   and you subtracted $780,000 from that, which

18   yielded $1,572,000, the amount of your exemption;

19   correct?

20             MS. RALLS:  Uh-huh.

21             MR. POTTER:  Yes; right?

22             MS. RALLS:  Yes.

1       MR. POTTER:  Yes.  We are being

2    recorded.

3       MS. RALLS:  That's what it looks like,

4    yes.

5       MR. POTTER:  And so mathematically,

6    approximately 67 percent of the property is

7    exempt. And roughly 33 percent is not.  Right?

8    The percentages are what they are.

9       MR. JOHNSON:  I am going to object here.

10   That is not a question, counselor, because you are

11   asking her questions about how the exemption was

12   calculated.  There is going to be a limitation to

13   her knowledge.

14       And it appears to me that you are really

15   having an issue with how Judge Teel ruled on your

16   first motion or your motion for relief.  And kind

17   of in your line of questioning, it is kind of a

18   backdoor attempt to bring light to whatever

19   argument you were attempting to make.  If you

20   continue down this line of questioning with her --

21   she doesn't have the present ability to respond in

22   the manner that you want her to respond.  So I

1   think we are going to waste a lot of time with you

2   pursuing this particular answer to this.  Now, I

3   will give you a lot of leeway with your line of

4   questioning because I think you have been

5   redundant with what Trustee Jones was doing with

6   the original 341 questions, but by virtue of the

7   fact that you are remaining on this issue, on

8   something that she clearly cannot answer, it seems

9   to me you are seeking for an answer to place on

10   the record such that you can make an argument

11   later.  That I cannot allow.

12              MR. POTTER:  Well, part of the purpose

13   of -- I am not going to argue with you on the

14   record, counsel.  You can object -- and you made

15   your objection -- or you can instruct your witness

16   not to answer.

17              If you instruct your witness not to

18   answer, then we will go from there because I can't

19   force her to answer.  But if you do that, then we

20   will either have a conversation with the judge --

21   we will do what we have to do to get the answers.

22              I actually don't plan to spend much more

Page 72

1   time on this, contrary to what you said.  And this

2   is a vehicle for discovery.  So, absolutely,  it

3   is absolutely entitled to find out the answer to

4   the question.

5           She signed these documents.  She signed

6   hem under oath.  And if she didn't understand

7   them, she shouldn't be signing hem under oath.

8           MR. JOHNSON:  Well, counselor --

9           MR. POTTER:  You are telling me she

10  doesn't understand them now?

11          MR. JOHNSON:  -- I am going to disagree

12  with you.  And I am not going to argue with you on

13  the record either.  Just understand.  Like I said,

14  I've given you leeway because I want you to get

15  whatever answers you think.

16          I think Judge Teel was very thorough in

17  his ruling.  However, if you are going to continue

18  to backdoor, then yes, I am going to instruct her

19  not to answer.  And then you can explain to Judge

20  Teel why you are pursuing an avenue that he has

21  already ruled on.

22          So it is up to you.  But if you want to

Page 73

1    ask her a question about her signature again,

2    which Mr. Jones already asked her, then I

3    understand. That is just you trying to figure out

4    what you need to do next.  But in terms of

5    specific questions about the petition, ask them,

6    and we will move on. And if it is something that

7    we don't want her to answer because she cannot

8    answer, then I will just instruct her not to

9    respond.

10          MR. POTTER:  Thank you, counsel.

11          You have given me a series of answers in

12   the last few minutes.  Do you want to amend your

13   answers in any way in light of your counsel's

14   speech?

15          MS. RALLS:  Well, clearly I don't

16   understand.  Okay?  So --

17          MR. POTTER:  So everything you just said

18   I should just throw out because you don't

19   understand it because your counsel said you don't

20   understand it?

21          MS. RALLS:  Well, you know, it looked --

22   if you look at, you know, the map, it looks like

Page 74

1    when the number of the value and the amount

2    exempted is taking my mortgage off of it.  That

3    much I can look at.  And that's what it looks like

4    it's saying, but --

5           MR. POTTER:  And you also testified that

6    a portion of the property is property of the

7    estate and a portion of the property is not

8    property of the estate.  Do you now recant that

9    answer?

10          MS. RALLS:  Well, I actually have no

11   idea. If you really want the truth, I have no

12   idea.  This is so not my area of expertise.  All I

13   know is it's my home, and I pay my mortgage and I

14   live there with my kids.  I really -- this is -- I

15   mean, without us reviewing so I am clear about it,

16   I really don't have any idea.  Okay?

17          MR. POTTER:  So your final answer on the

18   exemptions is you have no idea?

19          MS. RALLS:  Well, I mean, the -- what I

20   said before as far as the numbers, that looks like

21   it's correct and --

22          MR. POTTER:  Okay.  But the notion of

1  whether some piece of it is part of the bankruptcy

2  estate and part, some piece of it, is not part of

3  the bankruptcy estate, which is your prior

4  testimony, now you are now recanting?

5       MS. RALLS:  Well, I am actually -- the

6  reason I am saying that is because I listened to

7  the audio with Judge Teel and you -- and what was

8  said and you, you know, aggressively trying to

9  overthrow his decision.  So that's all the reason

10  I know. Truthfully, that's the only reason.  I

11  Know it because I listened to it.

12       MR. POTTER:  Contrary to what your

13  counsel has said and what you are repeating his

14  saying, I am actually not trying to overthrow his

15  decision.  I am trying to make sure that the

16  foundations for his decisions were actually

17  correct.

18       There were two foundations for his

19  decision.  His two foundations were:  number one,

20  there is property in this estate.  So that is

21  either true or it is not true.  And if you are

22  saying that everybody is behind what Judge Teel

Marsha Ann Ralls

Page 76

1   ruled, which is that part of this is property of

2   the estate, I am cool with that.  If we are not

3   going to take a position later that some of this

4   is not property of the estate, which would be

5   contrary to the judge's ruling, I am fine with

6   that.  The other --

7          MS. RALLS:  I prefer because -- to make

8   sure I clearly understand -- okay? -- not just

9   from listening to the audio or looking at

10  documents that I am not clear of the numbers, that

11  I have a -- I mean, we can step out and have a

12  conversation.  I don't know.  But I just -- I want

13  to make sure I'm clear because I don't want to

14  answer something that goes on the record where I

15  don't understand what I am saying because I think

16  I have been down this road for a while now.

17         MR. POTTER:  I think that is a great

18  idea if you are so inclined to do so.  You have

19  got a document that is signed under oath.  It is a

20  matter of record with the Court.  I am entitled to

21  look at it.  I am entitled to ask you definitive

22  questions on it.  The U.S. Trustee's Office is

1    entitled to ask you definitive questions on it.

2    And if we can't get definitive answers on it --

3    and if consulting with your counsel would help you

4    get a definitive answer on it, that is fine.  And

5    if your definitive answer is you don't know, then

6    you don't know and the foundation for Judge Teel's

7    ruling, one of the foundations for Judge Teel's

8    ruling, it seems to me, is put in question.  But

9    that is fine.

10            I am not trying to lead you to any

11   water. I just want to know the answer to the

12   question.

13            MR. JOHNSON:  All right.  Counsel, I

14   think Judge Teel answered that question.  And she

15   has already stated that she doesn't know the

16   intricacies of the exemptions.  So let's move on

17   to your next question.

18            MR. POTTER:  Page 18 of 43, you listed

19   the BWF Private Loan Fund debt at $800,000.  Where

20   did that number come from?

21            MS. RALLS:  That is what they are owed,

22   the 500 -- 400 and whatever is owed to attorneys.

Marsha Ann Ralls

Page 78

1           MR. POTTER:  Can you elaborate, please?

2      Eight hundred is the 400 that is owed to --

3           MS. RALLS:  And so the judgment that I

4      am in the Court of Appeals --

5           MR. POTTER:  Yes.

6           MS. RALLS:  -- that was given to me when

7      I was in bankruptcy was lifted to be put in place

8      is disputed.  That judgment is disputed that

9      800,000 is for BWF.  The 400 and something is

10     attorneys' fees. That's not BWF.  Those are

11     attorneys.

12          MR. POTTER:  So, as you know, I wasn't

13     counsel in that case.  If we had a copy of the

14     judgment in front of us, it would say $800,000?

15          MS. RALLS:  I think it says some -- it

16     just says -- it has them combined in there.

17          MR. POTTER:  If we looked at the

18     judgment, it would say $800,000 or it would say

19     something less or it would say something more?

20          MS. RALLS:  I think it -- I don't -- I

21     mean, I haven't really looked at the judgment

22     because I didn't think it was enforceable because

1  when you asked for it to be lifted, it says not to

2  enforce but to get information.  And we went back.

3  And Judge Motley kept canceling and canceling and

4  canceling.  And, finally, you know, if you read

5  that transcript from that day, he is pretty

6  annoyed but doesn't even seem to understand why I

7  am in his courtroom.

8          But, you know, it's -- I think it is --

9  it's 1. something is the amount, but it's

10 everything.  It's the interest, the BWF for the,

11 you know, loan.  And it's the attorneys' fees.

12 It's all of that.

13          MR. POTTER:  So you think the judgment

14 is $1.1 something?

15          MS. RALLS:  Yes.

16          MR. POTTER:  So where did the 800,000

17 come from?

18          MS. RALLS:  That's what BWF is owed, the

19 other -- I think it's like 1.2.  Four hundred and

20 something is attorney fees.

21          MR. POTTER:  So does the 800,000 reflect

22 the 1.2 something --

Page 80

1         MS. RALLS:  That's --

2         MR. POTTER:  -- less the attorneys'

3    fees? Is that what it represents?

4         MS. RALLS:  Yes.  I think so, yes.  I

5    mean, it's in dispute.

6         MR. POTTER:  The entire sum is in

7    dispute, not just a portion of it; right?

8         MS. RALLS:  Of course, it is.  All --

9    the entire sum is in dispute.

10        MR. POTTER:  So I am just --

11        MS. RALLS:  But this is --

12        MR. POTTER:  Ma'am, I didn't prepare

13   these.  If you don't know the answer, you can say,

14   "I don't know."  You are entitled to do that.  If

15   you don't know what the $800,000 represents, just

16   say, "I don't know."  But if you do know, then I

17   would like to know the answer.

18        MS. RALLS:  I just answered it.

19        MR. POTTER:  Okay.  You said that there

20   is a judgment for 1.2 million something.  If you

21   are trying to list the amount that was owed, one

22   would expect, even though it is disputed -- I know

Page 81

1    it is disputed.  Your counsel for the record

2    pointed out to you that it is disputed.  I got

3    that it is disputed.  I understand that.  It is on

4    appeal.

5              I am not trying to trick you here.  I am

6    just trying to figure out, what is the amount?

7    Where did the $800,000 come from?  How did you

8    calculate that number?

9              MS. RALLS:  It's BWF's amount.  The

10   other is attorneys' amount.

11             MR. POTTER:  They gave you a piece of

12   paper or said somewhere that they are owed

13   $800,000?

14             MS. RALLS:  Well, I know the attorneys'

15   fees are 400 and something thousand dollars.  So -

16   -

17             MR. POTTER:  Let me come at it from a

18   different angle.  If the judgment is 1.2 million

19   something, why didn't you use that number for the

20   amount that is owed, rather than $800,000?

21             MS. RALLS:  Because BWF has a lien

22   against my house for $500,000 when I went into

Page 82

1    bankruptcy for the 391.  And the interest that

2    they've calculated comes to the 800.  The other is

3    attorneys' fees.

4              MR. POTTER:  Okay.  So --

5              MS. RALLS:  So that's how I got it.

6              MR. POTTER:  Okay.  I am trying to

7    understand what you are saying to make sure I

8    understand it.  What you are saying is $800,000

9    represents the principal amount of a loan plus

10   someone's calculation of accrued interest but

11   excludes other things, like attorneys' fees.  Is

12   that how you derive the number?

13             MS. RALLS:  That's what it looks like.

14             MR. POTTER:  You don't know?

15             MS. RALLS:  No.  It's what it looks like

16   to me.  That's what I gave.

17             MR. POTTER:  That is the number you gave

18   to your counsel?

19             MS. RALLS:  Yes.

20             MR. POTTER:  And that is how you derived

21   it --

22             MS. RALLS:  Yes.

Marsha Ann Ralls

Page 83

1          MR. POTTER:  -- was principal, interest,

2    but excluded the attorneys' fees?

3          MS. RALLS:  And --

4          MR. POTTER:  Pardon me?

5          MS. RALLS:  I did the best I can to

6    block out your clients.  They've done a lot of

7    damage to --

8          MR. POTTER:  I understand, but, ma'am,

9    you have to fill these documents out.  You are

10   required to do so in order to enjoy the benefits

11   of bankruptcy.  And you have to do so to your best

12   ability.  And you have to sign them under oath.  I

13   am just trying to understand what it says, and you

14   have got to tell me what it says if you know.  If

15   you don't know, then you don't know.

16          So is it accurate to say that this

17   represents the principal and interest but excludes

18   attorneys' fees and other charges?

19          MS. RALLS:  Yes and that you are so

20   hostile that, really, I don't even want to answer

21   many more questions from you.  I mean, it is just

22   -- it's -- it -- like your clients are relentless.

Page 84

1          MR. POTTER:  I am just trying --

2          MS. RALLS:  You know, when you have

3    children -- I mean, really.  Can I ask you a

4    question?  Do you have children?

5          MR. POTTER:  Today is the day I will be

6    asking the questions.  I am trying to understand

7    how you derived this $800,000 number.

8          MS. RALLS:  It looks like that's how I

9    derived it.  That's what it looks like.  If I look

10   at it --

11         MR. JONES:  Do you mind if we take a

12   break for 5 or 10 minutes?

13         MR. POTTER:  Sure.

14         MR. JONES:  Okay.  Why don't we go off

15   the record?

16              (Off the record.)

17              (On the record.)

18         MR. JONES:  And we are back on the

19   record.

20         MR. POTTER:  So, Mr. Jones, I have got

21   about 3:00, just past 3:30.  We started a little

22   after 2:00 o'clock.  And I told you off the record

Page 85

1    I don't anticipate a lot more.  It goes faster

2    when we get answers to the questions.  Well, I am

3    going to move as quickly as I can.  I have no

4    intention of or desire to prolong this.

5          So, Ms. Ralls, turning your attention to

6    page 24 of 43 and 25 of 43 -- I am sorry.  This is

7    income, and then that is schedule I and schedule J

8    is the expenses.  I want to talk about income and

9    expenses.  I will try to not be redundant with Mr.

10   Jones.  I have no desire to be redundant with Mr.

11   Jones.  I do have some questions.

12         And there is another document that you

13   filed that Mr. Jones didn't ask you about.  It is

14   a document that you filed.  I presume you have a

15   signed copy of it somewhere, filed May 18th, so

16   just a couple of weeks ago.  The payment advices

17   covered, do you recognize that document?

18         MS. RALLS:  Okay.  I --

19         MR. POTTER:  You do recognize it?

20         MS. RALLS:  Uh-huh.

21         MR. POTTER:  So you reviewed that and

22   signed it before it was filed with the Court?

Page 86

1          MS. RALLS:  Uh-huh.

2          MR. POTTER:  And you understand what it

3    says?

4          MS. RALLS:  It says, "Declare under

5    penalty of perjury the proposed true and," "I have

6    not between employed by any employer within the 60

7    days before the date of filing the petition."

8    Well, employed by the employer, would that be my

9    company? I mean, you know, you have to understand

10   I am not -- like I am doing the best I can over

11   here.  I am not trying to avoid your questions,

12   but I feel like you're just trying to trick me up

13   so you can insult me more in public records.

14         MR. POTTER:  And I --

15         MS. RALLS:  So I --

16         MR. POTTER:  And you have made that

17   clear. Let me just --

18         MS. RALLS:  I mean, when I --

19         MR. POTTER:  Let me just tell you right

20   now you and I really don't know each other, but

21   you have dealt with other lawyers in other law

22   firms. And I am not here to talk about them, but I

Page 87

1   am actually not here to trip you up.  I am here to

2   try to find out what these papers that you filed

3   with the Court say, I promise you.

4         And this examination will be over much

5   more quickly if you can -- if you don't know the

6   answer to something, if you say, "Mr. Potter, I

7   don't know the answer," and I move on.  But if you

8   do know the answer because these are documents

9   that you filled out, that is really all I am

10  trying to find out.  This will be over so much

11  faster.

12         I understand what you are saying.  You

13  did the best you can do.  But now I really want to

14  understand what the facts are.  Okay?  Because

15  they have got documents and facts, and they don't

16  necessarily seem to marry up.  And I am not trying

17  to trip you up in this respect.  I am trying to

18  figure out, do you have an employer currently?  Do

19  you have an employer?  I have an employer.  I get

20  a W-2.  I get pay --

21         MS. RALLS:  I don't get a W-2.

22         MR. POTTER:  Okay.  You don't get.  When

Page 88

1   is the last time you had a W-2.

2          MS. RALLS:  From a job I did in 2014.

3          MR. POTTER:  Twenty fourteen.  So it has

4   been some number of years since you got a W-2.  I

5   get periodically, in my case once a month, a what

6   I will call paystub.  I am from the Midwest.  We

7   call them paystubs.  I think we call them

8   remittances here or something.  You don't get

9   paystubs?

10          MS. RALLS:  No.

11          MR. POTTER:  Right.  Okay.  And when I

12   get a paystub, it actually has my name on it.  It

13   has federal withholding and state withholding and

14   Social Security withholding and all of that kind

15   of stuff on it.

16          MS. RALLS:  No.  Well, that's why I have

17   an income tax bill, because I was fighting with

18   your clients and I didn't pay enough tax.  So I'm

19   paying it now out, paying it out now.

20          MR. POTTER:  That is from 2014; right?

21          MS. RALLS:  Correct.

22          MR. POTTER:  So when we sort of fast-

Page 89

1  forward to 2015 and 2016, you are not formally

2  employed by some entity.  Is that right?

3          MS. RALLS:  No, no.

4          MR. POTTER:  That is not right or it is

5  right?

6          MS. RALLS:  Well, I mean, I get paid as

7  a consultant.  And that goes to Marsha Ralls.

8          MR. POTTER:  Okay.  You get paid as a

9  consultant from the two entities that you or two

10  things that you mentioned to Mr. Jones, which are

11  Never on a Monday and the Women's Leadership;

12  right?

13          MS. RALLS:  Correct.

14          MR. POTTER:  Those are the two entities

15  that you consult with; right?

16          MS. RALLS:  Correct.

17          MR. POTTER:  And so when you get paid

18  from Women's Leadership, that is --

19          MS. RALLS:  I get a check from the

20  individual woman.

21          MR. POTTER:  "Here is a check for X

22  dollars"?

Page 90

1            MS. RALLS:  Yes.

2            MR. POTTER:  Okay.  And there is no

3    paystub that comes with it?

4            MS. RALLS:  No.

5            MR. POTTER:  They don't withdraw, they

6    don't hold back, any taxes?

7            MS. RALLS:  No.

8            MR. POTTER:  You get a check from Closed

9    Monday Productions, and it is the same.  There is

10   no withholding?

11           MS. RALLS:  If I take a check, it's -- I

12   mean, I haven't been.  I have already stated that.

13           MR. POTTER:  Right.  So when we fast-

14   forward in the documentation to the $35,000 that

15   Mr. Jones was asking you about earlier today --

16           MS. RALLS:  No.  I got no check stub

17   from the $35,000.

18           MR. POTTER:  Pardon me?

19           MS. RALLS:  I did not get a check stub

20   or -- from -- or a W-2 from that 35,000.

21           MR. POTTER:  Right.  That is not what I

22   was going to ask you.  What page is it on?  Page

Page 91

1    29 of 43, it says, "$35,000." For that $35,000,

2    the gross amount that you received is the same as

3    the net amount that you received. You got

4    $35,000?

5              MS. RALLS: Not necessarily.

6              MR. POTTER: So some money got stuck

7    somewhere? Like when I get my check --

8              MS. RALLS: What that --

9              MR. POTTER: -- some of it gets stuck

10   with the federal government.

11             MS. RALLS: No. When you own your own

12   business, you pay expenses. So you have things

13   you have to pay for. So it's not like I keep all

14   of that money. Some of that money is paid for,

15   whatever I have to pay for, you know, if it is

16   going to make copies to get out to one, if it is

17   going to, you know, do -- whatever it is.

18             MR. POTTER: Okay. So there are

19   expenses. That is one form of deduct from the 35.

20             MS. RALLS: Right.

21             MR. POTTER: And then there are things

22   like taxes, federal, state, Social Security.

Page 92

 1           MS. RALLS:  I pay all my taxes when I

 2    have taxes due but no --

 3           MR. POTTER:  Ma'am, I am not trying to

 4    trip you up.  I am not trying to say you don't pay

 5    your taxes.  I am trying to figure out whether

 6    those taxes for this $35,000 had been taken out.

 7           MS. RALLS:  I can't tell you that

 8    because I don't do my taxes until the end of the

 9    year.  So I can't give you an answer to that

10    without my accountant being here to tell me.  I

11    mean, I'm not an accountant either.

12           MR. POTTER:  So you --

13           MS. RALLS:  So I can't answer that

14    question.

15           MR. POTTER:  So some portion of the 35

16    may well, some portion of it may have, actually

17    been paid to the IRS and to the --

18           MS. RALLS:  Well, it wasn't paid to the

19    IRS because I haven't paid the IRS for 2016.

20           MR. POTTER:  So none of the $35,000

21    would have gone to the IRS?

22           MS. RALLS:  Not for 2016.

Marsha Ann Ralls

Page 93

1          MR. POTTER:  And you live in D.C.  So

2     none would have gone to the D.C. Treasury?

3          MS. RALLS:  No.  I usually pay all of

4     those bills at one time.

5          MR. POTTER:  And none of the $35,000

6     would have gone to Social Security?

7          MS. RALLS:  No, it would not, not in

8     this early in the year.  I haven't done any of

9     that.

10          MR. POTTER:  Okay.  And so those same

11     questions, rather than me just asking them in

12     seriatim again, you give me the same answers when

13     you talk about the $4,000 that was paid in April

14     that you testified to with Mr. Jones?  Same

15     answers?

16          MS. RALLS:  Uh-huh.  I think it was --

17     the 4,000 was in May.

18          MR. POTTER:  I am sorry.  May.  You are

19     right.  You are right, May.  It was zero in April.

20     And in June, you said you got -- beginning of

21     June, you got $10,000.  So that would have been

22     last Wednesday; right?

Page 94

1          MS. RALLS:  Uh-huh, I think.  I don't

2      have the paperwork.  I didn't realize you were

3      going to scrute me on everything.  I am afraid to

4      say anything because I'm afraid if I don't know

5      the exact answer, that you're going to slander me

6      all over public records again.  So I am doing the

7      best I can here.

8          MR. POTTER:  So you have testified when

9      Mr. Jones asked you --

10         MS. RALLS:  Yes, that 4,000 and --

11         MR. POTTER:  -- rather easily that --

12         MS. RALLS:  And that is correct.

13         MR. JOHNSON:  Let me his ask his

14     question first.

15         MR. POTTER:  You testified when Mr.

16     Jones asked you that in early June of this year,

17     of this month --

18         MS. RALLS:  Uh-huh.

19         MR. POTTER:  -- which started last

20     Wednesday --

21         MS. RALLS:  Correct.

22         MR. POTTER:  -- sometime between last

Page 95

1    Wednesday and today, you received $10,000?

2              MS. RALLS:  Correct.

3              MR. POTTER:  Is that $10,000 in the form

4    of a check?

5              MS. RALLS:  Correct.

6              MR. POTTER:  And was it made out to you

7    personally?

8              MS. RALLS:  Yes.

9              MR. POTTER:  And on whose account was it

10   drawn?

11             MS. RALLS:  From -- Closed Monday made

12   the payment.

13             MR. POTTER:  And the questions that I

14   asked you about federal withholding,

15   state/district withholding, Social Security, and

16   the like, none of that $10,000 was used to pay any

17   of that?

18             MS. RALLS:  No.

19             MR. POTTER:  Okay.  I am not suggesting

20   it should or it shouldn't have been.  I am just

21   trying to get to the facts.

22             And where did Closed Monday Productions

Marsha Ann Ralls

Page 96

1   get the $10,000.  Do you know?

2          MS. RALLS:  No.

3          MR. POTTER:  You don't know?

4          MS. RALLS:  No, not without looking at

5   the account to see exactly.

6          MR. POTTER:  Well, who would know the

7   answer to that?

8          MS. RALLS:  I would, but I would need to

9   look at the account.  It's consulting work.  That

10  much I know. It's consulting work.  But I again

11  want to make sure I give you the exact accurate

12  answer and without looking at the bank account.

13  It's consulting work, though.  That's what I'm

14  doing right now is consulting work because I can't

15  do my gallery anymore.

16         MR. POTTER:  Are you familiar with the

17  clients that -- let me step back.  Mr. Jones asked

18  you some questions about Closed Monday and how

19  many employees.  You said zero, but then you came

20  back and said that you actually work for Closed

21  Monday; right?

22         MS. RALLS:  Correct.

1          MR. POTTER:  And so being the only

2    person working for Closed Monday, are you familiar

3    with the clients of Closed Monday?

4          MS. RALLS:  Yes.

5          MR. POTTER:  And did the $10,000 that

6    came in --

7          MS. RALLS:  Uh-huh.

8          MR. POTTER:  -- to you from Closed

9    Monday come from one or more of those clients?

10          MS. RALLS:  Correct.

11          MR. POTTER:  Do you happen to have an

12   estimate, a range, which I am not going to hold

13   you to, of what the current balance is in the

14   Closed Monday account?

15          MS. RALLS:  No.

16          MR. POTTER:  You have no idea?

17          MS. RALLS:  No, I have no idea.

18          MR. POTTER:  Do you have any idea of

19   when you would expect a next significant payment

20   from a Closed Monday client?

21          MS. RALLS:  I don't know yet.

22          MR. POTTER:  Back to the schedules, the

Page 98

1   statement of financial affairs, page 24 of 43, the

2   number that you have used or the number that is

3   used in these pages, the starting point is $8,000

4   a month.

5           MS. RALLS:  Uh-huh.

6           MR. POTTER:  Is that number now, are you

7   now at this meeting amending this answer to

8   increase it to, 10,000?

9           MS. RALLS:  No.  Eight thousand is

10  correct, but if I have any extra things, you know,

11  I usually round it off to 10.  But eight is what -

12  - my monthly expenses for my mortgage and my

13  personal bills.

14          MR. POTTER:  Okay.  Do you have any

15  other sources of -- let me just go to the

16  schedules, rather.  Let me draw your attention to

17  page 25 of 43, "8(h).  Other Monthly Income."  Do

18  you have any other monthly income, other than the

19  income that you received from Closed Monday and

20  from the Women's Leadership?

21          MS. RALLS:  Right this minute, do I?

22          MR. POTTER:  I am going to ask you --

Page 99

1          MS. RALLS:  No.

2          MR. POTTER:  I am going to ask you right

3    this minute.  I am going to ask you what you have

4    been doing to close the gap on $13,000 that you

5    made last year versus your expenses for last year.

6          What I want to know, what I really want

7    to know because I am not going to try to play

8    games, is where you are getting your money from.

9    That is really what I want to know.  You are in

10   bankruptcy. And this transparency is required.

11   And we are entitled to know where you are getting

12   your money from.

13         MS. RALLS:  So if you look at my tax

14   return from a year I worked 24/7 and did a major,

15   multimillion-dollar deal, that I made 100 and

16   whatever I paid myself.  That is when I work.

17   That is an example.  Okay?

18         Where am I getting the money?  I am now

19   trying to bid on many jobs right now.  Okay?  I

20   came back last year after a very, very challenging

21   time, being forced into bankruptcy, having a

22   business that I had.  For almost 30 years, I was

Page 100

```
 1   in this business being liquidated.
 2            So yes, I am -- unless you have no
 3   emotion, I think most normal people would go
 4   through a very challenging time to lose.  It was
 5   part of my life, my identity, and, you know, a --
 6   very painful to have what to me is meaningful or
 7   to people like BWF means nothing.  So --
 8            MR. POTTER:  And --
 9            MS. RALLS:  So I know I didn't work last
10   year.  And now, I mean, I worked a little bit but
11   not that much because of, you know -- plus, if you
12   -- I mean, I'm not an accountant, but you -- I
13   mean, there's -- when you have your own business,
14   there's different -- I don't know, but I don't
15   always pay myself.  But now I'm paying myself.
16   And now I'm trying to close all of these
17   contracts, which could be a significant amount of
18   money if it all -- if I go back to the way I used
19   to work --
20            MR. POTTER:  Ma'am, in 2015, you were in
21   a bankruptcy.  In 2015, you were in a bankruptcy.
22   In 2016, you were in a bankruptcy.  In 2015,
```

1  according to your schedules, your income was

2  approximately $13,000.

3          You testified earlier that you are

4  current on your mortgage, your first mortgage.

5  Your first mortgage is $6,000 a month.  How did

6  you pay your $6,000 mortgage --

7          MS. RALLS:  From Closed Monday payments.

8          MR. POTTER:  Ma'am, let me finish my

9  question, please.

10         MS. RALLS:  You don't have to yell at me

11  and be rude.  Okay?  I am tired, too.

12         MR. POTTER:  Please let me ask my

13  question.  Then you can have as much time as you

14  want to answer it.  You can answer it or don't

15  answer it as best you can.

16         In 2015, your schedules reflect $13,000

17  of income.  Your testimony is that the first

18  mortgage on your home is $6,000 a month.  And your

19  testimony is that it is current.  My --

20         MS. RALLS:  My testimony is that --

21         MR. POTTER:  My question, ma'am, is, how

22  did you keep your $6,000-a-month first mortgage

Marsha Ann Ralls

Page 102

1    current during the year of 2015 with an income of

2    only $13,000?  How did you do that?

3              MS. RALLS:  Because I didn't pay my

4    mortgage during a loan modification.  So I was --

5    I am doing a loan modification in 2015.  And so my

6    mortgage was not paid.  That amount of money was

7    put back into the I guess primary amount.

8              MR. POTTER:  How much approximately did

9    you pay on your mortgage in 2015?

10             MS. RALLS:  I don't know.  I don't even

11   know if I paid my mortgage in 2015.  I'd have to

12   go look.

13             MR. POTTER:  I am talking about the

14   first mortgage with Capital One.

15             MS. RALLS:  I would have to go look and

16   see.

17             MR. POTTER:  So you think it is

18   conceivable that you didn't pay anything in 2015

19   on your first mortgage?

20             MS. RALLS:  It's possible because I

21   don't remember when we started my loan

22   modification.

1        MR. POTTER:  Can you describe the loan

2   modification, please?

3        MS. RALLS:  Where we worked together to

4   give me a chance to have a more reasonable monthly

5   payment given what I've just gone through.

6        MR. POTTER:  Is that loan modification

7   memorialized in documentation?

8        MS. RALLS:  Yeah.  There's all kinds of

9   back and forth.

10        MR. POTTER:  Is there an executed

11   agreement between you and the bank, signed, with

12   signatures?

13        MS. RALLS:  I don't know.  I'd have to

14   look.  We did it for months.  And then I got

15   turned down.  And we did it again.  And now that -

16   - I have no idea if there is anything signed.

17        MR. POTTER:  You testified earlier to

18   Mr. Jones that you paid $6,000 in early June to

19   the bank; correct?

20        MS. RALLS:  Yeah.  That's what I'm

21   paying monthly.

22        MR. POTTER:  For the month of June.  Did

Marsha Ann Ralls

Page 104

1   you pay the same amount in May?

2           MS. RALLS:  No.

3           MR. POTTER:  Did you pay anything in

4   May?

5           MS. RALLS:  I don't know.  I'd have to

6   look.

7           MR. POTTER:  Did you pay anything in

8   April?

9           MS. RALLS:  I have to look.

10          MR. POTTER:  Did you pay --

11          MS. RALLS:  I don't remember the dates.

12  So --

13          MR. POTTER:  Have you paid anything else

14  that you recall to the bank this year at all?

15          MS. RALLS:  Not without looking.

16          MR. POTTER:  How was the bank paid the

17  $6,000 for June?

18          MS. RALLS:  From money from my DIP

19  account.

20          MR. POTTER:  So a check was written on

21  the SunTrust DIP account signed by you and sent to

22  the bank in the amount of $6,000?

Page 105

1          MS. RALLS:  Correct.  I have cleared out

2     money, put it all in there.

3          MR. POTTER:  Is the $6,000 the amount

4     that you have agreed to pay them each month on a

5     go- forward basis?

6          MS. RALLS:  Well, it would be nice if

7     they lowered it, but for now, yes.

8          MR. POTTER:  Is that memorialized in a

9     document somewhere?

10         MS. RALLS:  I don't know.  I'd have to

11    look.

12         MR. POTTER:  Let's go back to again --

13    well, I don't think I moved from the page -- 25 of

14    43, 8(h).  I don't know if I got the answer to the

15    question.  Is there other monthly income that you

16    haven't described today?

17         MS. RALLS:  No.

18         MR. POTTER:  Then look at number 11,

19    please.  "State all other regular contributions to

20    the expenses that you list in schedule J."  Do you

21    have any other contributions?  I think that means

22    money, cash, wires, checks that are not

Page 106

1   characterized as income.  I think what the

2   schedule is trying to capture there is any money,

3   gifts, money that falls from the sky, money you

4   find in the street.  Is there any other source of

5   money other than income that you receive:  gifts,

6   for example?

7           MS. RALLS:  When this was filed?  No,

8   not that -- I mean, not that I can recall any

9   gifts.

10          MR. POTTER:  So for 2015, for example,

11  with a $13,000 income, you didn't receive any

12  gifts from anyone --

13          MS. RALLS:  From 2015?

14          MR. POTTER:  Yes, to pay your expenses.

15          MS. RALLS:  I'd have to look and see.

16          MR. POTTER:  You have no recollection of

17  receiving --

18          MS. RALLS:  I would --

19          MR. POTTER:  -- any gifts?

20          MS. RALLS:  I would definitely have to

21  look and see if I did.

22          MR. POTTER:  But my question is, do you

Page 107

1    have any recollections as you sit here today?

2         MS. RALLS:  You're talking about my

3    friends paying for the attorneys; right?

4         MR. POTTER:  I am going to get to that,

5    but I am not talking about that.  I am talking

6    about, how did you pay your expenses or were your

7    expenses limited to $13,000 in 2015?

8         MS. RALLS:  Well, if I wasn't paying my

9    mortgage, I didn't have many expenses.

10        MR. POTTER:  There is an outstanding

11   question, which is, do you have any present

12   recollection of receiving any monies above the

13   $13,000 in income that you have listed?

14        MS. RALLS:  I don't have any

15   recollection, but that doesn't mean anything given

16   the stress I'm under.  I'd have to look for

17   documents to be able to answer that properly.  I

18   mean, that can mean somebody giving me money to

19   take a taxi, like you.

20        MR. POTTER:  Going back up in the same

21   page to 5(a), where it says, "Tax, Medicare,

22   Social Security Deductions," do you see that,

Page 108

1   $1,500 a month?

2           MS. RALLS:  Uh-huh.

3           MR. POTTER:  That is actually not

4   happening; right?  We have been over this; right?

5   Example, you have got a --

6           MS. RALLS:  Well, I may have put that

7   because I am paying -- like I am paying money for

8   taxes, but I am paying it.  I am not taking it out

9   of a check.  So when I get money, when I get money

10  paid, I pay it out of that, but I am not paying it

11  like every -- you know, it is not consistent.

12  Sometimes when things are like normal, the way my

13  life was before I met your client, I would do it

14  quarterly based on income, but --

15          MR. JOHNSON:  Excuse me one second.

16          MS. RALLS:  But otherwise it doesn't --

17  it's not like there's withholding that happened.

18          MR. POTTER:  So counsel?

19          MR. JOHNSON:  One second.

20          MR. JONES:  Why don't we go off the

21  record.

22          (Off the record.)

Page 109

1                   (On the record.)

2                   MR. JONES:  And we are back on.

3                   MR. POTTER:  We are back on the record

4    at about 3:55 p.m.

5                   Ms. Ralls, again, I am really trying to

6    understand what your papers that you signed and

7    you prepared with your counsel say.  I am not

8    trying to do anything more.  The way I read this

9    is it is designed to capture what happens with

10   your money on a monthly basis.  And, if I heard

11   your testimony earlier with me, you have got a

12   $10,000 check for the month of June 2016, sometime

13   within the last week or so, for $10,000.  My

14   question is, during the month of June, not at some

15   future point in time, are you going to take $1,500

16   or has $1,500 been taken out of that check and

17   paid already?  And I believe the answer is no.

18                  MS. RALLS:  Well, it -- again, I have a

19   $340 payment to the IRS that is being paid every

20   month.  That is being paid.  So --

21                  MR. POTTER:  For your 2014 tax

22   liability.

1        MS. RALLS:  Correct.  And --

2        MR. POTTER:  This would be for your --

3        MS. RALLS:  And I paid some things for

4   2015 as well, but it -- so it's -- again, I don't

5   pay -- I don't take it out.  It's not like I have

6   a check payroll people giving me -- because

7   sometimes I can make 50,000.  Sometimes I make

8   2,000.  So it's very hard to be able to do and

9   answer your question. I -- you know, that's an

10  estimate for what that looks like because I don't

11  pay it every month like that.  That's not how I --

12  you know, it's not the way I paid my taxes.

13        MR. POTTER:  How do you pay your taxes?

14        MS. RALLS:  Sometimes, as I said, before

15  I met the client.  Sometimes it was done

16  quarterly. Sometimes it was done at the end of the

17  year.  I was not expecting to have a tax bill at

18  the end of 2014, which is why that amount -- I

19  asked to pay it out.

20        MR. POTTER:  Next page, 26 of 43, item

21  4, $4,600, what does that number represent?

22        MS. RALLS:  That is the amount that I am

Page 111

1    working with Capital One for my mortgage to be

2    that we're still in a loan modification.  That's

3    what I've requested.

4         MR. POTTER:  That's an aspirational

5    number?

6         MS. RALLS:  That's the amount I've

7    requested.  That's what the loan modification says

8    that we're still in a process.

9         MR. POTTER:  But --

10        MS. RALLS:  But I'm paying 6,000 with

11   the hopes that I am able to modify it to 4,600.

12        MR. POTTER:  When will you know whether

13   -- so there has not been a loan modification yet?

14        MS. RALLS:  There has -- that -- not one

15   that I'm happy with yet, no.

16        MR. POTTER:  So there has or has not

17   been a loan modification?  I understand there may

18   be one that you are not happy with, but that would

19   mean there is a loan modification or was a loan

20   modification.

21        MS. RALLS:  Yeah.  They've told me to

22   pay my mortgage and that they were going to work

Marsha Ann Ralls

Page 112

1   with me to get my loan modified, but I had to fill

2   out documents again.  That's how loan

3   modifications work.  You do a three-month period.

4   They look at it.  They try to do -- you do -- I

5   mean, I don't know.  This is the first time I've

6   ever done it.  So --

7             MR. POTTER:  Are you consulting with

8   legal counsel on this?

9             MS. RALLS:  For a loan modification?

10            MR. POTTER:  Yes, ma'am.

11            MS. RALLS:  Do I need to?  No, I'm not.

12            MR. POTTER:  Are you consulting with

13   anyone else other than the bank on this?

14            MS. RALLS:  No.

15            MR. POTTER:  Is anyone else representing

16   you in some other capacity on this?

17            MS. RALLS:  No.

18            MR. POTTER:  You are dealing with the

19   bank exclusively on this?

20            MS. RALLS:  Yes.

21            MR. POTTER:  The 4,600 represents a

22   number you would like to be paying; correct?

Page 113

1          MS. RALLS:  Correct.

2          MR. POTTER:  It does not reflect the

3     number that you actually are paying; correct?

4          MS. RALLS:  Correct.

5          MR. POTTER:  Thank you.

6          MS. RALLS:  But when this was filled

7     out, that was just -- well, let me make it clear

8     because you are going to say I am lying on here

9     and I signed it under oath.  So when this was

10    done, $4,600 was what I was asking for.  Okay?

11         When I went in to 11, they said, "You

12    need to pay your amount that you used to pay,"

13    which is the 6,000.  "And we will still work with

14    you."  So when this was filled out, I wasn't

15    paying 6,000.

16         MR. POTTER:  I am not under oath, but I

17    am promise you I am not going to accuse --

18         MS. RALLS:  Well, given I have read the

19    things that you say about me in documents, I mean,

20    they're slanderous.

21         MR. POTTER:  I am just trying to

22    understand what the 4,600 represents.  And you

Page 114

1   said -- and I was willing to leave it at that, but

2   you had to say more.

3         MS. RALLS:  Well, because this was

4   signed. At the time, it was 46.

5         MR. POTTER:  It is a number that you

6   wish you would be paying.

7         MS. RALLS:  Well, at that time, that was

8   the number that we were working --

9         MR. POTTER:  It is still the number you

10  wish you would be paying.

11        MS. RALLS:  No.  At that time, that was

12  the loan modification amount.  That was the

13  application amount.  Okay?  That was the amount

14  then.  Okay?  Then --

15        MR. POTTER:  Your testimony under oath

16  today is that the bank agreed that you only had to

17  pay $4,600 a month?

18        MS. RALLS:  They -- if we're in a loan

19  modification and they ask me to send -- "What is

20  the amount that you can pay?" this is the amount

21  that I offered that I wanted to pay.

22        MR. POTTER:  Okay.  It is not the number

Page 115

1  that you have ever paid?

2          MS. RALLS:  No.  I paid that amount

3  before.

4          MR. POTTER:  It is not the number that

5  is required in the loan documentation?

6          MS. RALLS:  I haven't been paying my

7  mortgage -- okay? -- because we are in a loan

8  modification.  They just told me to pay $6,000.

9  They just told me to pay that.

10          MR. POTTER:  When is the last time you

11  paid 4,600 to the bank?

12          MS. RALLS:  That's the amount -- I

13  wasn't paying my mortgage when this document was

14  done. That was the amount that they were working

15  with me, but we -- I had not been turned down.  It

16  was the amount that was in the loan modification.

17  You want me to put zero?  That's not accurate

18  either.  Okay? I'm doing the best I can, Mr.

19  Potter.

20          MR. POTTER:  When is the last time you

21  paid any amount to the bank before the $6,000 that

22  you paid?

1        MS. RALLS:  I don't know.  I'd have to

2   go back and look.

3            MR. POTTER:  Statement of financial

4   affairs, page 32 of 43.  I just want to understand

5   with a little bit more precision the facts, the

6   retainer and the filing fee.  So can you just tell

7   me what happened?

8            MS. RALLS:  For what?  For --

9            MR. POTTER:  I can ask you questions

10  about the documents.  You tell me the documents

11  are wrong or that I am trying to trip you up.  I

12  just want to know what happened.

13           MS. RALLS:  But what part are you asking

14  me what happened?  Which --

15           MR. POTTER:  Your counsel was paid a

16  retainer; correct?

17           MS. RALLS:  Correct.

18           MR. POTTER:  A filing fee was paid;

19  correct?

20           MS. RALLS:  Correct.

21           MR. POTTER:  What was the amount of the

22  retainer that was paid?

Marsha Ann Ralls

Page 117

1          MS. RALLS:  Five thousand dollars was

2    given by Mr. Hershman and $5,000 by Mr. Dickey,

3    which included the fee paid for filing.

4          MR. POTTER:  So Mr. Hershman either

5    wired or gave a check to Mr. Johnson for $5,000,

6    and Mr. Dickey did the same, for a total of

7    $10,000?

8          MS. RALLS:  Correct.

9          MR. POTTER:  So if we take the $10,000,

10   back out the filing bee, that should equal the

11   amount of the retainer; correct?

12         MS. RALLS:  I don't know.  What was the

13   filing fee?

14         MR. POTTER:  The filing fee for the

15   Chapter 11.

16         MS. RALLS:  I know, but how much was it

17   because --

18         MR. POTTER:  I don't know.  Somebody

19   help me out.

20         MR. JONES:  Would it refresh your

21   recollection if you saw the disclosure

22   compensation of attorney for Debtor that counsel

Page 118

1 | filed?

2 | MS. RALLS: Yeah, maybe that would help.

3 | MR. JONES: Okay. And I will direct

4 | your attention to the end of the first paragraph.

5 | MS. RALLS: Okay. So like the retainer

6 | amount should actually be $8,283, I guess. I

7 | don't know.

8 | MR. POTTER: Yes. Again, I understand

9 | the schedules say $7,500. I am not trying to trip

10 | you up on that. I am just trying to find out what

11 | the facts are.

12 | Ten thousand dollars was sent to

13 | counsel. Some of it was used for the filing fee.

14 | And the rest of it --

15 | MS. RALLS: Is the retainer.

16 | MR. POTTER: -- is the retainer. Right?

17 | MS. RALLS: Uh-huh. Correct.

18 | MR. POTTER: Is that your understanding?

19 | MS. RALLS: Correct.

20 | MR. POTTER: And the money from both

21 | gentlemen, those represent gifts from both

22 | gentlemen to you? They are not loans? There are

Page 119

1  no loan documents, promissory note?  You were

2  talking about it with Mr. Jones that --

3          MS. RALLS:  They are both gifts.

4          MR. POTTER:  Okay.  Have either of those

5  gentlemen given you gifts in the past?

6          MS. RALLS:  Yes.

7          MR. POTTER:  Monetary gifts?

8          MS. RALLS:  Yes.

9          MR. POTTER:  Significant monetary gifts?

10          MS. RALLS:  I --

11          MR. POTTER:  When is the last time

12  either one of them gave you a monetary gifts?

13          MS. RALLS:  Well, Mr. Hershman has paid

14  quite a few attorneys.  So I guess that is --

15  would be considered a gift since it's my attorneys

16  that are representing me.

17          MR. POTTER:  What about Mr. Dickey?

18          MS. RALLS:  Oh, God.  Years.  I mean, I

19  couldn't even tell you.

20          MR. POTTER:  Are they presently paying

21  your --

22          MS. RALLS:  Jim Dickey pays zero, zero.

Page 120

1   He gave $5,000 to help me with this.  He hasn't

2   paid anything.  I couldn't even tell you the last

3   time. He's my son's godfather, and that's about

4   it.

5          MR. POTTER:  Is there anyone else who

6   has given you similar gifts as Mr. Hershman and

7   Mr. Dickey?

8          MS. RALLS:  Like "similar gifts" meaning

9   what?

10         MR. POTTER:  Pardon me?

11         MS. RALLS:  "Similar gifts" meaning

12   what?

13         MR. POTTER:  Five thousand-dollar --

14         MS. RALLS:  For attorneys?

15         MR. POTTER:  For anything.

16         MS. RALLS:  No, but I am thinking about

17   doing a fund on Kickstarter from everybody I know

18   for attorneys' fees.

19         MR. POTTER:  Okay.  And Mr. Hershman's

20   monetary contributions have been primarily in the

21   area of attorneys' fees?

22         MS. RALLS:  Correct.  Maybe dinner.  I

Page 121

1 | do go out with him.  So --

2 |         MR. POTTER:  And have either of them

3 | committed to continue to fund Mr. Johnson's legal

4 | fees in this case?

5 |         MS. RALLS:  I couldn't answer that.  I

6 | don't know.

7 |         MR. POTTER:  Are you aware of whether

8 | either one of them has committed to continue to

9 | fund Mr. Johnson's legal fees in this case?

10 |         MS. RALLS:  Not in any formal way have

11 | they committed.

12 |         MR. POTTER:  Are you aware?  Your

13 | understanding is that --

14 |         MS. RALLS:  No.  I have no

15 | understanding. I am answering your question.  I

16 | have no understanding.  That doesn't meant they

17 | won't, but I have no understanding that they will.

18 |         MR. POTTER:  Do you know whether Mr.

19 | Hershman has spoken with Mr. Johnson?

20 |         MS. RALLS:  No, he's not.

21 |         MR. POTTER:  Pardon me?

22 |         MS. RALLS:  He has not.

Page 122

1        MR. POTTER:  Do you know whether Mr.

2   Dickey has ever spoken with Mr. Johnson?

3        MS. RALLS:  No, he has not.

4        MR. POTTER:  When Mr. Hershman and Mr.

5   Dickey interact with Mr. Johnson's office, do they

6   do so directly or do they do so through

7   assistance?

8        MS. RALLS:  They have never interacted.

9   They sent me a check, which I gave to Mr. Johnson.

10       MR. POTTER:  Each of them sent you the

11  $5,000 check, and you delivered it to Mr. Johnson?

12       MS. RALLS:  I think Mr. Hershman handed

13  it to me.  Since I was having dinner with him, he

14  gave it.  Mr. Dickey sent it to me.

15       MR. POTTER:  Where does Mr. Dickey live?

16       MS. RALLS:  In Ohio.

17       MR. POTTER:  Where in Ohio?

18       MS. RALLS:  I don't know exactly.  I

19  mean, his --

20       MR. POTTER:  Where does Mr. Hershman

21  live?

22       MS. RALLS:  In McLean.

Marsha Ann Ralls

Page 123

1          MR. POTTER:  Question 23, just to

2     confirm, you are not holding any property for

3     anyone other than, I guess, Mr. Hershman's cell

4     phone and the company's computer and printer?

5          MS. RALLS:  Yes.  I am not holding

6     anybody's property.

7          MR. POTTER:  Can the U.S. Trustee's

8     Office -- and I don't know.  Maybe you already

9     have one. You asked about it.  I would like to get

10    a copy of the property insurance, counsel.

11         MS. RALLS:  A property -- a copy of the

12    property insurance?

13         MR. POTTER:  We got a copy during the

14    Chapter 7.  I don't know why it would be an issue

15    now.

16         MR. JOHNSON:  I don't see a problem with

17    it.

18         MS. RALLS:  Let's try not to have me

19    lose my insurance, though, given that your clients

20    cost me my insurance already once.

21         MR. POTTER:  In your colloquy and

22    questioning with Mr. Jones, you said the Capital

Marsha Ann Ralls

Page 124

1    One payoff was $830,000.  Is that number on a

2    piece of paper somewhere or you called?

3              MS. RALLS:  I called them and asked them

4    to send me a payoff amount.

5              MR. POTTER:  And they sent it to you?

6              MS. RALLS:  Yes.

7              MR. POTTER:  Can I get a copy of that,

8    counsel?

9              In whose name -- does the property have

10    utilities and other --

11              MS. RALLS:  It's all in my name:  Marsha

12    Ralls.

13              MR. POTTER:  Pardon me?

14              MS. RALLS:  Everything is in my name.

15    Phone bill's in my name.

16              MR. POTTER:  So you have a landline?

17              MS. RALLS:  Yes.  The water company is

18    in my name.  The gas is in my name.  Everything's

19    in my name.

20              MR. POTTER:  So electricity, water, gas,

21    landline all in your name.  Trash?  Is there a

22    charge for trash in Georgetown?

Page 125

1          MS. RALLS:  No, no.  That's one of the

2    things that the D.C. government gives us for

3    taxes, is our trash.

4          MR. POTTER:  And you are current on all

5    of those and --

6          MS. RALLS:  Yes.  And they have always

7    been in my name, and I have always paid them.  And

8    they are all paid current.

9          MR. POTTER:  The appeal, it is the only

10   litigation that you are involved in.  The appeal

11   that involves my client, what is your intention?

12   What are your intentions in terms of --

13          MS. RALLS:  My intentions are to win the

14   appeal and get justice and get a second trial

15   where I get compensated for all of the damage that

16   your client has inflicted on my family and myself

17   and the business I lost that I had for 20-

18   something years and the humility and horrible

19   emotions when I walk into my house because all my

20   neighbors are worried about me because they all

21   know that I've been in a lawsuit -- okay? -- when

22   people come up to my house and look in the window

Page 126

1    because you publicly put a foreclosure.  So my

2    intentions are to get justice.

3              MR. POTTER:  And the sooner, the better;

4    right?

5              MS. RALLS:  Well, I'm -- been waiting

6    this long.  I think I'm going to make sure I have

7    a really good attorney.  And I don't know how long

8    that will take.  But I don't think the Court of

9    Appeals was in any hurry.  And I think you know

10   that.  They take their time with whatever they do.

11   So sooner would be, you know, we'll see.

12             MR. POTTER:  What is the obstacle?  What

13   are the obstacles to continuing with the

14   litigation?

15             MS. RALLS:  There's no obstacles except

16   that I have to find sufficient counsel and I have

17   to now purchase transcripts a second time.

18             MR. POTTER:  How long have you known

19   about the transcript issue that you have to

20   purchase?

21             MS. RALLS:  Well, let's see.  If you

22   would ever let me leave her, I'm headed over to

Page 127

1    the bar -- whatever council to file my complaint

2    against Mr. Aronson, who never paid for the

3    transcripts.

4         MR. POTTER:  When did you learn that the

5    transcript payment and ordering --

6         MS. RALLS:  Well, I learned a while

7    back. It's been quite a while because I kept

8    asking for them and asking for them, and they were

9    never provided.  I just learned that he has no

10   intentions because he didn't pay for them.  So I'm

11   not going to get them because he didn't pay for

12   them.  The ones that he paid for I did get.

13        MR. POTTER:  Other than the transcripts,

14   are there other obstacles?

15        MS. RALLS:  Well, I have to retain an

16   attorney for that --

17        MR. POTTER:  And have you started --

18        MR. JONES:  -- because he is no longer

19   my attorney.  Hard ethically to trust someone that

20   doesn't do what they're supposed to do with money

21   that you work hard or borrow or get given as a

22   gift.

Page 128

1        MR. POTTER:  Is Mr. Johnson going to

2    represent you?

3        MS. RALLS:  I don't think Mr. Johnson is

4    representing me.  I think if he had to step in, he

5    would.  But I have been interviewing attorneys who

6    are appellate attorneys who understand that your

7    client set me up who are very familiar with the

8    law.

9        MR. POTTER:  How long have you been

10    interviewing attorneys?

11        MS. RALLS:  I guess a week maybe.  I

12    don't know exactly how long.  I mean, I talked to

13    other people about looking for attorneys when I --

14    you know, I had given way more opportunity to Mr.

15    Aronson to do the right thing.  So I had, I would

16    say, longer because I talked to people when it

17    looked like we weren't going to be able to resolve

18    the issue.

19        MR. POTTER:  With Mr. Aronson?

20        MS. RALLS:  Correct.

21        MR. POTTER:  Which was when?

22        MS. RALLS:  I don't know.  I couldn't

Page 129

1   give you an exact date, but it's been -- I mean, I

2   gave him a check October 2nd, 2015.  So that

3   should give you an indication that it's been a

4   while.

5           MR. POTTER:  So you've been at odds with

6   Mr. Aronson since sometime in the fall?

7           MS. RALLS:  No.  Sometime in the new

8   year.

9           MR. POTTER:  When is the last time you

10  had a home inspection?

11          MS. RALLS:  From insurance, I had a home

12  inspection, so like a year ago maybe -- less.

13  Less.

14          MR. POTTER:  What was that in connection

15  with?

16          MS. RALLS:  My home insurance, trying to

17  get the rate down because I pay four times what I

18  used to pay after my home was broken into.

19          MR. POTTER:  Is there a report?  Did you

20  get a written report?

21          MS. RALLS:  Yes.

22          MR. POTTER:  Counsel, can we get a copy

Page 130

1    of the home inspection report?

2              MS. RALLS:  Oh, the written -- no.  I

3    don't have that.  I thought you meant the written

4    report from the break-in.  That I have.

5              MR. POTTER:  You don't have a home

6    inspection report?

7              MS. RALLS:  I'd have to look.  I don't

8    know if there is one.

9              MR. POTTER:  Do you have any sense of

10   within the last year or a year ago, six months

11   ago? Do you have any idea of when it was done?

12   Fall? Spring?

13             MS. RALLS:  Probably in the fall because

14   it's paid through October.  So it was probably

15   somewhere around then.

16             MR. POTTER:  If you have a copy, can we

17   get a copy of it?

18             MS. RALLS:  I think you'd have to ask my

19   attorney.

20             MR. POTTER:  Okay.  Do you have any

21   objection to my client doing a home inspection

22   with a home inspector?

Page 131

1        MS. RALLS:  Yes, I do.  My children are

2    at home.  And I do not want anybody to deal with

3    them in my house.  You have already been in my

4    house once, Mr. Potter, and made a scene in front

5    of my house, speaking so loudly that I had to

6    finally ask you all to move on.  I mean, this is

7    my home and all my neighbors, and everybody is

8    home for the summer.

9        MR. POTTER:  You reside in the home;

10   correct?

11       MS. RALLS:  Yes, I live in the home.

12       MR. POTTER:  All year-round?

13       MS. RALLS:  Yes, year-round.

14       MR. POTTER:  Do you rent any portion of

15   it out?

16       MS. RALLS:  No.

17       MR. POTTER:  Who else lives in the home?

18       MS. RALLS:  My two sons.

19       MR. POTTER:  How old are your sons?

20       MS. RALLS:  Nathan is 21, and Jake is

21   22.

22       MR. POTTER:  Twenty-one and 22.  Anyone

Page 132

1    else live there?

2            MS. RALLS:  No.

3            MR. POTTER:  Does anyone use the home

4    for business purpose free of charge?

5            MS. RALLS:  No.

6            MR. POTTER:  Does anyone use the home

7    for business purpose otherwise?

8            MS. RALLS:  No.

9            MR. POTTER:  Has Mr. Dickey or Mr.

10   Hershman ever paid your first mortgage for you,

11   monthly mortgage payment for you?

12           MS. RALLS:  No.

13           MR. POTTER:  Has anybody?

14           MS. RALLS:  Not that I recall, no.

15           MR. POTTER:  Has anyone else?

16           MS. RALLS:  No, not that I recall just

17   in case.  I'd hate eight years ago that someone

18   paid my mortgage.  I don't -- not that I recall.

19   No.  I've always paid my mortgage, Mr. Potter, as

20   a single mom since my sons were one and two years

21   old.  I bought that house, not an ex-husband.

22           MR. POTTER:  Ma'am, you can keep

Page 133

1    talking, but it is going to cause me to ask more

2    questions. Do you really want to do that?  You

3    told me in 2015, you testified under oath, that

4    you didn't pay the mortgage.  Now you are saying

5    you did pay the mortgage, you have always paid the

6    mortgage.

7              MS. RALLS:  I am talking about for 20

8    years, I paid the mortgage.  I didn't pay it

9    during a loan modification --

10             MR. POTTER:  And in 2015, you didn't pay

11   the mortgage; correct?

12             MS. RALLS:  -- because that's what they

13   say to do.  You can always find something wrong

14   with what I say to, you know, make your case.

15             MR. POTTER:  If you stop speaking.  It

16   is 4:20.  I am done.  I am done examining.

17             MR. JONES:  Okay.  Do you mind if I -- a

18   couple of things.  I don't want to keep you

19   longer, but --

20             MS. RALLS:  No.  That's fine.

21             MR. JONES:  On schedule D, I just wanted

22   to make sure I understood the judgment from the

Page 134

1    Court of Appeals.

2              MS. RALLS:  Uh-huh.

3              MR. JONES:  If I understood your

4    testimony -- and please correct me if I am wrong -

5    - there was $800,000 that was owed or that was a

6    result of the loan for BWF.  And there was 400,000

7    in attorneys' fees?

8              MS. RALLS:  I think it's more than

9    400,000 in attorneys' fees.

10             MR. JONES:  Okay.

11             MS. RALLS:  But correct.

12             MR. JONES:  All right.

13             MS. RALLS:  I think that's, you know, an

14   estimate because --

15             MR. JONES:  And I understand that.  Do

16   you know if you are taking the position -- you

17   might not know, and I understand that -- that

18   those fees are unsecured and that is why they are

19   not on schedule D?

20             MS. RALLS:  They -- well, I --

21             MR. JONES:  You might not know.

22             MS. RALLS:  Yeah.  I don't know about

1    that.

2              MR. JONES:  Okay.

3              MS. RALLS:  I think that -- I mean,

4    clearly I thought they were separate.  So yes,

5    unsecured.

6              MR. JONES:  Okay.  And then on -- and

7    this is my last question -- for Mr. Hershman, you

8    mentioned -- and maybe I misunderstood.  Does he

9    pay attorney fees outside of this bankruptcy case;

10   for instance, in the Superior Court litigation or

11   in the appeal?

12             MS. RALLS:  No.  He paid Joel Aronson

13   the 3,000 for the transcripts, which given he's

14   world- renowned on ethics has a real issue with

15   Mr. Aronson being my attorney.

16             MR. JONES:  Okay.

17             MS. RALLS:  And he paid him a retainer.

18             MR. JONES:  But other than the money

19   that was paid for the transcript and the retainer,

20   to the best of your knowledge, there are not other

21   legal fees out there?

22             MS. RALLS:  No.

Page 136

1        MR. JONES:  Okay.  Those are all the

2   questions I have.  At this time, we will conclude

3   the 341 meeting, and we will go off the record.

4              (Whereupon, the meeting of creditors of

5           MARSHA ANN RALLS was concluded.)

6                    *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 137

1              CERTIFICATE OF TRANSCRIBER

2

3

4        I, Sarah Veach, do hereby certify that this

5    transcript was prepared from audio to the best of

6    my ability.

7        I am neither counsel for, related to, nor

8    employed by any of the parties to this action, nor

9    financially or otherwise interested in the outcome

10   of this action.

11

12

13

14

15                    Sarah Veach

16

17

18

19

20

21

22

Case 16-00222   Doc 32-1   Filed 06/16/16   Entered 06/16/16 11:52:23   Desc Exhibit
Attachment   Page 139 of 155
Marsha Ann Ralls

Page 1

[1 - 9]

| 1 |
|---|
| **1** 32:15 79:9 |
| **1,500** 108:1 109:15 109:16 |
| **1,572,000** 69:18 |
| **1,717** 36:21 |
| **1.1** 79:14 |
| **1.2** 79:22 80:20 81:18 |
| **1.2.** 6:21 79:19 |
| **1.572** 66:22 |
| **10** 31:7 84:12 98:11 |
| **10,000** 13:7,9 14:7 14:19 15:11 39:3 93:21 95:1,3,16 96:1 97:5 98:8 109:12,13 117:7,9 |
| **100** 57:17 59:16 65:7 66:6,7 99:15 |
| **109** 24:14,22 |
| **109,000** 24:11,17 25:7 |
| **11** 1:7 26:20 38:17 42:20 52:6,13,18,20 53:5 55:7 105:18 113:11 117:15 |
| **120** 53:8 |
| **1200** 2:5 |
| **1207** 1:18 |
| **13** 8:14 52:5,13,18 52:22 53:4,17 54:17 |
| **13,000** 33:2 99:4 101:2,16 102:2 106:11 107:7,13 |
| **15** 27:13 33:9 54:17 |
| **15th** 27:15 53:12 |
| **16** 63:15 |
| **16-00222** 1:6 |
| **16-222** 3:8 |
| **17** 57:16 |
| **17th** 2:5 |
| **18** 69:4 77:18 |
| **180** 48:4,5 |
| **18th** 85:15 |
| **19** 60:11 61:5,7 |
| **193,000** 33:17 49:11 |

| 1st 26:14,18 |
|---|
| **2** |
| **2** 6:14 87:20,21 88:1 88:4 90:20 |
| **2,000** 110:8 |
| **2,352,000** 66:20 69:1,16 |
| **2.3** 64:10 |
| **2.352** 65:6 |
| **2.5** 47:12 |
| **20** 7:17 8:4 9:6 16:21 25:19 41:12 125:17 133:7 |
| **20,000** 54:19,22 |
| **20036** 2:6 |
| **2011** 25:12,13 |
| **2012** 25:13 |
| **2013** 25:14,16 26:1 33:9 49:16 50:4,8 50:15 |
| **2014** 31:21 33:18 88:2,20 109:21 110:18 |
| **2015** 8:5 33:1,5 34:5 54:1,4 89:1 100:20 100:21,22 101:16 102:1,5,9,11,18 106:10,13 107:7 110:4 129:2 133:3 133:10 |
| **2016** 1:11 3:3 11:16 26:18 50:20 51:3 89:1 92:19,22 100:22 109:12 |
| **202** 2:6,7 |
| **20th** 53:12 |
| **21** 131:20 |
| **216** 37:11 |
| **22** 131:21,22 |
| **23** 123:1 |
| **24** 85:6 98:1 |
| **24/7** 99:14 |
| **25** 24:2 31:9,11 85:6 98:17 105:13 |
| **25,000** 39:3 |
| **26** 110:20 |

| 27,000 54:16 |
|---|
| **29** 31:14 91:1 |
| **2:00** 1:19 3:3 84:22 |
| **2nd** 29:22 129:2 |

| 3 |
|---|
| **3** 31:20 55:10 |
| **3,000** 135:13 |
| **30** 7:6 99:22 |
| **32** 116:4 |
| **33** 70:7 |
| **333** 1:17 |
| **340** 15:12,17 16:2,4 109:19 |
| **341** 71:6 136:3 |
| **35** 7:7 24:2 91:19 92:15 |
| **35,000** 31:21 38:19 39:1 48:9,10 49:4 62:5 90:14,17,20 91:1,1,4 92:6,20 93:5 |
| **390,000** 26:5 |
| **391** 24:22 82:1 |
| **391,000** 23:8 |
| **3:00** 84:21 |
| **3:30** 84:21 |
| **3:55** 109:4 |

| 4 |
|---|
| **4** 31:19 110:21 |
| **4,000** 93:13,17 94:10 |
| **4,600** 110:21 111:11 112:21 113:10,22 114:17 115:11 |
| **400** 77:22 78:2,9 81:15 |
| **400,000** 134:6,9 |
| **401** 16:15 |
| **43** 51:4 55:5,7 63:15 69:5 77:18 85:6,6 91:1 98:1,17 105:14 110:20 116:4 |
| **46** 114:4 |
| **4:20** 133:16 |
| **4th** 50:20 51:3,12,17 |

| 5 |
|---|
| **5** 84:12 107:21 |
| **5,000** 37:1 117:2,5 120:1 122:11 |
| **50,000** 110:7 |
| **500** 77:22 |
| **500,000** 7:1 24:21 81:22 |
| **54** 7:9 17:8 |
| **5th** 29:21 |

| 6 |
|---|
| **6** 48:5,5 51:4 |
| **6,000** 101:5,6,18,22 103:18 104:17,22 105:3 111:10 113:13,15 115:8,21 |
| **60** 86:6 |
| **663-8000** 2:6 |
| **663-8007** 2:7 |
| **67** 70:6 |

| 7 |
|---|
| **7** 8:1,3,10,15 52:6 52:13,18,19 53:3,17 56:1,2 60:14 61:16 123:14 |
| **7,500** 118:9 |
| **780** 21:5 |
| **780,000** 69:11,17 |

| 8 |
|---|
| **8** 1:11 3:3 55:5 98:17 105:14 |
| **8,000** 98:3 |
| **8,283** 36:18 118:6 |
| **800** 82:2 |
| **800,000** 6:20 68:5 77:19 78:9,14,18 79:16,21 80:15 81:7 81:13,20 82:8 84:7 134:5 |
| **830** 21:6 |
| **830,000** 124:1 |
| **8th** 51:11 |

| 9 |
|---|
| **9** 34:15 |

[ability - back]                                                                                                    Page 2

**a**

ability  70:21 83:12
  137:6
able  5:14 14:9,12
  22:14,20 28:2 39:13
  40:4 41:15 107:17
  110:8 111:11
  128:17
absolutely  72:2,3
account  11:22 53:14
  57:19 58:9,12,15,18
  58:21 59:15,17,22
  60:3,6,8 61:22,22
  66:5,8 95:9 96:5,9
  96:12 97:14 104:19
  104:21
accountant  92:10
  92:11 100:12
accounts  12:6 59:11
accrued  82:10
accurate  41:18 57:1
  83:16 96:11 115:17
accuse  113:17
achieve  48:21 49:2
  49:3,11
achieved  48:10
achieving  48:8
acknowledge  19:15
acquired  22:4
action  34:16,21 35:3
  137:8,10
actions  34:16
additional  25:16
  52:4 53:16
adequate  11:19
advices  85:16
adviser  5:18,21 7:5
affairs  17:12 18:13
  19:18 31:12 49:11
  50:10 98:1 116:4
afraid  94:3,4
afternoon  3:2 42:8
agent  38:5 40:16,17
  43:21 62:14
aggressively  75:8
ago  48:12,15 51:13
  85:16 129:12

130:10,11 132:17
agree  67:3
agreed  105:4 114:16
agreement  43:22
  44:4,7 45:5,8 46:1
  46:20 47:6,10
  103:11
ahead  10:3 67:8
allow  71:11
amend  73:12
amended  69:8
amending  98:7
amount  21:5 24:3
  25:6 33:21 54:4,11
  65:9 67:11 68:4,7,8
  69:18 74:1 79:9
  80:21 81:6,9,10,20
  82:9 91:2,3 100:17
  102:6,7 104:1,22
  105:3 110:18,22
  111:6 113:12
  114:12,13,13,20,20
  115:2,12,14,16,21
  116:21 117:11
  118:6 124:4
amounts  67:12
analyst  27:7
angle  81:18
ann  1:6 3:7 4:2
  136:5
anniversary  23:10
annoyed  79:6
answer  15:16 20:2
  26:17 38:22 56:22
  59:3 60:13 69:8
  71:2,8,9,16,18,19
  72:3,19 73:7,8 74:9
  74:17 76:14 77:4,5
  77:11 80:13,17
  83:20 87:6,7,8 92:9
  92:13 94:5 96:7,12
  98:7 101:14,14,15
  105:14 107:17
  109:17 110:9 121:5
answered  55:13
  77:14 80:18
answering  43:16
  121:15

answers  71:21
  72:15 73:11,13 77:2
  85:2 93:12,15
anticipate  39:5 47:2
  85:1
anticipated  45:8
anybody  33:11
  131:2 132:13
anybody's  123:6
anymore  6:3 8:7
  34:10 96:15
appeal  29:17,18,20
  34:18,20 81:4 125:9
  125:10,14 135:11
appeals  29:10 78:4
  126:9 134:1
appearances  3:11
appears  70:14
appellate  128:6
application  30:16
  37:12 114:13
appraisal  62:16
appraisals  5:20
  62:11
appraised  63:8,8,9
appraiser  62:17,21
appropriate  23:9
approximately  1:19
  3:3 70:6 101:2
  102:8
april  15:2,4 93:13
  93:19 104:8
area  65:16 74:12
  120:21
argue  71:13 72:12
argument  70:19
  71:10
aronson  127:2
  128:15,19 129:6
  135:12,15
art  5:18,20 6:5 7:5
  25:18,21 65:19
artwork  5:20,22 6:2
  28:2 57:6,8,13
ascribed  66:19
asked  53:20 61:20
  62:4 73:2 79:1 94:9
  94:16 95:14 96:17

110:19 123:9 124:3
asking  30:5 35:2
  70:11 84:6 90:15
  93:11 113:10
  116:13 127:8,8
aspirational  111:4
asset  6:10
assets  6:8 20:11
  21:20 62:11
assistance  122:7
assume  49:20
atm  58:17,19
attempt  70:18
attempting  70:19
attention  20:22 65:3
  85:5 98:16 118:4
attorney  29:14,16
  30:5 35:4,15 36:9
  79:20 117:22 126:7
  127:16,19 130:19
  135:9,15
attorneys  30:14,16
  77:22 78:10,11
  79:11 80:2 81:10,14
  82:3,11 83:2,18
  107:3 119:14,15
  120:14,18,21 128:5
  128:6,10,13 134:7,9
audio  75:7 76:9
  137:5
authority  58:15,21
  59:8
avenue  1:17 72:20
avoid  86:11
aware  21:13,15 26:4
  121:7,12

**b**

b  34:17 37:11 44:12
  44:12,13,13,17,17
  55:8
back  4:12 5:6 13:5
  21:16 28:2,4,6
  31:20 37:3 42:12,15
  45:1 51:10 62:3,7
  79:2 84:18 90:6
  96:17,20 97:22
  99:20 100:18 102:7

103:9 105:12
107:20 109:2,3
116:2 117:10 127:7
**backdoor** 70:18
72:18
**backyard** 41:1
**balance** 97:13
**bank** 11:22 12:2,6
53:13 57:17 58:9,11
58:12,13 59:10,16
66:5 96:12 103:11
103:19 104:14,16
104:22 112:13,19
114:16 115:11,21
**banking** 57:21
**bankruptcies** 8:17
**bankruptcy** 1:1,16
3:7,9 5:9 6:9 7:20
9:2 15:8 17:11,11
18:12 21:18 22:10
26:22 27:2,17 28:10
28:14 32:16 33:10
33:14 34:7 37:15
38:8 49:6 66:6
67:19 68:11,12,18
68:19 75:1,3 78:7
82:1 83:11 99:10,21
100:21,21,22 135:9
**bar** 127:1
**based** 48:21 53:10
108:14
**basic** 53:2
**basically** 37:4
**basis** 48:10 105:5
109:10
**bedroom** 28:5
**bee** 117:10
**beginning** 1:18
14:17 25:13,16
93:20
**behalf** 2:2,4
**believe** 6:13 23:6
109:17
**benefits** 83:10
**best** 6:22 18:11,15
19:14 20:10 28:10
28:12 35:13 39:19
43:15,17 53:22 83:5

83:11 86:10 87:13
94:7 101:15 115:18
135:20 137:5
**better** 29:6 126:3
**bid** 99:19
**big** 28:21
**bill** 56:8,10,10 60:4
88:17 110:17
**bill's** 124:15
**bills** 93:4 98:13
**bit** 24:20 100:10
116:5
**block** 83:6
**bonnie** 35:10
**borrow** 55:18
127:21
**bottom** 31:19
**bought** 16:20
132:21
**boy** 44:17
**boyfriend** 36:4
**brad** 8:13
**bradley** 1:15 3:4
**break** 33:6,8 84:12
130:4
**brief** 30:1,1
**bring** 16:5 20:21
39:13 40:4 70:18
**broken** 5:12 50:15
129:18
**brought** 15:22
**bubes** 44:8,10 45:16
45:17,18 62:19 63:2
63:4,6,6
**build** 40:10
**bullied** 50:17
**bus** 55:17
**business** 5:14,15,17
22:2 23:15 26:6
33:7 61:11 91:12
99:22 100:1,13
125:17 132:4,7
**buy** 6:5
**bwf** 2:4 3:17 5:10
6:20 20:18 22:11,14
22:21 24:5,10 25:17
28:20 30:3 33:10
34:13,17 37:19,22

39:4 42:11 43:22
67:9 77:19 78:9,10
79:10,18 81:21
100:7 134:6
**bwf's** 81:9

**c**

**c** 2:1 3:1 63:14 65:3
**calculate** 81:8
**calculated** 68:22
70:12 82:2
**calculation** 82:10
**call** 54:13 88:6,7,7
**called** 4:2 9:18
124:2,3
**canceling** 79:3,3,4
**capacity** 112:16
**capital** 6:19 20:18
21:5 22:11,13,17
26:11,13 37:21 68:5
69:11 102:14 111:1
123:22
**captioned** 1:14
**capture** 106:2 109:9
**card** 58:17
**care** 26:9 48:16
**carefully** 57:6
**cars** 55:11,18
**case** 1:6 3:7,8 8:6,10
19:14 27:12 34:19
37:8 42:18 43:10
78:13 88:5 121:4,9
132:17 133:14
135:9
**cases** 52:7
**cash** 105:22
**cause** 133:1
**cell** 56:4,7,9 123:3
**certain** 48:5
**certificate** 137:1
**certify** 137:4
**cetera** 55:11
**chain** 66:12
**challenging** 99:20
100:4
**chance** 43:5 47:15
62:21 103:4

**changed** 18:16,19
18:22
**chapter** 1:7 7:22 8:3
8:10,14 26:20 38:16
42:19 52:5,6,12,19
52:20 53:3,4,5
60:14 61:16 117:15
123:14
**chapters** 52:17 53:7
**characterized** 106:1
**charge** 124:22 132:4
**charges** 83:18
**check** 4:17 29:21
54:14 58:22 89:19
89:21 90:8,11,16,19
91:7 95:4 104:20
108:9 109:12,16
110:6 117:5 122:9
122:11 129:2
**checks** 105:22
**children** 10:19 23:3
23:18 41:6 84:3,4
131:1
**choice** 34:9
**chronological** 50:9
**chubb** 10:11,13,14
**city** 23:13
**claiming** 67:18
**clarification** 8:14
**clean** 42:14
**clear** 60:10 68:1,2
74:15 76:10,13
86:17 113:7
**cleared** 105:1
**clearly** 44:2 65:21
71:8 73:15 76:8
135:4
**client** 49:7 63:10
67:9 97:20 108:13
110:15 125:11,16
128:7 130:21
**clients** 83:6,22
88:18 96:17 97:3,9
123:19
**close** 38:19 39:1
67:6 99:4 100:16
**closed** 9:18 10:5
12:6,9 18:17,22

[closed - debtor]                                                                                     Page 4

31:3,4 32:1,3,11
34:3,4,5 56:21
57:18,20 58:8,11
59:17,22 60:15
61:16,22 90:8 95:11
95:22 96:18,20 97:2
97:3,8,14,20 98:19
101:7
closing  39:8
clothing  66:12
collectibles  57:3
collection  7:17 8:21
9:3 18:16 31:1,7,22
32:4 33:19 34:3,7
48:15 60:14 61:15
colloquy  63:15
123:21
columbia  1:2 3:9
column  65:6,8
columns  65:7
combined  78:16
come  6:4 41:5 45:1
51:10 57:12 59:14
59:21,22 60:2 62:7
63:19 68:6,9 77:20
79:17 81:7,17 97:9
125:22
comes  19:13 53:11
65:18 82:2 90:3
commentary  52:4
commission  47:14
47:18
committed  121:3,8
121:11
company  8:20 9:6,9
9:15,18 10:1 12:9
13:2,8 14:5 16:15
31:2 44:18,19 48:13
56:20 58:10 86:9
124:17
company's  123:4
compensated
125:15
compensation
117:22
complaint  127:1
complete  38:8

computer  56:19,19
56:21 123:4
conceivable  102:18
conclude  136:2
concluded  136:5
confirm  45:1 47:5
123:2
connected  56:18
connection  129:14
conserve  45:3
considered  119:15
consistent  108:11
constitute  1:13
constitution  1:17
consult  89:15
consultant  89:7,9
consulting  9:20,22
32:2,6,11,14,22
33:2,19 62:1 77:3
96:9,10,13,14 112:7
112:12
contained  17:10
18:2,12
continue  50:8 70:20
72:17 121:3,8
continuing  126:13
contract  40:20 45:4
46:12
contracts  39:8
100:17
contrary  72:1 75:12
76:5
contributions
105:19,21 120:20
conversation  71:20
76:12
converted  8:15 52:6
cool  76:2
copies  51:20,20,21
52:1 91:16
copy  18:17 46:19
47:1 51:22 78:13
85:15 123:10,11,13
124:7 129:22
130:16,17
corporations  58:3
60:12

correct  18:9,14 25:8
31:9 34:20 36:22
46:3 49:4 53:17,18
54:2 55:12 58:1
59:19 60:15,22 62:6
66:13,14,20 67:6
68:14,20 69:12,19
74:21 75:17 88:21
89:13,16 94:12,21
95:2,5 96:22 97:10
98:10 103:19 105:1
110:1 112:22 113:1
113:3,4 116:16,17
116:19,20 117:8,11
118:17,19 120:22
128:20 131:10
133:11 134:4,11
corrected  60:17
correction  35:17
correctly  53:21
cost  55:20 123:20
council  127:1
counsel  3:12 17:15
23:9 45:1 46:18
51:20 52:4 55:1
63:20,20 64:6 71:14
73:10,19 75:13 77:3
77:13 78:13 81:1
82:18 108:18 109:7
112:8 116:15
117:22 118:13
123:10 124:8
126:16 129:22
137:7
counsel's  73:13
counseling  52:8,10
counselor  70:10
72:8
counselors  52:11
couple  9:19 16:8
27:16 85:16 133:18
course  22:1 49:22
50:2 80:8
court  1:1,16 3:9
19:19 29:10 46:22
50:20 76:20 78:4
85:22 87:3 126:8
134:1 135:10

courtroom  79:7
cover  10:15,21
coverages  11:19
covered  10:17 85:17
credit  52:7,9,11
creditor  2:4 22:1
42:10
creditors  1:14 3:7
20:16 22:11 42:5
136:4
current  11:13 14:2
22:12,13 53:22
97:13 101:4,19
102:1 125:4,8
currently  7:11
12:10,17 13:3 26:12
87:18
cut  67:8

**d**

d  1:15 3:1 133:21
134:19
d.c.  1:10 2:6 93:1,2
125:2
damage  23:17 83:7
125:15
data  63:18 64:22
date  32:15 86:7
129:1
dated  50:19
dates  104:11
day  5:11 30:2,3 33:9
41:20,20 51:3,9
61:21 79:5 84:5
days  12:22 39:7
48:4,5 51:12 53:8
86:7
deal  99:15 131:2
dealing  33:13
112:18
dealt  33:5 86:21
death  23:10
debating  29:1,4
debt  6:18 24:22
34:13 38:14 52:22
77:19
debtor  1:7 2:2 3:13
4:2 5:4 11:22 27:6

Marsha Ann Ralls

Page 5

117:22
decision 75:9,15,19
decisions 23:12
  75:16
declare 86:4
deduct 91:19
deductions 107:22
deeper 55:7
definitely 11:3
  38:11 40:6 54:21
  106:20
definitive 76:21
  77:1,2,4,5
delivered 122:11
delta 67:16,18
depended 48:18
depends 48:13 59:4
derive 82:12
derived 68:7,8
  82:20 84:7,9
describe 24:19
  27:21 103:1
described 64:14
  105:16
designed 109:9
desire 85:4,10
deteriorated 30:10
devastated 33:4
  50:16
dickey 36:1,2,5
  117:2,6 119:17,22
  120:7 122:2,5,14,15
  132:9
died 48:17
difference 52:12,17
  67:17,18
differences 53:2
different 19:13 53:7
  58:9,9 65:10 81:18
  100:14
difficulty 33:14
dining 28:3
dinner 120:22
  122:13
dip 60:6 104:18,21
direct 118:3
directly 122:6

disagree 72:11
discharge 8:10
discharged 8:8
disclosure 117:21
discovery 72:2
discuss 45:22
discussed 48:7
disguised 23:14
dispute 29:8 67:10
  67:10 80:5,7,9
disputed 29:3,5
  78:8,8 80:22 81:1,2
  81:3
distraught 39:9
district 1:2 3:9
  95:15
document 16:5
  64:11 76:19 85:12
  85:14,17 105:9
  115:13
documentation 55:2
  90:14 103:7 115:5
documents 17:16
  18:4,19 28:20 31:13
  72:5 76:10 83:9
  87:8,15 107:17
  112:2 113:19
  116:10,10 119:1
doing 5:20 47:3
  61:18 71:5 86:10
  94:6 96:14 99:4
  102:5 115:18
  120:17 130:21
dollar 66:8,8 99:15
  120:13
dollars 24:1,13 34:1
  81:15 89:22 117:1
  118:12
doubt 23:12
draw 13:20 65:3
  98:16
drawn 95:10
dropped 33:15
due 27:11 30:2
  53:11 54:4,11 92:2
duly 4:3
duration 48:2

dying 26:9

e

e 2:1,1 3:1,1 44:12
  44:13,14,14,15,17
  51:4
earlier 52:3 90:15
  101:3 103:17
  109:11
early 27:12 32:20
  93:8 94:16 103:18
easily 94:11
easy 66:4
eight 21:6 78:2 98:9
  98:11 132:17
either 30:2 49:12
  60:13 71:20 72:13
  75:21 92:11 115:18
  117:4 119:4,12
  121:2,8
elaborate 78:1
electricity 60:5
  124:20
electronics 56:3
  57:1
else's 56:8,10
emailed 46:14
emotion 100:3
emotionally 39:8
  49:6
emotions 125:19
employ 30:16
employed 7:12,15
  9:9,12,15 31:7 86:6
  86:8 89:2 137:8
employees 12:13
  96:19
employer 31:1 86:6
  86:8 87:18,19,19
employment 37:12
ends 65:6
energy 17:1
enforce 79:2
enforceable 78:22
enjoy 83:10
enter 3:10
entered 45:4,5

entire 43:15 66:7
  80:6,9
entirely 64:4
entities 58:3 59:11
  89:9,14
entitled 72:3 76:20
  76:21 77:1 80:14
  99:11
entity 10:1 13:21
  22:5 60:15 89:2
entry 48:6
equal 66:15 117:10
equity 7:1
errors 20:21 21:13
  21:14
esquire 2:3,5
essentially 13:20
estate 28:10 38:5
  40:16,17 42:18
  43:21 62:12,14 63:7
  66:19 67:19 68:10
  68:11,11,12,18,19
  74:7,8 75:2,3,20
  76:2,4
estimate 55:19
  97:12 110:10
  134:14
et 55:11
ethically 127:19
ethics 135:14
everybody 23:13
  75:22 120:17 131:7
everything's 39:15
  124:18
ex 132:21
exact 94:5 96:11
  129:1
exactly 27:9 43:16
  59:9 60:9 96:5
  122:18 128:12
examination 87:4
examined 4:3
examining 133:16
example 51:4 58:6
  66:3 99:17 106:6,10
  108:5
excluded 83:2

[excludes - give]                                                                                     Page 6

excludes 82:11
  83:17
exclusively 112:19
excuse 108:15
executed 103:10
exempt 28:16 70:7
exempted 74:2
exempting 65:9
exemption 28:17,19
  28:22 66:2,7,9,15
  67:1,15,15,19 69:18
  70:11
exemptions 65:4
  74:18 77:16
exhibit 6:2
expect 80:22 97:19
expecting 36:11
  110:17
expenses 26:8 27:4
  59:14,21 85:8,9
  91:12,19 98:12 99:5
  105:20 106:14
  107:6,7,9
experience 50:16
expert 65:18
expertise 65:16
  74:12
explain 52:12 72:19
explained 27:7
  52:15
extra 98:10

f

f 44:13
fact 71:7
facts 87:14,15 95:21
  116:5 118:11
fair 42:19,21 43:2
  54:20
fall 26:1 129:6
  130:12,13
falls 106:3
familiar 17:10 18:2
  96:16 97:2 128:7
family 8:18 125:16
far 31:21 43:13
  45:13 74:20

fargo 12:3
fast 88:22 90:13
faster 55:7 85:1
  87:11
fax 2:7
federal 88:13 91:10
  91:22 95:14
fee 36:21 53:9 116:6
  116:18 117:3,13,14
  118:13
feel 86:12
fees 24:15 25:1,2,2
  26:22 27:2 78:10
  79:11,20 80:3 81:15
  82:3,11 83:2,18
  120:18,21 121:4,9
  134:7,9,18 135:9,21
fifteen 16:12
fighting 88:17
figure 37:4 68:10
  73:3 81:6 87:18
  92:5
figured 68:7
file 19:13 27:13,14
  28:17,19 30:15
  33:10 42:19 43:1
  46:22 53:11 127:1
filed 5:9,12 7:19,20
  7:22 8:3,14 9:2
  16:11 18:20 19:19
  21:19 22:10 27:12
  28:18,22 29:19,21
  29:22 30:3 33:9
  37:12,13 43:2,10
  50:19 52:5,6 54:1
  61:21 85:13,14,15
  85:22 87:2 106:7
  118:1
filing 26:21 32:15
  34:7 36:21 41:3
  66:6 86:7 116:6,18
  117:3,10,13,14
  118:13
fill 83:9 112:1
filled 87:9 113:6,14
final 74:17
finalize 46:21

finally 79:4 131:6
financial 17:12
  18:13 19:18 31:12
  49:10 50:10 98:1
  116:3
financially 137:9
financing 34:17
find 72:3 87:2,10
  106:4 118:10
  126:16 133:13
fine 5:1 8:16 32:12
  44:20 65:17,19 68:8
  76:5 77:4,9 133:20
finish 29:17 101:8
finished 8:22
firm 19:1
firms 86:22
first 3:6 24:14,15
  25:4,6 27:10,14,17
  28:1 42:16 70:16
  94:14 101:4,5,17,22
  102:14,19 112:5
  118:4 132:10
five 47:17 117:1
  120:13
floor 28:1,7 42:5
floors 27:22
flows 69:10
focused 57:5
focusing 30:13
follow 4:4
following 1:13
force 71:19
forced 42:1 43:7,8
  49:5 99:21
foreclose 30:3
foreclosed 43:14
foreclosure 41:4
  126:1
form 91:19 95:3
formal 121:10
formally 89:1
formed 22:4
forms 19:11
forth 103:9
forty 15:18
forward 37:15 45:9
  89:1 90:14 105:5

foundation 77:6
foundations 75:16
  75:18,19 77:7
four 15:1 51:12
  79:19 129:17
fourteen 54:10 88:3
free 132:4
friends 35:13 107:3
front 17:16 31:13
  50:21,22 78:14
  131:4
full 12:12 16:9
fund 77:19 120:17
  121:3,9
funny 35:12
furniture 66:13
further 53:6
future 109:15

g

g 3:1
gallery 34:10 96:15
games 99:8
gap 99:4
gas 124:18,20
gather 56:18 65:5
general 10:15
generate 40:9
generating 39:6
gentleman 4:11
  64:13
gentlemen 35:18
  118:21,22 119:5
georgetown 57:17
  58:13 59:16 66:5
  124:22
getting 99:8,11,18
gift 37:4,6 119:15
  127:22
gifts 106:3,5,9,12,19
  118:21 119:3,5,7,9
  119:12 120:6,8,11
give 4:12 21:9 46:12
  46:22 53:1 55:8
  63:20 71:3 92:9
  93:12 96:11 103:4
  129:1,3

[given - inspection]                                                                                    Page 7

**given** 38:13 72:14
73:11 78:6 103:5
107:15 113:18
117:2 119:5 120:6
123:19 127:21
128:14 135:13
**gives** 125:2
**giving** 107:18 110:6
**go** 10:3 26:6 28:4
33:12 39:4 42:12,13
42:15 46:16 49:19
55:6 56:11 67:8
68:2 71:18 84:14
98:15 100:3,18
102:12,15 105:5,12
108:20 116:2 121:1
136:3
**god** 119:18
**godfather** 36:7
120:3
**goes** 40:13 53:14
76:14 85:1 89:7
**going** 21:16 31:20
37:15 39:19 40:15
40:17 42:11 45:11
45:14 48:20 60:11
65:2 70:9,12 71:1
71:13 72:11,12,17
72:18 76:3 85:3
90:22 91:16,17 94:3
94:5 97:12 98:22
99:2,3,7 107:4,20
109:15 111:22
113:8,17 126:6
127:11 128:1,17
133:1
**good** 3:2 39:22 42:8
126:7
**government** 91:10
125:2
**great** 76:17
**gross** 13:11,13
48:11 91:2
**group** 42:1 64:8
**guess** 14:16 24:14
28:13 41:19 42:9
56:15 59:15 102:7
118:6 119:14 123:3

128:11
**guest** 28:8
**guidelines** 26:20
**guy** 56:11

**h**

**h** 98:17 105:14
**half** 6:14,15 24:1,12
47:11
**hand** 65:5,8
**handed** 122:12
**handing** 5:4,6
**handwritten** 51:5
**happen** 40:1 47:7
97:11
**happened** 33:8
108:17 116:7,12,14
**happening** 44:2
108:4
**happens** 109:9
**happy** 111:15,18
**hard** 41:12 43:16
110:8 127:19,21
**hate** 132:17
**headed** 126:22
**health** 11:11
**hear** 15:15 20:1
26:17 38:21
**heard** 15:17 53:21
109:10
**hearing** 53:21
**heart** 43:17,18
**heating** 60:4
**held** 1:14,15 4:20
**help** 77:3 117:19
118:2 120:1
**helping** 37:16
**helps** 4:22
**hem** 72:6,7
**hershman** 35:21
36:3 56:11 117:2,4
119:13 120:6
121:19 122:4,12,20
132:10 135:7
**hershman's** 120:19
123:3
**hire** 40:17

**historical** 31:18
**historically** 59:13
**hold** 90:6 97:12
**holder** 3:18
**holding** 123:2,5
**home** 5:12 6:11,13
16:16,16,21,22 17:2
17:4 20:14 27:21
38:9,12 41:5 42:17
43:8,14,19 50:15
74:13 101:18
129:10,11,16,18
130:1,5,21,22 131:2
131:7,8,9,11,17
132:3,6
**homeowners** 5:13
**honest** 68:2
**hope** 17:4
**hopes** 111:11
**hoping** 39:10
**horrible** 23:17
33:11 125:18
**hostile** 37:19 41:22
83:20
**hotels** 6:1
**house** 6:1 11:4 23:2
23:14 24:13 27:18
30:4 41:9 46:10
57:13 81:22 125:19
125:22 131:3,4,5
132:21
**huh** 31:5 34:14
44:16 46:7 47:13
51:1,7 66:17,21
68:16 69:2,6,13,20
85:20 86:1 93:16
94:1,18 97:7 98:5
108:2 118:17 134:2
**humiliating** 33:11
**humility** 125:18
**hundred** 15:18 21:6
33:22 34:1 78:2
79:19
**hurry** 126:9
**husband** 132:21

**i**

**idea** 74:11,12,16,18
76:18 97:16,17,18
103:16 130:11
**identified** 20:12
30:19 42:9
**identify** 34:16
**identity** 100:5
**illegal** 29:10
**imagine** 30:10 38:4
**important** 23:12
**impossible** 37:20
38:1
**inclined** 76:18
**included** 117:3
**including** 26:21
39:2 61:11 62:11
**income** 31:18,20
33:15 38:15 39:6,14
40:5,10,10 41:15
48:9,11 53:10 85:7
85:8 88:17 98:17,18
98:19 101:1,17
102:1 105:15 106:1
106:5,11 107:13
108:14
**incorporated** 61:10
**incorrect** 13:16
50:14 56:6 60:13
68:15
**increase** 98:8
**indicated** 56:2
69:11
**indication** 129:3
**individual** 89:20
**inflicted** 125:16
**information** 17:10
18:2,11 19:12 21:10
64:5,6,9,15,16,19
79:2
**informed** 30:8
**initial** 27:5 36:17
**injured** 10:16
**insiders** 8:18
**inspection** 129:10
129:12 130:1,6,21

[inspector - lasts]

inspector 130:22
instance 135:10
instruct 71:15,17
  72:18 73:8
insult 86:13
insurance 5:13 6:3
  10:10,15 11:1,4,7,8
  11:11,12,19 123:10
  123:12,19,20
  129:11,16
intend 37:2
intention 42:20 43:3
  43:4,10,11,12,14
  85:4 125:11
intentions 43:18
  125:12,13 126:2
  127:10
interact 122:5
interacted 122:8
interest 8:19 22:5
  23:20 24:1 29:1
  37:8 43:15 58:4
  61:10,11 79:10 82:1
  82:10 83:1,17
interested 137:9
internet 41:5
interruption 33:7
interview 27:6
interviewing 30:14
  128:5,10
intricacies 77:16
involved 35:8
  125:10
involves 125:11
irs 15:11,13 20:19
  37:22 39:3 92:17,19
  92:19,21 109:19
issue 6:9 28:21
  37:21 42:16 70:15
  71:7 123:14 126:19
  128:18 135:14
issues 19:11
item 110:20
items 42:15

j

j 85:7 105:20

jake 131:20
james 36:1
january 8:4 32:15
  61:20
jim 36:1 119:22
job 88:2
jobs 99:19
joel 135:12
johnson 2:3 3:12,12
  4:17,19 8:13 15:15
  19:1,5,8,10 27:15
  35:16 46:15,21 47:4
  47:17,20 48:1,4
  55:3 70:9 72:8,11
  77:13 94:13 108:15
  108:19 117:5
  121:19 122:2,9,11
  123:16 128:1,3
johnson's 121:3,9
  122:5
jones 1:15 3:2,4,19
  3:22 4:5,10,13,16
  5:1,3,8,16,19 6:6,12
  6:15,17,22 7:4,8,11
  7:14,19 8:2,6,9,12
  8:16 9:1,5,8,11,14
  9:22 10:3,9,12,14
  10:20,22 11:6,10,12
  11:16,18,21 12:2,5
  12:8,12,15,17,20
  13:2,6,8,10,15,20
  14:1,4,7,14,18,21
  15:2,4,7,14,17,20
  16:1,6,10,13,18
  17:3,9,14,18,20
  18:1,5,10,18 19:3,6
  19:16,22 20:4,7,10
  20:15,20 21:8,12,18
  21:22 22:4,7,9,16
  22:19 23:5,19 24:4
  24:9,16,19 25:5,9
  25:15,21 26:2,5,11
  26:15,19 27:3,5,10
  27:16,21 28:9,15
  29:2,7,12,18 30:11
  30:15,18,20 31:4,6
  31:11,17 32:5,8,10
  32:17,19 33:1,6,13

33:17,22 34:6,12,15
  34:21 35:2,7,10,14
  35:22 36:3,5,8,11
  36:14,17,20 37:2,7
  37:11 38:2,7,15,20
  39:5,12,18 40:2,8
  40:15 41:14,21 42:3
  42:12 48:8 50:21
  53:19 61:1,7 62:4
  71:5 73:2 84:11,14
  84:18,20 85:10,11
  85:13 89:10 90:15
  93:14 94:9,16 96:17
  103:18 108:20
  109:2 117:20 118:3
  119:2 123:22
  127:18 133:17,21
  134:3,10,12,15,21
  135:2,6,16,18 136:1
judd 19:1
judge 70:15 71:20
  72:16,19 75:7,22
  77:6,7,14 79:3
judge's 76:5
judgment 78:3,8,14
  78:18,21 79:13
  80:20 81:18 133:22
june 1:11 3:2 14:17
  14:19 26:14,18
  27:13,15 51:11
  93:20,21 94:16
  103:18,22 104:17
  109:12,14
justice 36:15 125:14
  126:2

k

k 16:15
keep 45:2 51:19
  91:13 101:22
  132:22 133:18
kept 30:5 79:3
  127:7
kickstarter 120:17
kids 74:14
kind 5:16 9:16
  30:12 31:18 33:14
  40:3,10 70:16,17

88:14
kinds 103:8
kitchen 28:4
know 6:17 10:16
  11:4 14:16 16:6,22
  17:13 18:21 21:6
  23:21 28:21 32:7,10
  38:1,15,19 39:10
  40:3,4,22 41:10,11
  43:6,17,20 44:1
  49:18 50:12,14
  51:21 52:14,19,20
  54:17 57:8 61:4
  63:8,15,16 73:21,22
  74:13 75:8,10,11
  76:12 77:5,6,11,15
  78:12 79:4,8,11
  80:13,14,15,16,16
  80:17,22 81:14
  82:14 83:14,15,15
  84:2 86:9,20 87:5,7
  87:8 91:15,17 94:4
  96:1,3,6,10 97:21
  98:10 99:6,7,9,11
  100:5,9,11,14
  102:10,11 103:13
  104:5 105:10,14
  108:11 110:9,12
  111:12 112:5 116:1
  116:12 117:12,16
  117:18 118:7
  120:17 121:6,18
  122:1,18 123:8,14
  125:21 126:7,9,11
  128:12,14,22 130:8
  133:14 134:13,16
  134:17,21,22
knowledge 7:1
  18:11,15 20:11
  28:11,13 63:11,13
  70:13 135:20
known 126:18
knows 23:13

l

landline 124:16,21
lasts 16:7

[law - modification]                                                                                                   Page 9

**law** 19:1 86:21 128:8

**lawsuit** 5:10,12 24:8 33:9 125:21

**lawyers** 23:22 86:21

**lead** 77:10

**leadership** 9:21 10:7 89:11,18 98:20

**learn** 127:4

**learned** 127:6,9

**leave** 114:1 126:22

**led** 34:6

**leeway** 71:3 72:14

**left** 42:1 56:4 65:5 66:1

**legal** 34:16 35:7 67:10 112:8 121:3,9 135:21

**lenders** 23:1,6

**level** 39:14 40:4,11 41:10,11,15

**liability** 10:15 11:5 109:22

**lien** 81:21

**life** 39:16 100:5 108:13

**life's** 43:15

**lifted** 78:7 79:1

**light** 70:18 73:13

**limitation** 70:12

**limited** 107:7

**line** 39:17 70:17,20 71:3

**liquidated** 7:17 25:19 34:9,12 57:9 100:1

**liquidation** 25:22 53:4

**list** 26:8 45:8 60:13 60:15 80:21 105:20

**listed** 20:16 29:2 30:22 47:21 69:7 77:18 107:13

**listened** 75:6,11

**listening** 76:9

**listing** 41:17 43:21 44:3,6 45:5,9,22 46:19 47:6,10 48:3

**lists** 31:19

**litigation** 29:12 125:10 126:14 135:10

**little** 15:11 24:20 28:6 30:21 84:21 100:10 116:5

**live** 17:5 74:14 93:1 122:15,21 131:11 132:1

**lives** 131:17

**living** 28:1 37:8

**llc** 61:11

**llcs** 60:12

**loan** 23:15,20 25:6 25:11 26:6,12 29:1 29:3,4 34:17 37:4 77:19 79:11 82:9 102:4,5,21 103:1,6 111:2,7,13,17,19,19 112:1,2,9 114:12,18 115:5,7,16 119:1 133:9 134:6

**loaned** 35:14 36:8

**loans** 22:7 118:22

**long** 7:4,9,14 16:7 23:16 40:2 126:6,7 126:18 128:9,12

**longer** 40:7 127:18 128:16 133:19

**look** 6:5 11:3 17:15 18:6 21:1 31:19 32:9 41:1,7,16 45:1 47:16 50:7 51:3 62:7 63:17 65:12 67:21 73:22 74:3 76:21 84:9 94:9 99:13 102:12,15 103:14 104:6,9 105:11,18 106:15 106:21 107:16 112:4 116:2 125:22 130:7

**looked** 37:18 73:21 78:17,21 128:17

**looking** 4:9 18:3 29:16 31:12 32:12 50:13 62:14 76:9

96:4,12 104:15 128:13

**looks** 68:3 70:3 73:22 74:3,20 82:13 82:15 84:8,9 110:10

**lose** 100:4 123:19

**lost** 5:13 6:2 125:17

**lot** 17:8 18:4,9 25:2 39:8 71:1,3 83:6 85:1

**lots** 23:10

**loudly** 131:5

**lowered** 105:7

**luxury** 5:22

**lying** 113:8

**m**

**ma'am** 48:8 59:13 80:12 83:8 92:3 100:20 101:8,21 112:10 132:22

**main** 6:8 34:11

**major** 99:14

**making** 23:11

**manner** 70:22

**map** 73:22

**marked** 34:18

**market** 40:18,21

**marry** 87:16

**marsha** 1:6 3:7,13 3:15 4:2 89:7 124:11 136:5

**marshal** 56:4

**marshall** 34:18

**master** 28:5

**match** 49:20

**mathematically** 70:5

**matter** 1:14 76:20

**mcdaniel** 35:11

**mclean** 122:22

**mean** 4:13 9:13 10:5 11:2,4 16:18,20 17:3,8,19 18:8 29:3 32:21 37:19,21 39:18,21 40:6 41:19 41:21 48:12 49:19 54:14,14,17 55:22

61:17 63:18 64:14 67:8,9 74:15,19 76:11 78:21 80:5 83:21 84:3 86:9,18 89:6 90:12 92:11 100:10,12,13 106:8 107:15,18,18 111:19 112:5 113:19 119:18 122:19 128:12 129:1 131:6 135:3

**meaning** 14:3,4 62:15 120:8,11

**meaningful** 100:6

**means** 100:7 105:21

**meant** 121:16 130:3

**medicare** 107:21

**meet** 46:9,16

**meeting** 1:13,18 3:6 98:7 136:3,4

**meets** 47:5

**member** 8:18

**memorialized** 103:7 105:8

**mentioned** 12:8 56:17 89:10 135:8

**met** 27:7 45:15,21 46:8 68:3 108:13 110:15

**michael** 35:20

**midwest** 88:6

**million** 6:15 24:1,13 47:12 66:22 80:20 81:18

**mind** 23:13 84:11 133:17

**minute** 67:13 98:21 99:3

**minutes** 55:9 73:12 84:12

**missed** 60:19

**misunderstood** 135:8

**modification** 102:4 102:5,22 103:2,6 111:2,7,13,17,19,20 112:9 114:12,19 115:8,16 133:9

[modifications - omissions]

**modifications** 112:3
**modified** 112:1
**modify** 111:11
**mom** 132:20
**monday** 9:19 10:5
12:9 18:17,22 31:3
31:4 32:1,3,11 34:4
34:4,5 46:4,5,5,9,12
56:21 58:8,11 59:17
59:22 60:15 61:16
89:11 90:9 95:11,22
96:18,21 97:2,3,9
97:14,20 98:19
101:7
**monday's** 61:22
**monetary** 119:7,9
119:12 120:20
**money** 14:5 17:1
20:16,17 23:2 26:2
29:14 35:14 36:9
61:19 91:6,14,14
99:8,12,18 100:18
102:6 104:18 105:2
105:22 106:2,3,3,5
107:18 108:7,9,9
109:10 118:20
127:20 135:18
**monies** 107:12
**month** 13:7,9 14:8,8
15:12,20 22:17
38:19 39:1,6 48:9
48:11 51:12,17
53:12 88:5 94:17
98:4 101:5,18,22
103:22 105:4 108:1
109:12,14,20
110:11 112:3
114:17
**monthly** 26:21 27:2
27:14 55:20 98:12
98:17,18 103:4,21
105:15 109:10
132:11
**months** 14:9,12
40:7,9,13 41:16
48:5,5 103:14
130:10

**mortgage** 3:18 6:19
20:18 39:2 67:5
68:4 74:2,13 98:12
101:4,4,5,6,18,22
102:4,6,9,11,14,19
107:9 111:1,22
115:7,13 132:10,11
132:18,19 133:4,5,6
133:8,11
**mother** 26:10 48:16
**mother's** 23:10
**motion** 46:22 47:8
70:16,16
**motivated** 39:19,22
**motley** 79:3
**move** 45:9 66:11
73:6 77:16 85:3
87:7 131:6
**moved** 105:13
**moving** 45:2
**multimillion** 99:15

| **n** |
| --- |

**n** 2:1 3:1
**n.w.** 1:17 2:5
**name** 3:4,16 5:5
19:20 35:17 59:11
63:1 88:12 124:9,11
124:14,15,18,18,19
124:21 125:7
**names** 35:19 59:11
**nancy** 44:8,9
**nathan** 131:20
**nature** 29:8
**necessarily** 87:16
91:5
**necessary** 38:8
**need** 39:4 47:7 73:4
96:8 112:11 113:12
**needs** 37:14 60:16
**neighbor** 45:19
**neighbors** 125:20
131:7
**neither** 54:6,7 137:7
**net** 91:3
**never** 23:11 29:15
58:19 89:11 122:8
127:2,9

**new** 9:14,18 19:11
29:16 31:2 129:7
**nice** 105:6
**ninety** 33:22
**non** 61:9
**normal** 100:3
108:12
**note** 119:1
**notice** 29:18,20
**notion** 74:22
**number** 53:15 55:10
56:1,2 60:20,20
61:1,4,5,7 74:1
75:19 77:20 81:8,19
82:12,17 84:7 88:4
98:2,2,6 105:18
110:21 111:5
112:22 113:3 114:5
114:8,9,22 115:4
124:1
**numbers** 31:15
49:20 64:21 65:19
67:17 69:16 74:20
76:10

| **o** |
| --- |

**o** 3:1
**o'clock** 84:22
**oath** 72:6,7 76:19
83:12 113:9,16
114:15 133:3
**object** 70:9 71:14
**objection** 71:15
130:21
**obstacle** 126:12
**obstacles** 126:13,15
127:14
**obtained** 22:7
**obviously** 51:5
**occur** 25:22
**occurring** 63:16
**october** 11:15 29:21
29:22 129:2 130:14
**odds** 129:5
**offered** 114:21
**office** 1:16 3:5 27:6
30:7 46:19 76:22
122:5 123:8

**officer** 4:14
**oh** 4:10 5:1 16:18
19:3 32:7 41:9 49:1
65:14 119:18 130:2
**ohio** 122:16,17
**okay** 4:16,19 5:2,3
5:16,19 6:6,12,17
6:22 7:4,8,11,14,19
8:2,6,9,12,16 9:1,5
9:11,14,22 10:9,20
10:22 11:6,10,18,21
12:5,12,17 13:2,6
13:15 14:1,7,14,18
14:21 15:14 16:6,10
16:18 17:3,9,17,20
18:18 19:3,4,6,9,16
19:22 20:7,15,20
21:8,12,18 22:19
23:5 24:9 25:5,9,15
25:21 26:11 27:16
28:9,15 29:2,7,7
30:11 31:6,11,16
32:5,8,10 33:1,6,17
34:15 35:1,10 36:8
36:20 37:7,11 38:2
38:7,20 40:15 41:14
42:3 43:19 50:18
52:2,21 56:13 59:10
59:20 62:10 64:18
65:2 67:7,14 68:21
73:16 74:16,22 76:8
80:19 82:4,6 84:14
85:18 87:14,22
88:11 89:8 90:2
91:18 93:10 95:19
98:14 99:17,19
101:11 113:10
114:13,14,22 115:7
115:18 118:3,5
119:4 120:19
125:21 130:20
133:17 134:10
135:2,6,16 136:1
**old** 17:7 131:19
132:21
**omissions** 20:21
21:13

once  30:18 46:2,21
  88:5 123:20 131:4
ones  127:12
ongoing  29:12
open  42:4
opened  11:21
operate  34:10
operating  9:16
  12:10,18 26:21 27:3
  27:11,14
operation  27:4
opportunity  38:13
  128:14
order  38:8,16 40:9
  45:9 83:10
ordering  127:5
ordinary  22:1
original  71:6
outcome  137:9
outside  22:1 135:9
outstanding  107:10
overhead  39:2
oversight  60:18,21
  61:12 62:9
overthrow  75:9,14
overturned  29:11
owe  14:5 15:8 20:16
  20:17 54:12
owed  34:13 69:11
  69:14,15 77:21,22
  78:2 79:18 80:21
  81:12,20 134:5
owned  57:9
owns  56:20

**p**

p  2:1,1 3:1
p.m.  1:19 3:3 109:4
page  31:14,14,19
  51:4 55:5,7 56:1
  57:16 69:4 77:18
  85:6 90:22,22 98:1
  98:17 105:13
  107:21 110:20
  116:4
pages  1:13 69:4
  98:3

paid  10:7 11:14
  13:17,17,18 14:8
  16:9 21:22 24:12,14
  25:2 26:7 29:15
  30:9 35:19 36:20
  48:19 49:14 54:16
  60:5,7 61:19 89:6,8
  89:17 91:14 92:17
  92:18,19 93:13
  99:16 102:6,11
  103:18 104:13,16
  108:10 109:17,19
  109:20 110:3,12
  115:1,2,11,21,22
  116:15,18,22 117:3
  119:13 120:2 125:7
  125:8 127:2,12
  130:14 132:10,18
  132:19 133:5,8
  135:12,17,19
painful  100:6
paintings  57:4
paper  18:9 66:20
  68:22 69:9,10 81:12
  124:2
papers  15:22 28:21
  87:2 109:6
paperwork  94:2
paragraph  118:4
pardon  47:19 50:1
  59:2 63:3 83:4
  90:18 120:10
  121:21 124:13
part  12:15 27:10
  30:8,13 61:17 71:12
  75:1,2,2 76:1 100:5
  116:13
particular  71:2
parties  3:10 137:8
partners  59:5
partnership  61:12
passport  4:21 5:5
patrick  2:5 3:16
  42:8
pause  16:3 18:7
  21:3
pay  14:21 15:5,12
  35:4,15 36:9 37:2

38:13 48:14 50:5
  53:9 59:14,21 74:13
  87:20 88:18 91:12
  91:13,15 92:1,4
  93:3 95:16 100:15
  101:6 102:3,9,18
  104:1,3,7,10 105:4
  106:14 107:6
  108:10 110:5,11,13
  110:19 111:22
  113:12,12 114:17
  114:20,21 115:8,9
  127:10,11 129:17
  129:18 133:4,5,8,10
  135:9
paying  6:20 13:3,8
  13:14 14:13 16:21
  22:16 26:12,22
  30:16 48:14 56:15
  88:19,19 100:15
  103:21 107:3,8
  108:7,7,8,10 111:10
  112:22 113:3,15
  114:6,10 115:6,13
  119:20
payment  15:12 16:7
  20:19 22:14,20 24:5
  24:6,7,10 25:19
  26:13 37:18,20 38:4
  53:4,5,19 54:3,8,12
  85:16 95:12 97:19
  103:5 109:19 127:5
  132:11
payments  14:10,12
  22:10 24:15 25:1,4
  25:5,17 38:17 101:7
payoff  21:5,7 124:1
  124:4
payroll  110:6
pays  119:22
paystub  88:6,12
  90:3
paystubs  88:7,9
pen  19:20
penalty  86:5
pending  8:7,17
people  6:4 10:18
  20:17 40:22 41:5

64:8 100:3,7 110:6
  125:22 128:13,16
people's  55:18
percent  24:2 47:17
  47:20,22 70:6,7
percentages  70:8
period  15:9 112:3
periodic  38:17
periodically  88:5
perjury  86:5
person  12:20 59:8
  97:2
personal  15:7 26:8
  27:18 59:14 60:3
  61:21 98:13
personally  7:20
  10:8 17:9 18:1
  48:14 50:6 60:5
  61:19 95:7
petition  12:6 17:11
  18:12 19:17 22:1,9
  73:5 86:7
ph  19:2 60:3
phone  4:17 21:10
  56:4,7,9,14 123:4
  124:15
photo  4:7
pica  60:3
pick  42:11
picking  19:19
picture  5:5
piece  75:1,2 81:11
  124:2
pillsbury  3:17
place  71:9 78:7
placed  17:15 19:12
plan  16:7,14,15,17
  20:19 22:15 37:15
  37:18,20 38:4,17
  41:14 43:6 53:4,5,9
  53:19 54:3,8,12
  71:22
planning  27:12,13
  28:15,16
play  99:7
playroom  28:7
please  3:10,19 4:5
  44:11 46:20 65:10

Case 16-00222    Doc 32-1    Filed 06/16/16    Entered 06/16/16 11:52:23    Desc Exhibit
Attachment    Page 150 of 155
Marsha Ann Ralls

[please - question]                                                              Page 12

78:1 101:9,12 103:2
  105:19 134:4
plus  82:9 100:11
point  17:4 37:3
  41:17 98:3 109:15
pointed  81:2
portion  67:7 68:17
  68:18 74:6,7 80:7
  92:15,16 131:14
position  76:3 134:16
possession  11:22
possibility  48:8
possible  102:20
post  22:9
potter  2:5 3:16,16
  20:1 26:17 38:21
  42:7,9 43:1,9 44:3,6
  44:9,11,13,15,17,22
  45:7,11,15,18,21
  46:3,5,8,11,18 47:2
  47:9,12,14,19,22
  48:2,7,20 49:3,9,15
  49:19 50:1,4,7,18
  51:2,8,16,19 52:1
  52:11,16,21 53:1,6
  53:15,19 54:3,6,8
  54:11,19 55:1,4,13
  55:16,19 56:1,6,9
  56:13,17,22 57:3,10
  57:12,16,21 58:2,6
  58:11,14,17,20 59:2
  59:7,10,13,20 60:7
  60:10,18,21 61:5,8
  61:13 62:3,7,10,15
  62:18,22 63:3,6,11
  63:14 64:2,11,18,21
  65:2,14,17,20 66:3
  66:11,15,18,22 67:3
  67:7,12,22 68:6,17
  68:21 69:3,7,14,21
  70:1,5 71:12 72:9
  73:10,17 74:5,17,22
  75:12 76:17 77:18
  78:1,5,12,17 79:13
  79:16,21 80:2,6,10
  80:12,19 81:11,17
  82:4,6,14,17,20
  83:1,4,8 84:1,5,13

84:20 85:19,21 86:2
  86:14,16,19 87:6,22
  88:3,11,20,22 89:4
  89:8,14,17,21 90:2
  90:5,8,13,18,21
  91:6,9,18,21 92:3
  92:12,15,20 93:1,5
  93:10,18 94:8,11,15
  94:19,22 95:3,6,9
  95:13,19 96:3,6,16
  97:1,5,8,11,16,18
  97:22 98:6,14,22
  99:2 100:8,20 101:8
  101:12,21 102:8,13
  102:17 103:1,6,10
  103:17,22 104:3,7
  104:10,13,16,20
  105:3,8,12,18
  106:10,14,16,19,22
  107:4,10,20 108:3
  108:18 109:3,21
  110:2,13,20 111:4,9
  111:12,16 112:7,10
  112:12,15,18,21
  113:2,5,16,21 114:5
  114:9,15,22 115:4
  115:10,19,20 116:3
  116:9,15,18,21
  117:4,9,14,18 118:8
  118:16,18,20 119:4
  119:7,9,11,17,20
  120:5,10,13,15,19
  121:2,7,12,18,21
  122:1,4,10,15,17,20
  123:1,7,13,21 124:5
  124:7,13,16,20
  125:4,9 126:3,12,18
  127:4,13,17 128:1,9
  128:19,21 129:5,9
  129:14,19,22 130:5
  130:9,16,20 131:4,9
  131:12,14,17,19,22
  132:3,6,9,13,15,19
  132:22 133:10,15
praying  36:15
pre  12:6 15:8 21:22
  24:12 41:4

precision  116:5
predatory  23:1,6,7
prefer  38:13 40:21
  76:7
premiums  11:13,13
prepare  80:12
prepared  109:7
  137:5
present  3:14 70:21
  107:11
presently  119:20
presume  85:14
pretty  50:16 63:22
  67:6 79:5
previous  29:13
  31:20
price  47:9
primarily  120:20
primary  102:7
principal  82:9 83:1
  83:17
printed  46:15
printer  46:15 56:18
  123:4
prints  57:4,10,14
prior  75:3
private  34:17 77:19
probably  32:14 34:3
  34:5 38:18,19 63:13
  130:13,14
problem  19:15
  37:19 123:16
proceedings  35:8
proceeds  17:5
process  45:2 111:8
produce  30:6
productions  9:19
  12:9 90:9 95:22
project  59:4
projections  48:21
projects  13:18
prolong  85:4
promise  87:3
  113:17
promissory  119:1
pronounce  62:22
properly  107:17

properties  44:20
property  8:19 10:10
  10:15,16,19,22 11:3
  11:7,12 28:9,10,13
  28:14,16,17 37:9
  40:18 42:17,18,20
  43:3,7,8,11 55:8
  68:18,19 70:6 74:6
  74:6,7,8 75:20 76:1
  76:4 123:2,6,10,11
  123:12 124:9
proposed  86:5
proprietorship  9:16
proven  65:22
provided  127:9
public  41:2 86:13
  94:6
publicly  61:9 126:1
purchase  47:9
  126:17,20
purpose  71:12
  132:4,7
purposes  69:15
pursuing  71:2 72:20
put  5:22 17:1 24:12
  24:18,21 29:6 41:13
  45:11 49:7 50:21
  77:8 78:7 102:7
  105:2 108:6 115:17
  126:1
putting  37:18

q

quarterly  26:22
  27:1 53:10 108:14
  110:16
question  34:15
  42:16 43:9 51:10
  55:10 56:2 57:16
  60:11 64:1,2 70:10
  72:4 73:1 77:8,12
  77:14,17 84:4 92:14
  94:14 101:9,13,21
  105:15 106:22
  107:11 109:14
  110:9 121:15 123:1
  135:7

[questioning - relationship]                                                                                                   Page 13

questioning  70:17
  70:20 71:4 123:22
questions  27:17
  42:4,5,13,14 55:9
  62:4 70:11 71:6
  73:5 76:22 77:1
  83:21 84:6 85:2,11
  86:11 93:11 95:13
  96:18 116:9 133:2
  136:2
quickly  64:1 85:3
  87:5
quite  24:20 50:17
  119:14 127:7

              r

r  2:1 3:1
ralls  1:6 3:8,13,13
  3:15,15,19,21 4:2,8
  4:11,15,18,21 5:2,7
  5:10,18,22 6:7,10
  6:14,16,19 7:3,6,9
  7:13,16,17,22 8:4,8
  8:11,21,21 9:3,3,6
  9:10,12,18 10:2,4
  10:11,13,18,21 11:2
  11:9,11,14,17,20
  12:1,3,7,11,14,16
  12:19,22 13:4,7,11
  13:13,18,22 14:3,6
  14:11,16,20 15:1,3
  15:6,10,18,21 16:2
  16:4,8,12,16,20
  17:7,13,17,19,22
  18:3,8,15,16,21
  19:4,9,16,21 20:3,5
  20:9,13,17 21:1,4,9
  21:16,21 22:3,6,8
  22:13,18,22 23:8,21
  24:6,11,18,21 25:8
  25:11,18 26:1,4,7
  26:14,16,18 27:1,4
  27:9,20,22 28:12,18
  29:5,9,13,20 30:12
  31:1,3,5,7,9,16,22
  32:2,3,7,9,13,18,21
  33:4,8,16,18,20
  34:2,2,6,8,14,18,20

35:1,6,9,12,20 36:1
  36:4,6,10,13,15,19
  36:22 37:6,10,17
  38:3,11,18 39:1,7
  39:15,21 40:6,12,19
  41:19,22 42:8,21
  43:4,13 44:5,8,10
  44:12,14,16,19 45:6
  45:10,13,17,19 46:2
  46:4,7,10,14 47:11
  47:13,15 48:12,15
  49:1,5,13,17,22
  50:2,5,12 51:1,7,14
  51:18,22 52:9,14,19
  52:22 53:3,8,18
  54:2,5,7,10,13,21
  55:12,15,17,21 56:5
  56:7,11,15,20 57:2
  57:8,11,15,20 58:1
  58:5,8,13,16,19
  59:1,3,9,12,19 60:2
  60:9,14,16,19,22
  61:3,9,14,15 62:6,9
  62:13,16,20 63:2,4
  63:9,13,22 64:10,16
  64:20 65:1,12,15,18
  65:21 66:10,14,17
  66:21 67:2,5,9,21
  68:1,16,20 69:2,6
  69:13,20,22 70:3
  73:15,21 74:10,19
  75:5 76:7 77:21
  78:3,6,15,20 79:15
  79:18 80:1,4,8,11
  80:18 81:9,14,21
  82:5,13,15,19,22
  83:3,5,19 84:2,8
  85:5,18,20 86:1,4
  86:15,18 87:21 88:2
  88:10,16,21 89:3,6
  89:7,13,16,19 90:1
  90:4,7,11,16,19
  91:5,8,11,20 92:1,7
  92:13,18,22 93:3,7
  93:16 94:1,10,12,18
  94:21 95:2,5,8,11
  95:18 96:2,4,8,22
  97:4,7,10,15,17,21

98:5,9,21 99:1,13
  100:9 101:7,10,20
  102:3,10,15,20
  103:3,8,13,20 104:2
  104:5,9,11,15,18
  105:1,6,10,17 106:7
  106:13,15,18,20
  107:2,8,14 108:2,6
  108:16 109:5,18
  110:1,3,14,22 111:6
  111:10,14,21 112:9
  112:11,14,17,20
  113:1,4,6,18 114:3
  114:7,11,18 115:2,6
  115:12 116:1,8,13
  116:17,20 117:1,8
  117:12,16 118:2,5
  118:15,17,19 119:3
  119:6,8,10,13,18,22
  120:8,11,14,16,22
  121:5,10,14,20,22
  122:3,8,12,16,18,22
  123:5,11,18 124:3,6
  124:11,12,14,17
  125:1,6,13 126:5,15
  126:21 127:6,15
  128:3,11,20,22
  129:7,11,16,21
  130:2,7,13,18 131:1
  131:11,13,16,18,20
  132:2,5,8,12,14,16
  133:7,12,20 134:2,8
  134:11,13,20,22
  135:3,12,17,22
  136:5
range  97:12
rate  23:20 129:17
reach  22:14,20
read  63:17 68:13
  79:4 109:8 113:18
reading  68:14,14
real  38:5 40:16,17
  42:18 43:21 62:12
  62:13 63:7 66:19
  135:14
realistic  39:12,16
realize  94:2

really  10:4 39:22
  70:14 74:11,14,16
  78:21 83:20 84:3
  86:20 87:9,13 99:6
  99:9 109:5 126:7
  133:2
reason  5:9 23:4 75:6
  75:9,10
reasonable  103:4
reasons  23:11
recall  23:19 104:14
  106:8 132:14,16,18
recant  74:8
recanting  75:4
receive  8:9 106:5,11
received  14:18
  24:22 25:19 31:21
  91:2,3 95:1 98:19
receiving  106:17
  107:12
receptions  6:4
recognize  17:18
  85:17,19
recollection  106:16
  107:12,15 117:21
recollections  107:1
record  5:3 42:10
  56:3 71:10,14 72:13
  76:14,20 81:1 84:15
  84:16,17,19,22
  108:21,22 109:1,3
  136:3
recorded  70:2
records  86:13 94:6
redundant  71:5
  85:9,10
referring  62:3,18
reflect  5:4 79:21
  101:16 113:2
refresh  117:20
refund  54:4
regarding  8:17 62:5
regular  48:10
  105:19
reinvent  5:15
related  137:7
relationship  30:9
  57:22

Marsha Ann Ralls

[released - sitting]                                                          Page 14

released  29:15
relentless  83:22
relief  70:16
remaining  71:7
remember  7:10
   19:17,19 20:5 49:16
   50:4,15 51:13,14
   63:7 102:21 104:11
remittances  88:8
renowned  135:14
rent  131:14
repeating  75:13
report  27:11,14
   29:22 53:11 129:19
   129:20 130:1,4,6
reports  26:21
represent  3:4
   110:21 118:21
   128:2
representing  3:17
   112:15 119:16
   128:4
represents  80:3,15
   82:9 83:17 112:21
   113:22
request  21:10
requested  111:3,7
required  83:10
   99:10 115:5
requirements  26:20
   27:7
requires  34:15
reside  131:9
residence  27:19
resolve  128:17
resort  38:6,10 43:12
respect  41:12 66:7
   66:12,13,18 87:17
respond  70:21,22
   73:9
rest  118:14
result  134:6
retain  127:15
retainer  36:17
   116:6,16,22 117:11
   118:5,15,16 135:17
   135:19

retirement  16:14,17
   16:22 17:6
return  16:11 36:14
   50:8 99:14
returns  49:21 53:20
   54:1
revenue  34:11 53:10
reverse  50:9
review  53:13
reviewed  20:7 85:21
reviewing  74:15
ridiculous  23:22
   24:3
right  3:22 15:17
   19:8 41:14 44:13
   48:22 49:21 50:21
   51:3 52:8 54:18
   55:6,14 59:1,3,5,7
   59:18 61:8,13 63:1
   63:19,21 65:5,8,8
   66:2,4,8,9 67:1,4,15
   67:20 69:1,21 70:7
   77:13 80:7 86:19
   88:11,20 89:2,4,5
   89:12,15 90:13,21
   91:20 93:19,19,22
   96:14,21 98:21 99:2
   99:19 107:3 108:4,4
   118:16 126:4
   128:15 134:12
road  76:16
room  1:18,18 28:1,3
   28:3,6,8
rooms  28:8
roughly  70:7
round  98:11 131:12
   131:13
rude  101:11
ruled  70:15 72:21
   76:1
ruling  72:17 76:5
   77:7,8

s

s  2:1 3:1 44:12,14
   44:14,15,17
salary  13:17

sarah  137:4,15
savings  43:16
saw  21:4 37:11,12
   117:21
saying  74:4 75:6,14
   75:22 76:15 82:7,8
   87:12 133:4
says  21:5 57:4 67:2
   67:14,14 78:15,16
   79:1 83:13,14 86:3
   86:4 91:1 107:21
   111:7
scene  131:4
schedule  24:7 30:1
   30:22 49:10 55:8
   63:14 65:3,4 85:7,7
   105:20 106:2
   133:21 134:19
schedules  17:11
   18:12 19:17 20:12
   27:17 42:13 50:19
   63:16,18 97:22
   98:16 101:1,16
   118:9
scrute  94:3
seat  4:6
second  3:18 28:3
   42:10 68:9 108:15
   108:19 125:14
   126:17
secured  22:11 42:10
security  4:14 88:14
   91:22 93:6 95:15
   107:22
see  7:6,16 15:21
   17:15,19 18:16
   19:21 20:4 21:17
   27:11 29:2 30:22
   37:15 39:20 41:15
   42:14 45:7,14 51:4
   52:3 55:6,7,10
   57:13 59:15 64:21
   96:5 102:16 106:15
   106:21 107:22
   123:16 126:11,21
seeing  64:14
seeking  71:9

seen  17:20
self  7:12,15 9:9,12
   9:15
sell  17:4 38:9 42:1
   43:7,8,11
selling  41:9,17
   42:17,20 43:3
send  62:21 114:19
   124:4
sense  130:9
sent  104:21 118:12
   122:9,10,14 124:5
separate  10:1,4
   59:17 135:4
seriatim  93:12
series  73:11
set  23:1,14 50:21
   128:7
seven  12:22 34:1
   39:7
show  28:2
sick  48:16
sign  46:16 63:17
   83:12
signature  19:21
   20:4 51:5,6 58:14
   58:21 59:8 73:1
   137:14
signatures  103:12
signed  20:8 46:11
   46:13 47:6 51:2,8
   51:16,19,20,21,22
   52:1 72:5,5 76:19
   85:15,22 103:11,16
   104:21 109:6 113:9
   114:4
significant  97:19
   100:17 119:9
signing  19:17,20
   20:6 51:13,14 72:7
similar  120:6,8,11
single  132:20
sir  6:16 7:13,22 8:11
   15:21 33:16 36:10
   36:19
sit  107:1
sitting  41:2

| | | t | thank 4:5 5:7 31:4 |
|---|---|---|---|
| six 22:18 40:12 | starting 98:3 | | 42:7 55:4 73:10 |
| 41:16 47:20,22 | starts 31:14 63:14 | table 41:2 | 113:5 |
| 130:10 | 65:6 | take 4:10 13:4 16:1 | therapy 49:7 |
| sky 106:3 | startup 10:6 | 17:14 18:6 23:14 | thing 20:13 128:15 |
| slander 94:5 | state 50:13 88:13 | 30:21 40:3,8 41:20 | things 39:22 47:7 |
| slanderous 113:20 | 91:22 95:15 105:19 | 55:17 65:20 66:3 | 53:16 82:11 89:10 |
| small 30:8 | stated 77:15 90:12 | 76:3 84:11 90:11 | 91:12,21 98:10 |
| social 88:14 91:22 | statement 17:12 | 107:19 109:15 | 108:12 110:3 |
| 93:6 95:15 107:22 | 18:13 19:18 31:12 | 110:5 117:9 126:8 | 113:19 125:2 |
| software 19:11 | 47:8 49:10 50:9 | 126:10 | 133:18 |
| sold 21:19 | 98:1 116:3 | taken 92:6 109:16 | think 6:14 8:22 12:3 |
| sole 9:16 57:21 | states 1:1 3:5 5:5 | talk 38:5 50:18 85:8 | 15:10,19 16:2,4 |
| somebody 40:20 | status 34:19 | 86:22 93:13 | 22:22 23:3,22 25:18 |
| 56:8 64:7 107:18 | stay 43:18 | talked 34:17 40:16 | 28:18,22 29:9 32:13 |
| 117:18 | step 45:8 76:11 | 43:21 128:12,16 | 37:13 39:12,13,22 |
| someone's 82:10 | 96:17 128:4 | talking 34:22 35:3 | 40:2,8 41:9 42:21 |
| somewhat 10:6 | stock 61:9 | 48:13 61:4 102:13 | 43:13 44:20 47:11 |
| son 64:13 | stop 51:9 133:15 | 107:2,5,5 119:2 | 48:4 50:10 52:22 |
| son's 36:6 120:3 | stranger 41:8 | 133:1,7 | 54:17 56:3 63:9 |
| sons 28:8 131:18,19 | street 2:5 23:3 44:1 | tax 16:11 49:20 50:8 | 65:21 68:22 71:1,4 |
| 132:20 | 106:4 | 53:20,22 54:9 88:17 | 72:15,16 76:15,17 |
| soon 47:4 | stress 107:16 | 88:18 99:13 107:21 | 77:14 78:15,20,22 |
| sooner 16:9 126:3 | strike 51:9 | 109:21 110:17 | 79:8,13,19 80:4 |
| 126:11 | stub 90:16,19 | taxes 13:12,16 15:7 | 88:7 93:16 94:1 |
| sorry 12:4 85:6 | stuck 91:6,9 | 15:8 90:6 91:22 | 100:3 102:17 |
| 93:18 | study 28:6 | 92:1,2,5,6,8 108:8 | 105:13,21 106:1 |
| sort 17:5 39:20 | stuff 88:15 | 110:12,13 125:3 | 122:12 126:6,8,9 |
| 88:22 | subject 45:22 | taxi 107:19 | 128:3,4 130:18 |
| source 34:11 64:15 | submit 38:3 | teel 70:15 72:16,20 | 134:8,13 135:3 |
| 106:4 | subtracted 69:17 | 75:7,22 77:14 | thinking 120:16 |
| sources 98:15 | sufficient 126:16 | teel's 77:6,7 | third 28:7 |
| space 6:1 | suggesting 95:19 | tell 52:21 65:11 | thirteen 49:17 |
| speaking 61:2 131:5 | sum 80:6,9 | 68:13 83:14 86:19 | thirty 21:6 |
| 133:15 | summer 131:8 | 92:7,10 116:6,10 | thorough 72:16 |
| specific 73:5 | suntrust 12:4,5 | 119:19 120:2 | thought 130:3 135:4 |
| speech 73:14 | 57:22 60:8 104:21 | telling 72:9 | thousand 15:1 |
| spell 44:11 | superior 135:10 | ten 118:12 | 22:18 25:20 34:1 |
| spend 71:22 | support 47:8 | terms 73:4 125:12 | 81:15 98:9 117:1 |
| spoken 19:14 | supposed 127:20 | terrified 41:7 | 118:12 120:13 |
| 121:19 122:2 | sure 4:10 16:1 18:4 | testified 4:4 52:3 | three 5:11 15:18 |
| spring 130:12 | 21:2 31:17 49:1 | 74:5 93:14 94:8,15 | 27:22 33:22 34:1 |
| stand 3:20 | 55:3 57:5 59:1 | 101:3 103:17 133:3 | 40:7,9,12,13 41:16 |
| start 9:14 14:15 | 65:14 75:15 76:8,13 | testimony 57:18 | 48:17 112:3 |
| 64:3 | 82:7 84:13 96:11 | 75:4 101:17,19,20 | throw 44:1 73:18 |
| started 13:14 14:13 | 126:6 133:22 | 109:11 114:15 | throwing 23:2 |
| 34:4 48:16 84:21 | sworn 3:20 4:3 | 134:4 | time 4:10 12:12,15 |
| 94:19 102:21 | system 19:12 45:12 | | 15:4 16:1 17:15 |
| 127:17 | | | |

[time - wired]

| | | | |
|---|---|---|---|
| 18:6 23:16 24:4 | true 18:13 58:2 | understand 18:5,10 | **w** |
| 30:21 40:7 42:4 | 75:21,21 86:5 | 24:20 26:19 27:1,2 | **w** 87:20,21 88:1,4 |
| 45:3 48:9 63:7,12 | trust 127:19 | 30:20 31:18 43:20 | 90:20 |
| 65:20 71:1 72:1 | trustee 1:15,16 3:5 | 43:22 44:2 53:21 | wages 13:3 14:1 |
| 88:1 93:4 99:21 | 53:10 71:5 | 57:17 61:15 65:4,8 | waiting 126:5 |
| 100:4 101:13 | trustee's 1:17 27:6 | 69:8,10 72:6,10,13 | walk 40:22 41:6,8 |
| 109:15 112:5 114:4 | 46:19 76:22 123:7 | 73:3,16,19,20 76:8 | 55:17,22 125:19 |
| 114:7,11 115:10,20 | truth 74:11 | 76:15 79:6 81:3 | want 31:17 38:12 |
| 119:11 120:3 | truthfully 75:10 | 82:7,8 83:8,13 84:6 | 49:1 50:13 53:20 |
| 126:10,17 129:9 | try 85:9 87:2 99:7 | 86:2,9 87:12,14 | 54:15 63:1 64:3 |
| 136:2 | 112:4 123:18 | 109:6 111:17 | 70:22 72:14,22 73:7 |
| **times** 45:15,21 | **trying** 23:1 29:10 | 113:22 116:4 118:8 | 73:12 74:11 76:12 |
| 129:17 | 37:3 43:22 61:3 | 128:6 134:15,17 | 76:13 77:11 83:20 |
| **tired** 101:11 | 64:3 65:12 67:13 | **understanding** 43:5 | 85:8 87:13 96:11 |
| **today** 4:7 45:6 46:3 | 68:9 73:3 75:8,14 | 52:17 53:2,7 64:4,5 | 99:6,6,9 101:14 |
| 46:13 51:11 84:5 | 75:15 77:10 80:21 | 65:10,13 69:15 | 115:17 116:4,12 |
| 90:15 95:1 105:16 | 81:5,6 82:6 83:13 | 118:18 121:13,15 | 131:2 133:2,18 |
| 107:1 114:16 | 84:1,6 86:11,12 | 121:16,17 | **wanted** 57:5 114:21 |
| **told** 84:22 111:21 | 87:10,16,17 92:3,4 | **understands** 67:13 | 133:21 |
| 115:8,9 133:3 | 92:5 95:21 99:19 | **understood** 133:22 | **washington** 1:10 |
| **tomorrow** 45:14 | 100:16 106:2 109:5 | 134:3 | 2:6 44:20 |
| 46:17 | 109:8 113:21 | **unfortunately** 29:13 | **waste** 71:1 |
| **top** 25:3 31:15 | 116:11 118:9,10 | **unincorporated** | **water** 77:11 124:17 |
| **total** 54:11 117:6 | 129:16 | 61:10 | 124:20 |
| **tractors** 55:11 | **turn** 55:5 69:3 | **united** 1:1 3:5 5:4 | **way** 5:15 29:6 68:21 |
| **traded** 61:9 | **turned** 103:15 | **unsecured** 134:18 | 73:13 100:18 |
| **transcribed** 35:18 | 115:15 | 135:5 | 108:12 109:8 |
| **transcriber** 137:1 | **turning** 85:5 | **upstairs** 28:4 | 110:12 121:10 |
| **transcript** 30:7 79:5 | **twenty** 16:12 49:17 | **use** 17:5 81:19 | 128:14 |
| 126:19 127:5 | 54:10 88:3 131:22 | 132:3,6 | **we've** 24:7 |
| 135:19 137:5 | **two** 6:15 28:7 35:18 | **usually** 93:3 98:11 | **wednesday** 1:11 |
| **transcripts** 29:14,22 | 47:11 67:17 69:4 | **utilities** 124:10 | 93:22 94:20 95:1 |
| 30:6 35:4 126:17 | 75:18,19 89:9,9,14 | | **week** 13:1 39:7 46:6 |
| 127:3,13 135:13 | 131:18 132:20 | **v** | 109:13 128:11 |
| **transferred** 21:19 | **type** 5:15 11:7 | | **weeks** 85:16 |
| **transparency** 99:10 | | **valuation** 65:7 | **wells** 12:3 |
| **transportation** | **u** | **value** 6:13 57:3 65:9 | **went** 26:3 30:7 52:7 |
| 55:20 | **u** 44:12,13,17 | 66:1,5,9,15,19 | 52:9 63:22 79:2 |
| **trash** 124:21,22 | **u.s.** 1:16,16,17 3:8 | 67:14,16 69:1 74:1 | 81:22 113:11 |
| 125:3 | 27:6 46:18 76:22 | **vans** 55:11 | **william** 2:3 3:12 |
| **treasury** 93:2 | 123:7 | **veach** 137:4,15 | **willing** 38:9 39:4 |
| **trial** 125:14 | **uh** 31:5 34:14 44:16 | **vehicle** 55:14 72:2 | 114:1 |
| **trick** 81:5 86:12 | 46:7 47:13 51:1,7 | **verbally** 69:9 | **win** 125:13 |
| **tried** 23:16 | 66:17,21 68:16 69:2 | **verified** 47:8 | **window** 41:1,6 |
| **trip** 87:1,17 92:4 | 69:6,13,20 85:20 | **versus** 32:11 99:5 | 125:22 |
| 116:11 118:9 | 86:1 93:16 94:1,18 | **view** 11:18 14:5 | **wired** 117:5 |
| **trucks** 55:11 | 97:7 98:5 108:2 | 22:19 23:5 | |
| | 118:17 134:2 | **virtue** 71:6 | |

wires  105:22
wish  20:21 114:6,10
withdraw  90:5
withholding  13:12
   13:15 88:13,13,14
   90:10 95:14,15
   108:17
witness  4:3 15:15
   20:1 38:21 71:15,17
woman  89:20
women's  9:20 89:11
   89:18 98:20
wondering  41:7
work  5:14 10:7 17:8
   32:3,6 38:17 39:9
   41:12 43:5,16 53:9
   57:4 62:1 96:9,10
   96:13,14,20 99:16
   100:9,19 111:22
   112:3 113:13
   127:21
worked  15:12 20:19
   41:11 99:14 100:10
   103:3
working  7:5 12:22
   26:9 37:17,22 39:7
   39:10 40:3 46:15
   59:4 97:2 111:1
   114:8 115:14
works  12:21 65:5
world  135:14
worried  125:20
write  58:21
written  104:20
   129:20 130:2,3
wrong  43:6 116:11
   133:13 134:4

| x |
| --- |

x  67:14 89:21

| y |
| --- |

y  67:15
yeah  13:4 17:7 29:5
   38:18 40:12 60:16
   60:19 61:3 62:20
   64:1 66:10 103:8,20
   111:21 118:2
   134:22

year  8:4 16:10
   24:12,14,15 25:4,6
   25:9 26:15 31:22
   33:15 39:9 48:21
   49:2,4,9,12,15 52:5
   52:7 54:1,9 92:9
   93:8 94:16 99:5,5
   99:14,20 100:10
   102:1 104:14
   110:17 129:8,12
   130:10,10 131:12
   131:13
years  5:11 7:7,18
   9:7,20 16:8,21 17:8
   31:8,10,11,20 41:12
   48:12,15,17 65:22
   88:4 99:22 119:18
   125:18 132:17,20
   133:8
yell  101:10
yep  18:8 51:18
yielded  69:18
younger  36:6

| z |
| --- |

zero  12:14,16 93:19
   96:19 115:17
   119:22,22